COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. _____

RPAI WORCESTER LINCOLN PLAZA, L.L.C., :
          Plaintiff, :
   vs. :
                        :
DICK'S SPORTING GOODS, INC., :
          Defendant. :

**COMPLAINT**

## PARTIES

1.      Plaintiff, RPAI Worcester Lincoln Plaza, L.L.C. ("RPAI"), is a limited liability company organized and existing under the laws of Delaware, is registered to do business in the Commonwealth of Massachusetts, and owns certain real property known as the Lincoln Plaza in Worcester, Massachusetts located at 525 Lincoln Street, Worcester, Massachusetts.

2.      Defendant, Dick's Sporting Goods, Inc. ("Dick's"), upon information and belief, is a corporation organized and existing under the laws of the Delaware with a corporate office located at 200 Industry Drive, Pittsburgh, Pennsylvania 15275.

## SUBJECT MATTER JURISDICTION

3.      The claims set forth in this Complaint are within the general jurisdiction of the Superior Court pursuant to M.G.L.A. c.212, §4. In addition, this Court has jurisdiction pursuant to, inter alia, M.G.L.A. c.231A, §2, i.e. the Massachusetts Declaratory Judgment Act, which gives this Court jurisdiction to issue binding declarations regarding the rights, duties and/or legal relations under contracts.

## PERSONAL JURISDICTION

4.      Dick's owns and operates a retail sporting goods store in Worcester, Massachusetts, transacts business in the Commonwealth of Massachusetts and the within legal

action arises directly from those purposeful and intentional contacts of Dick's within the

Commonwealth of Massachusetts. This Court has personal jurisdiction over Dick's pursuant to

M.G.L.A. c.223A, §3.

<div align="center">VENUE</div>

5.     Venue is appropriate in this Court in that this action concerns RPAI and Dick's

rights and obligation under a certain contractual lease agreement for certain real property located

in Worcester, County of Worcester, Commonwealth of Massachusetts, and the application of a

force majeure provision in that contractual lease agreement.

<div align="center">BACKGROUND</div>

6.     On or about January 2, 2001, Dick's entered into a certain Lease Agreement dated

as of January 2, 2001, as amended by that certain First Lease Amendment dated as of May 1,

2003, that certain Second Lease Amendment dated as of June 24, 2004, and that certain Third

Amendment of Lease dated as of June 30, 2017 (hereafter "Amended Lease") with RPAI for that

certain premises located at 525 Lincoln Street, Worcester, Massachusetts, as further described

therein ("Premises"). The original term of the Amended Lease expires on January 31, 2023. A

copy of the Amended Lease is attached hereto as Exhibit A.

7.     The Amended Lease contains the following provision:

17.3    Force Majeure

Provided (i) the delayed Party has periodically kept the other party hereto
fully advised by notice of such delays and the cause thereof and (ii) the delayed
party uses best efforts and all due diligence to effect the required performance, in
any case where either party hereto is required to do any act, such delays caused by
or resulting from an Event of Force Majeure shall not be counted in determining
the time when the performance of such act must be completed, whether such time
be designated by a fixed time, a fixed period of time or "a reasonable time." The
provisions of this Section 17.3 shall not be applicable with respect to payment of
money or to obligations under Article II. For the purposes hereof, an "Event of
Force Majeure" shall be defined as the occurrence of any of the following:  Act of

<div align="center">2</div>

God, war, civil commotion, fire or other casualty, extreme weather conditions not predictable in the normal course of work scheduling, strikes, lockouts and the inability to procure labor or materials or reasonable substitutes, uncontrollable governmental interference or other causes beyond the reasonable control of such Party, its agents, employees, contractors or subcontractors (other than causes related to such Party's financial condition.)  See Section 17.3, p.33, Amended Lease (emphasis added).

<u>COUNT I</u>
(Declaratory Judgment)

8.       RPAI incorporates by reference paragraphs one (1) through seven (7) above as if fully set forth herein.

9.       By letter dated March 19, 2020, Dick's notified RPAI that Dick's believed that the COVID-19 Pandemic constituted a force majeure event under three different contractual agreements pertaining to properties in Lansing, MI, Worcester, MA and Northgate (Seattle), WA and that any "sunsets" on Dick's leasehold rights are tolled for the period of such closure.  A copy of Dick's March 19, 2020 Letter is attached hereto as <u>Exhibit B</u>.  Dick's letter did not refer to any particular provision of the Amended Lease, and it is unclear from Dick's letter what Dick's believes its current obligations are under the Amended Lease.

10.       RPAI disputes Dick's contention that COVID-19 Pandemic constituted a force majeure event under the Amended Lease which somehow voided Dick's obligation to pay rent for the months of April and May, 2020 under the Amended Lease.

11.       By letters dated May 15, 2020, RPAI provided written notice to Dick's of Dick's failure to pay in accordance with the Amended Lease.  A copy of RPAI's Notices of Default to Dick's dated May 15, 2020 are attached hereto collectively as <u>Exhibit C</u>.  Despite RPAI's efforts to contact Dick's to discuss payment of the monies to RPAI, Dick's did not respond to those efforts.

12.    By letter dated September 16, 2020, RPAI, by and through RPAI's counsel, once again notified Dick's of the monies due under the Amended Lease, and requested either payment of the sum of $110,684.77 from Dick's, and/or an opportunity to discuss with Dick's a mutually acceptable resolution.  A copy of RPAI's September 16, 2020 letter is attached hereto as Exhibit D.  Dick's did not respond and/or contact RPAI and/or its representatives to discuss a resolution.

13.    At all pertinent times, Dick's was in and remains in possession of the Premises, and in June, 2020 Dick's resumed business operations at the Premises and is otherwise paying all other monies due RPAI under the Amended Lease.

14.    To date, Dick's has failed to pay the rent for the months of April and May, 2020 to RPAI under the Amended Lease and/or to contact RPAI to discuss a resolution to this matter.

15.    RPAI asserts that (i) that the Force Majeure provision of the Amended Lease relating to delayed performance is inapplicable to Dick's obligation to pay monies due RPAI under the Amended Lease, including rent for April and May, 2020; or in the alternative (ii) that if the Force Majeure provision applies to Dick's obligation to pay monies and/or rent to RPAI under the Lease that the asserted Force Majeure event only delayed, but did not excuse, Dick's obligation to pay monies and/or rent for April and May, 2020 to the date on which the purported Force Majeure event expired and Dick's resumed business at the Premises.

WHEREFORE, RPAI respectfully requests that this Court in accordance with M.G.L.A. c. 231A, §2 declare the rights and obligations of RPAI and Dick's under the Amended Lease with respect to Force Majeure provisions contained therein, including entering judgment under Count I of the Complaint in favor of RPAI and against Dick's declaring (i) that the Force Majeure provision of the Amended Lease relating to delayed performance is inapplicable to Dick's obligation to pay monies due RPAI under the Amended Lease, including rent for April

4

and May, 2020; or in the alternative, (ii) if the Force Majeure provision applies to Dick's obligation to pay monies and/or rent under the Amended Lease that the purported Force Majeure event delayed, but did not excuse, Dick's obligation to pay rent for April and May, 2020 to the date on which the purported Force Majeure event expired and Dick's resumed business; and (iii) awarding RPAI the reasonable attorneys' fees and expenses incurred by RPAI in accordance with the Amended Lease, along with any such other relief this Court deems just and proper.

<div align="center">

COUNT II
(Breach of Contract)

</div>

16.     RPAI incorporates by reference paragraphs one (1) through fifteen (15) above as if fully set forth herein.

17.     To date, Dick's has failed to pay to RPAI the monies and/or rent for the months of April and May, 2020 under the Amended Lease.

18.     RPAI has demanded payment of the monies and/or rent for the months of April and May, 2020.  The sum of $110,684.77 is due and owing to RPAI.

19.     Dick's has breached the terms of the Amended Lease, and as a direct and proximate result of that breach, RPAI has suffered damages.

WHEREFORE, RPAI respectfully requests that this Court enter judgment under Count II of the Complaint in favor of RPAI against Dick's for all unpaid rent and/or monies due under the Amended Lease for the months of April and May, 2020 in the amount of $110,684.77, plus the reasonable attorneys' fees and expenses incurred by RPAI in accordance with the Amended Lease, and grant RPAI such other relief as this Court deems just and proper.

RPAI WORCESTER LINCOLN PLAZA, L.L.C.

By and through its attorneys

Richard L. Gemma, Esq. (BBO #553880)
Wieck DeLuca & Gemma Incorporated
One Turks Head Place, Suite 1300
Providence, RI  02903
(401) 454-8706
(401) 454-8755 (Fax)
rgemma@wdglaw.com
Dated:  October ___, 2020

G:\RPAI\Dick's Sporting Goods\Pleadings\Complaint 092420.docx

6

# WORCESTER LINCOLN LLC

**11-6062-3-1 Dick's Sporting Goods**

# LEASE

DICK'S SPORTING GOODS, INC.

LEASE WITH
WORCESTER LINCOLN LLC
A Delaware Limited Liability Company



**EXHIBIT**

tabbies

A

INDEX

Page

ARTICLE I....................................................................................................................................1

PREMISES ...................................................................................................................................1
1.1     Demised Premises ...................................................................................................1
1.2     No-Build and Protected Parking Areas...................................................................1
1.3     Restrictions on Common Areas ..............................................................................1
1.4     Restrictions on Use of Shopping Center .................................................................2
1.5     Competition Rent Reduction...................................................................................2
1.6     Initial Co-Tenancy Requirement.............................................................................3
1.7     Ongoing Co-Tenancy Requirement ........................................................................4

ARTICLE II...................................................................................................................................4

TERM ...........................................................................................................................................4
2.1     Original Term..........................................................................................................4
2.2     Option to Renew .....................................................................................................4
2.3     Rental Commencement Date ...................................................................................5
2.4     Commencement of Construction .............................................................................5
2.5     Completion of Construction....................................................................................5
2.6     Landlord's Construction Representations................................................................6

ARTICLE III..................................................................................................................................7

CONSTRUCTION ........................................................................................................................7
3.1     Landlord's Construction Work ................................................................................7
3.2     Measurement of Demised Premises.........................................................................8
3.3     Pre-Delivery Date Entry .........................................................................................8
3.4     Landlord's Contribution..........................................................................................9

ARTICLE IV..................................................................................................................................9

RENT ............................................................................................................................................9
4.1     Minimum Rent.........................................................................................................9

ARTICLE V..................................................................................................................................10

TAXES.........................................................................................................................................10
5.1     Payment of Taxes...................................................................................................10
5.2     Multiple Taxing Authorities ..................................................................................12
5.3     Proceedings to Contest Taxes ................................................................................12
5.4     Payment Procedures...............................................................................................12

ARTICLE VI................................................................................................................................13

LEASE YEAR AND GROSS SALES DEFINITIONS...............................................................13
6.1     A "lease year"........................................................................................................13
6.2     Gross Sales.............................................................................................................13
6.3     Substitute Rent ......................................................................................................14
6.4     Gross Sales Audit...................................................................................................14
6.5     Open for Business ..................................................................................................15

ARTICLE VII..............................................................................................................................15

REPAIRS AND MAINTENANCE .............................................................................................15
7.1     Tenant's Repair Obligations ..................................................................................15
7.2     Landlord's Repair Obligations...............................................................................15
7.3     HVAC Maintenance...............................................................................................16

110700

7.4    Utilities........................................................................................................................16
7.5    Utilities Easements.....................................................................................................16

ARTICLE VIII.....................................................................................................................16

ALTERATIONS....................................................................................................................16
8.1    Alterations...................................................................................................................16
8.2    Surrender of Alterations.............................................................................................17
8.3    Permits........................................................................................................................17
8.4    Signage........................................................................................................................17
8.5    Mechanics' Liens by Tenant......................................................................................18
8.6    Mechanics' Liens by Landlord...................................................................................18

ARTICLE IX........................................................................................................................18

FIRE AND OTHER CASUALTY........................................................................................18
9.1    Landlord's Obligations...............................................................................................18
9.2    End of Term Casualty.................................................................................................19

ARTICLE X.........................................................................................................................20

EMINENT DOMAIN...........................................................................................................20
10.1   Condemnation of Demised Premises..........................................................................20
10.2   Partial Condemnation..................................................................................................20
10.3   Condemnation Awards................................................................................................21

ARTICLE XI........................................................................................................................21

INDEMNIFICATION...........................................................................................................21
11.1   Landlord's Insurance..................................................................................................21
11.2   Tenant's Insurance......................................................................................................22
11.3   Liability Insurance......................................................................................................22
11.4   Waiver of Subrogation................................................................................................22
11.5   General Requirements.................................................................................................22
11.6   Indemnification...........................................................................................................23

ARTICLE XII.......................................................................................................................22

DEFAULT.............................................................................................................................23
12.1   Tenant's Default..........................................................................................................23
12.2   Landlord's Remedies...................................................................................................23
12.3   Default by Tenant's Assignee.....................................................................................24
12.4   Landlord's Waiver of Lien in Favor of Financing Company.....................................24
12.5   Landlord's Successor...................................................................................................25

ARTICLE XIII......................................................................................................................25

SELF-HELP...........................................................................................................................25
13.1   Landlord's Right to Self-Help....................................................................................25
13.2   Tenant's Right to Self-Help........................................................................................25

ARTICLE XIV......................................................................................................................26

COMMON AREAS...............................................................................................................26
14.1   Right to Common Areas.............................................................................................26
14.2   Landlord's Management of Common Areas...............................................................26
14.3   Charge for Common Area Maintenance.....................................................................26
14.4   Tenant's Right to Audit..............................................................................................30

110700

**ARTICLE XV** ....................................................................................................30

MORTGAGE SUBORDINATION .............................................................................30
15.1   Mortgage Subordination .............................................................................30
15.2   Senior Lease ..............................................................................................30
15.3   Landlord's Failure to Pay Mortgage .........................................................30

**ARTICLE XVI** ..................................................................................................31

ASSIGNMENT, RECAPTURE AND USE...................................................................31
16.1   Assignment and Subletting ........................................................................31
16.2   Recapture Right of Landlord .....................................................................32
16.3   Intentionally deleted..................................................................................32
16.4   Use of Premises.........................................................................................32

**ARTICLE XVII** ...............................................................................................32

INTERPRETATION.................................................................................................32
17.1   Severability ................................................................................................32
17.2   Successors and Assigns .............................................................................32
17.3   Delays ........................................................................................................33
17.4   Holding Over ..............................................................................................33
17.5   Waivers ......................................................................................................33
17.6   Disputes......................................................................................................34
17.7   Quiet Enjoyment ........................................................................................34
17.8   Notices .......................................................................................................34
17.9   Cost and Expense .......................................................................................35
17.10  Hazardous Material....................................................................................35
17.11  Tenant's Financial Statements ..................................................................37
17.12  Headings and Captions ..............................................................................37
17.13  Brokers.......................................................................................................37
17.14  Relationship of the Parties ........................................................................37
17.15  Memorandum of Lease ...............................................................................37
17.16  Representations and Warranties.................................................................38
17.17  Attorney's Fees ..........................................................................................39
17.18  Waiver of Trial By Jury .............................................................................39
17.19  This instrument ..........................................................................................39
17.20  Access ........................................................................................................39
17.21  Compactors and Dumpsters .......................................................................39
17.22  Estoppel Certificate....................................................................................39
17.23  Interpretation..............................................................................................40
17.24  Break Up Fee .............................................................................................40
17.25  Plats, Riders and Exhibits ..........................................................................40

Exhibit A:          Lease Plan
Exhibit A-1:        Legal Description
Exhibit B:          Title Matters
Exhibit C:          Landlord's Construction Work
Exhibit D:          Subordination, Non-Disturbance and Attornment Agreement
Exhibit E:          N/A
Exhibit F:          Landlord's Waiver and License Agreement
Exhibit G:          Memorandum of Lease
Exhibit H-1:        Building Signs
Exhibit H-2:        Shopping Center and Monument Signs
Exhibit I:          Not Applicable
Exhibit J:          Common Area Maintenance

110700

Form 030100
032900
062900
081100
110300

<u>LEASE</u>

This Lease dated _____, 2000, by and between Worcester Lincoln LLC, a Delaware limited liability company having a mailing address at 7 Sunderland Road, Worcester, MA  01604-3338 as landlord (hereinafter referred to as "Landlord") and **DICK'S SPORTING GOODS, INC.,** a Delaware corporation having a mailing address at *200 Industry Drive, Pittsburgh, PA, 15275, as tenant (hereinafter referred to as "Tenant").*  Landlord and Tenant are sometimes hereinafter referred to as the "Party(ies)"

<u>ARTICLE I</u>

<u>PREMISES</u>

1.1 <u>Demised Premises.</u>

In consideration of the rents, agreements and conditions herein reserved and contained on the part of Tenant to be paid, performed and observed, Landlord demises and leases to Tenant, for the term hereinafter set forth, that certain store premises shown on <u>Exhibit A</u> (the "Lease Plan") attached hereto as the Demised Premises containing a ground floor leasable area ("GFLA") of *approximately forty five thousand (45,000) thousand square feet with a minimum frontage of 200 lineal feet shown on the Lease Plan attached hereto* ("the Demised Premises") within the shopping center shown on the Lease Plan and described in <u>Exhibit A-1</u> ("the Shopping Center"). The Demised Premises are demised subject to and with the benefit of the easements, rights, restrictions, agreements and encumbrances set forth in <u>Exhibit B</u> hereof (collectively called "Title Matters"). In addition, Tenant shall have the right to use during the term of this Lease, the exterior area located immediately adjacent to the rear of the Demised Premises identified as Tenant Service Area on the Lease Plan for the sole purpose, and only in connection with Tenant's use of the Demised Premises, as permitted by Section 16.4 of this Lease, as a loading area, compactor and dumpster station and location for an electrical transformer and generator, if applicable (herein such areas are collectively referred to as the "Tenant Service Area").

1.2 <u>No-Build and Protected Parking Areas.</u>

(a)  No buildings, signs or structures other than canopies and signs attached to store buildings, lighting equipment and directional and other signs permitted by the provisions of this Lease may be built in any area of the Shopping Center shown as "the No-Build Areas" on the Lease Plan.

(b)  No portion of the Parking Areas (defined in Section 1.3 below) identified on the Lease Plan as the "Protected Parking Areas" may be modified (including, but not limited to, any change in the configuration of the parking stalls) without Tenant's consent which shall not be unreasonably withheld or conditioned.

1.3 <u>Restrictions on Common Areas.</u>

The areas of the Shopping Center shown on the Lease Plan as Parking Areas shall at all times maintain the parking ratio defined below.  The expression "Parking Areas" includes parking spaces, driveways and footways adjacent to parking spaces, and includes the areas shown as Parking Areas on the Lease Plan plus such other areas as Landlord shall from time to time designate as Parking Areas.  The areas in the Shopping Center currently used for service or labeled SERVICE DRIVE upon the Lease Plan shall be maintained during the term hereof as service roads and areas (collectively, the foregoing are referred to herein as the "Service Areas").  The Parking Areas, the Service Areas, the Tenant's Service Area, the entrances and exits of the Shopping Center and any landscaped areas within the Shopping Center are called "the Common Areas."  Landlord agrees that except for necessary and emergency repairs there will be free and uninterrupted access as shown on the Lease Plan

and further that Landlord shall take no action nor consent to a third party's taking any action to materially and adversely affect access as shown on the Lease Plan: (i) for motor vehicles between any and all access streets to the Shopping Center and the Protected Parking Areas and the Demised Premises and in, to and around the Tenant Service Area; and (ii) for pedestrians between the Protected Parking Areas and the main customer entrance of the Demised Premises except for necessary and emergency repairs or alterations which do not permanently adversely affect such areas. The entrances and exits between all adjacent streets and Parking Areas shall be maintained substantially as shown on the Lease Plan. Landlord agrees that the Parking Areas within the Shopping Center will always contain at least four and one quarter (4.25) parking spaces for automobiles provided not more than thirty percent (30%) shall be for compact cars, and driveways and footways incidental thereto, for each one thousand (1,000) square feet of leasable floor area existing in the Shopping Center from time to time, unless the reduction in the parking is related to an action governed by Article X hereof, in which event the terms of Article X shall govern and control.

### 1.4 Restrictions on Use of Shopping Center.

Landlord agrees that during the term of this Lease and for so long as any permitted sales activity shall be conducted in the Demised Premises and for six (6) months thereafter, the Shopping Center shall not be used for any non-retail purposes (however, repairs, altera-tions, storage and offices incidental to retailing, and banks and small loan offices, shall be deemed retail), or for any entertainment purposes such as a bowling alley, skating rink, bar (which term shall exclude any establishment which derives less than fifty percent (50%) of its gross revenue from the sale of beer, wine and/or alcohol and is located at least five hundred (500) lineal feet from the Demised Premises), night club, discotheque, amusement gallery, cinema, poolroom, health club (except that premises at the Shopping Center now occupied by Bally's as a health club may be used as a health club, spa or gym so long as such premises operates as a Bally's or by another national spa, gym or health club operation or by a regional operator with at least three (3) other locations in the Worcester area.), massage parlor or off-track betting club.

### 1.5 Competition Rent Reduction.

Landlord covenants and agrees that during the term of this Lease that it has not and will not, nor will any entity under common control with Landlord, enter into any lease(s) or occupancy agreement(s) for premises situated on the Shopping Center. (other than the Demised Premises), or otherwise transfer or allow a possessory interest in the Shopping Center to a tenant or occupant whose primary use shall be the sale of sporting goods and sporting equipment or athletic footwear. Landlord warrants and agrees that during the term of this Lease that it will not, nor will any entity under common control with Landlord, enter into any lease(s) or occupancy agreements for premises situated on the Shopping Center (other than the Demised Premises), or otherwise transfer or allow a possessory interest in the Shopping Center which does not prohibit ("Precluded Sales Activities"): (i) the sale of sporting goods and sporting equipment in five thousand (5,000) or more square feet of sales floor area on the Shopping Center; and, (ii) the retail sale of athletic footwear in three thousand (3,000) or more square feet of sales floor area on the Shopping Center. The foregoing restrictions in this Section 1.5 shall not apply to the premises designated on Exhibit A as "Lowes" or "Home Improvement Store" and "Target" unless Landlord can reasonably control any subletting, assignment or use change which would violate the provisions herein. Notwithstanding, if Landlord or a parent, affiliate or other entity controlled by or under common control with Landlord, regains control of any such premises the provisions of this Section 1.5 shall apply to each such premises thereafter. If Landlord shall violate the provisions of this Section 1.5 and the tenant or occupant of any such premises shall engage in such Precluded Sales Activity, then Tenant may, at its sole option, exercise the following remedies upon prior written notice to Landlord and Landlord's failure to cure such violation:

> (i)      to pay to Landlord monthly in respect of each applicable calendar month, in arrears, not later than the thirtieth (30th) of each such following calendar month in lieu of Minimum Rent (defined in Section 4.1(c)) hereunder, two percent (2%) of Gross Sales (as defined in Section 6.2), but never more than

the *Minimum Rent* for that month that would have otherwise been payable for such calendar month ("Substitute Rent"), during the period which extends from the beginning of the first full calendar month following the date on which the *Precluded Sales Activities are commenced and continuing until the end of the calendar month* in which such Precluded Sales Activities are ceased; and

(ii) if Landlord fails to cure such *violation within one hundred and eighty (180) days after the Precluded Sales Activities commenced*, then Tenant shall have the right to terminate this Lease at anytime prior to the date of discontinuance of the Precluded Sales Activity by giving thirty (30) days advance notice to Landlord unless Landlord cures such *violation or such Precluded Sales Activities ceases prior* to the date Landlord receives Tenant's termination notice.

In addition to the foregoing remedies, Tenant shall also have the *right to recover from Landlord the unamortized cost of Tenant's leasehold improvements and trade fixtures* paid for by Tenant if this Lease is terminated, as well as any other rights or remedies available to Tenant in equity.

## 1.6 Initial Co-Tenancy Requirement

(a) If on the Rental Commencement Date (as defined Section 2.3) the Initial Co-Tenancy Requirement is not met, Tenant shall have the remedies *as defined in (b) below.* The "Initial Co-Tenancy Requirement" shall mean (i) that Lowes and Target shall have executed leases and commenced construction on their premises in the Shopping Center and one (1) of the two (2) has **opened for business within ninety (90) days of the Delivery Date** and (ii), *Stop and Shop, and a minimum of 50,000 square feet of additional midsize retailers* comprised of at least *two (2) tenants from* the following co-tenancy pool: Circuit City, PetSmart, Office Depot, Office Max, Linens & Things, Staples, Bed, Bath & Beyond, Michaels Arts & Crafts, Old Navy, Barnes and Noble and Borders or other such category replacement of similar size and merchandising (the "Midsize Retailers") shall be open or will be open with Tenant. The Initial Co-Tenancy Requirement will be deemed to have been met if, in lieu of Target, an additional 50,000 square feet comprised of at least two (2) Midsize Retailers, for a total of at least four (4) Midsize Retailers comprising at least 100,000 square feet, shall be open or will be open with Tenant.

(b) In the event the Initial Co-Tenancy Requirement is not met and Tenant elects to open and remains open for business in the Demised Premises until the Initial Co-Tenancy Requirement is met, no Minimum Rent shall be payable to Landlord by Tenant under this Lease during such period, and in lieu thereof Tenant shall pay to Landlord on or before the thirtieth (30th) day after the end of each calendar month or fraction thereof included in such period, Substitute Rent (as defined in Section 1.5) for said month. In the event the *Initial Co-Tenancy Requirement is not met and Tenant does not elect to open for business in the Demised Premises within one (1) year after the Rental* Commencement Date, Tenant shall (i) either terminate this Lease within thirty (30) days of the end of such one (1) year period and the term of this Lease shall then terminate and Landlord and Tenant shall be released from all obligations under the Lease accruing after the date of termination or (ii) resume the full payment of Rent. In the event Tenant opens for business and the Initial Co-tenancy Requirement is not met within two (2) years of the Rental Commencement Date as defined in Section 2.3, Tenant shall either terminate this Lease or resume the full payment of Rent. In the event the Initial Co-Tenancy Requirement is not met and Tenant does not elect to open for business in the Demised Premises the Rental Commencement Date as defined in Section 2.3 shall be delayed until the Initial Co-Tenancy Requirement is met. *Notwithstanding anything to the contrary contained in this Lease, under no circumstances will Tenant be obligated under this Lease to open for business in the Demised Premises; or, subject to the* requirements to resume the payment of Rent above, to pay any Rent to Landlord hereunder unless and until the Initial Co-Tenancy Requirement has been met.

### 1.7 Ongoing Co-Tenancy Requirement.

As used in this Section 1.7, the term "Ongoing Co-Tenancy Requirement" shall mean that one tenant occupying at least ninety thousand (90,000) square feet of GFLA in the Shopping Center and two (2) national or regional retailers in excess of twenty thousand (20,000) square feet excluding Bally's and Tenant (hereinafter together referred to as "Other Required Lessees") shall be occupied by the respective Other Required Lessees ("Required Premises") and shall be open and continuously operated in the Shopping Center during the term of this Lease by such *Other Required Lessees or a Required Tenant* (as defined below) except for periods of remodeling (not to exceed sixty (60) days) and restoration periods due to casualty or Eminent Domain. "*Required Tenant*" *shall mean one of the Other Required Lessees or a tenant which* (a) *on a regional or national basis, operates under the same trade name at least fifty (50) high quality retail stores comparably sized to the respective Required Premises, in a manner which is consistent with a first class shopping center in the Worcester, Massachusetts Metropolitan area, and* (b) *operates as one of the following:* (i) *full line department store,* (ii) *junior department store,* (iii) *soft good store,* (iv) *home improvement store,* (v) *catalog store,* (vi) *toy superstore,* (vii) *electronic equipment/appliance superstore,* (viii) *craft store or* (ix) *warehouse department store* (e.g. Costco or Sams Club).

If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied for a period of sixty (60) days, Tenant shall pay to Landlord *monthly, in arrears, no later than the thirtieth* (30th) *of the following month in lieu of* Minimum Rent, Substitute Rent, until such time as the On-Going Co-Tenancy requirement is satisfied. In addition to the rights of Tenant to pay *Substitute Rent, if the non-satisfaction of the On-Going Co-Tenancy Requirement shall continue for a period in excess of twelve* (12) *months after such sixty* (60) *day period, and for so long as such non-satisfaction shall continue, Tenant shall have the right to terminate this Lease by* sixty (60) days' written notice delivered to Landlord.

## ARTICLE II

## TERM

### 2.1 Original Term.

The original term of this Lease shall be the period commencing on the Delivery Date (as defined in *Section 3.1 hereof*) and continuing for fifteen (15) years from the Rental Commencement Date (as defined in Section 2.3 hereof) plus a fraction of a year commencing on the fifteenth (15th) anniversary of the Rental Commencement Date and terminating on January 31 following the fifteenth (15th) anniversary of the Rental Commencement Date.

### 2.2 Option to Renew.

Tenant shall have the option at its election, to extend the original term of this Lease, for five (5) consecutive, additional Extension Period(s) of five (5) years each (individually, each period is referred to as an "Extension Period"), the first of which Extension Periods shall commence upon the expiration of the original term. Tenant shall exercise an Extension Period(s) by delivering to Landlord, no later than nine (9) months prior to the expiration of the then current term, written notice of Tenant's desire to extend the term of this Lease (the "Notice Date"). Notwithstanding the foregoing, if *Tenant fails to give notice by such date,* Tenant's time to give notice of its election shall continue until the date which is fifteen (15) days after Landlord notifies Tenant that Tenant has failed to make such election. If *Landlord does not give such notice to Tenant on or before the seventy fifth* (75th) *day before the effective expiration date of the term of this Lease, the term will extend automatically past such expiration date to the date seventy-five* (75) *days after the earlier of* (i) *Landlord's notice to Tenant of Tenant's failure to exercise its Extension Period* (subject to Tenant's right within such fifteen (15) day period to extend the term of this Lease, or (ii) Tenant's notice to Landlord that it will not exercise its option to extend the term of this Lease. Time shall be of the essence for all time periods set forth in this Section 2.2. The expression "the original term" means the period described in Section 2.1 as the original term. Prior to the

exercise by Tenant of any of such elections, the expression "the term of this Lease" shall mean the original term; after the exercise by Tenant of any such elections to extend the original term, the expression "the term of this Lease" shall mean the original term as it may have been then extended. Except as expressly otherwise provided in this Lease, all the agreements and conditions contained in this Lease shall apply to each Extension Period[s] to which the original term shall be extended as aforesaid. If Tenant shall give notice of the exercise of any such election in the manner and within the time provided aforesaid, the term of this Lease shall be automatically extended upon the giving of such notice without the requirement of any additional action on the part of Landlord or Tenant except that either Landlord or Tenant may request from the other Party confirmation of any remaining Extension Period(s).

### 2.3  Rental Commencement Date.

An "Opening Day" shall be any Monday through Friday (except for legal holidays) between February 15 and the following May 15, and between August 1 and the following November 15. The "Rental Commencement Date" shall be (i) the first Opening Day to occur sixty (60) days after the Delivery Date (as defined in Section 3.1 hereof) or (ii) the date on which Tenant opens for business in the Demised Premises, whichever occurs first. However, the Delivery Date shall not be earlier than June 1, 2001.

Notwithstanding the foregoing, if either Party shall be unable to obtain a certificate of occupancy (or local equivalent) for the Demised Premises because of the condition of the property (and such condition is not the result of some act or omission of Tenant or Tenant's employees, invitees, agents or contractors) Landlord is required to maintain (as defined in Section 7.2 hereof) or any default by Landlord under Sections 2.6, 3.1, 7.4 or any other Section of this Lease, then in such event: (a) Landlord shall promptly correct such condition or default so that such certificate may be obtained; and (b) the Rental Commencement Date shall be the first Opening Day that is more than thirty (30) days after such certificate is obtained. However, if the Demised Premises shall be opened for business with customers prior to the Rental Commencement Date as determined under (b) above, such date of opening shall be the Rental Commencement Date for all purposes under this Lease. For the purposes of this Section 2.3 and Sections 2.5 and 3.1 hereof, Landlord's Construction Work for the Demised Premises shall be deemed substantially complete notwithstanding that certain "touch-ups" or "adjustments" or the completion of "punch list" items may be required for full completion, provided that (i) neither the failure of substantial completion (hereinafter defined in Section 3.1) nor the act of substantial completion shall materially interfere with Tenant's use or enjoyment of the Demised Premises or any rights of Tenant under this Lease; and (ii) Landlord shall diligently complete any such touchups or adjustments or punch list items upon receiving notice of the need therefor.

### 2.4  Commencement of Construction.

If Landlord shall not have commenced Landlord's Construction Work for the Demised Premises before April 1, 2001 then at any time thereafter, but prior to the commencement of Landlord's Construction Work for the Demised Premises, Tenant shall have the right, at its election, to terminate this Lease, by giving Landlord notice thereof.

### 2.5  Completion of Construction.

Promptly following the execution date of this Lease, Tenant shall provide to Landlord a preliminary block out drawing for the Demised Premises based upon Tenant's set of Prototype Plans dated April 1, 2000. Thereafter, Landlord shall prepare an initial set of construction drawings and specifications for the Demised Premises based upon Tenant's prototype drawings and specifications as modified by the preliminary block out drawing, existing building conditions and governmental requirements. Following receipt of such initial set of construction drawings and specifications, Tenant shall review such initial set of construction drawings and specifications and inform Landlord of required revisions or corrections thereto within fifteen (15) days after receipt of such drawings. Landlord shall within fifteen (15) days thereafter submit a revised set of construction drawings and specifications to Tenant for Tenant's approval. Tenant shall have ten (10) days after receipt

of such revised construction drawings and specifications to review and approve or comment upon required revisions or corrections thereto which are necessary to conform such revised set of construction drawings and specifications to Tenant's prototype drawings and specifications (subject to the limitations of the existing building conditions and governmental requirements) or required revisions or corrections thereto which are necessary to accommodate the site specific and code specific conditions indicated by Landlord's architects or engineers. Landlord shall within fifteen (15) days thereafter revise the revised set of construction drawings and specifications until approved by Tenant. Tenant shall have, in each instance, ten (10) days after receipt of each revised set of construction drawings and specifications to review and comment thereon. The construction drawings and specifications as approved by Tenant shall be deemed to be the "Final Plans".

Landlord shall complete the Demised Premises in accordance with the Final Plans or any revisions thereto as contemplated in Exhibit C attached hereto and incorporated herein by reference. If Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business shall not be substantially completed and possession of the Demised Premises shall not be delivered to Tenant on or before September 1, 2001 then, notwithstanding anything in Section 4.1 hereof to the contrary, Landlord shall pay to Tenant, as liquidated damages, on the Delivery Date or within ten (10) days of the date Tenant terminates this Lease, as the case may be, the amount of Five Thousand Dollars ($5,000.00) multiplied by the number of days between September 1, 2001 and the date Landlord delivers the Demised Premises to Tenant with Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business substantially complete or the date Tenant terminates this Lease, whichever is earlier. If Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business shall not be substantially complete (subject to completion of punch list items) and if possession of the Demised Premises shall not be delivered to Tenant on or before October 1, 2001 then at any time thereafter, but prior to substantial completion of Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business and such delivery of possession of the Demised Premises to Tenant, Tenant shall have the right, at its election, to terminate this Lease, by giving Landlord notice thereof.

2.6 Landlord's Construction Representations.

Upon the Delivery Date Landlord agrees that:

(a) the Demised Premises and all rights of Tenant under this Lease will be free and clear of all liens and encumbrances other than the Title Matters, set forth in Exhibit B of this Lease; and

(b) that construction of the Demised Premises and the Shopping Center and the use of the Shopping Center, including the Demised Premises, for retail stores, the Tenant Service Area, the Service Drive and Parking Areas in connection therewith, shall be in material compliance with all laws, ordinances and regulations of public authorities and insurance rating bureaus having jurisdiction (including, without limitation, zoning and building codes).

Furthermore, Landlord agrees that if at any time or times any public authorities or insurance rating bureaus having jurisdiction shall determine that the Shopping Center, including the Demised Premises, shall not have been constructed or is not operated in material compliance with any law, ordinance or regulation of any public authority or insurance rating bureaus having jurisdiction and shall request compliance, and if Landlord's failure to comply shall in any way adversely affect the use of the Demised Premises, the Tenant Service Area, the Service Drive, the Service Areas and the Parking Areas by Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation upon Tenant not contained in this Lease, then Landlord shall, upon receipt of notice of such complaint, promptly cause such repairs, alterations or other work to be done or action to be taken so as to bring about the compliance requested. If by reason of such failure of compliance or by reason of such repairs, alterations or other work done by Landlord, Tenant shall be deprived of the use or enjoyment of the whole or any part of the Demised Premises, the Tenant Service Area or the Common Areas, all Rent shall abate on a per diem basis in

to review and approve or comment upon required revisions or corrections thereto which are necessary to conform such revised set of construction drawings and specifications to Tenant's prototype drawings and specifications (subject to the limitations of the existing building conditions and governmental requirements) or required revisions or corrections thereto which are necessary to accommodate the site specific and code specific conditions indicated by Landlord's architects or engineers.  Landlord shall within fifteen (15) days thereafter revise the revised set of construction drawings and specifications until approved by Tenant.  Tenant shall have, in each instance, fifteen (15) days after receipt of each revised set of construction drawings and specifications to review and comment thereon.  The construction drawings and specifications as approved by Tenant shall be deemed to be the "Final Plans".

Landlord shall complete the Demised Premises in accordance with the Final Plans or any revisions thereto as contemplated in Exhibit C attached hereto and incorporated herein by reference.  If Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business shall not be substantially completed and possession of the Demised Premises shall not be delivered to Tenant on or before September 1, 2001 then, notwithstanding anything in Section 4.1 hereof to the contrary, Landlord shall pay to Tenant, as liquidated damages, on the Delivery Date or within ten (10) days of the date Tenant terminates this Lease, as the case may be, the amount of Five Thousand Dollars ($5,000.00) multiplied by the number of days between September 1, 2001 and the date Landlord delivers the Demised Premises to Tenant with Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business substantially complete or the date Tenant terminates this Lease, whichever is earlier.  If Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business shall not be substantially complete (subject to completion of punch list items) and if possession of the Demised Premises shall not be delivered to Tenant on or before October 1, 2001 then at any time thereafter, but prior to substantial completion of Landlord's Construction Work for the Demised Premises and the Common Areas necessary for Tenant to operate its business and such delivery of possession of the Demised Premises to Tenant, Tenant shall have the right, at its election, to terminate this Lease, by giving Landlord notice thereof.

2.6 Landlord's Construction Representations.

Upon the Delivery Date Landlord agrees that:

(a)  the Demised Premises and all rights of Tenant under this Lease will be free and clear of all liens and encumbrances other than the Title Matters, set forth in Exhibit B of this Lease; and

(b)  that construction of the Demised Premises and the Shopping Center and the use of the Shopping Center, including the Demised Premises, for retail stores, the Tenant Service Area, the Service Drive and Parking Areas in connection therewith, shall be in material compliance with all laws, ordinances and regulations of public authorities and insurance rating bureaus having jurisdiction (including, without limitation, zoning and building codes).

Furthermore, Landlord agrees that if at any time or times any public authorities or insurance rating bureaus having jurisdiction shall determine that the Shopping Center, including the Demised Premises, shall not have been constructed or is not operated in material compliance with any law, ordinance or regulation of any public authority or insurance rating bureaus having jurisdiction and shall request compliance, and if Landlord's failure to comply shall in any way adversely affect the use of the Demised Premises, the Tenant Service Area, the Service Drive, the Service Areas and the Parking Areas by Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation upon Tenant not contained in this Lease, then Landlord shall, upon receipt of notice of such complaint, promptly cause such repairs, alterations or other work to be done or action to be taken so as to bring about the compliance requested.  If by reason of such failure of compliance or by reason of such repairs, alterations or other work done by Landlord, Tenant shall be deprived of the use or enjoyment of the whole or any part of the Demised Premises, the Tenant Service Area or the Common Areas, all Rent shall abate on a per diem basis in

proportion to such deprivation. Furthermore, if at any time the applicable zoning shall not permit the retail sale of any and all types of wearing apparel or sporting goods in the Demised Premises, then in addition to the aforesaid Rent abatement Tenant, without waiving any other rights that Tenant may have on account thereof, may terminate this Lease, by giving Landlord notice thereof, provided Landlord shall have sixty (60) days in which to cure such zoning compliance prior to Tenant's exercising such right to terminate.

<div align="center">

ARTICLE III

CONSTRUCTION

</div>

3.1  Landlord's Construction Work.

Landlord agrees that the work described in Section 2.5 and Exhibit C attached hereto as Landlord's Construction Work and Landlord's Construction Work for the Demised Premises will be commenced promptly after the last to occur of (i) the execution hereof, (ii) approval of Final Plans (as defined in Section 2.5 hereto), and (iii) issuance of a building permit, and in no event later than April 1, 2001. Landlord shall provide Tenant notice of the commencement of Landlord's Construction Work for the Demised Premises and a detailed schedule of completion of such work. Once Landlord's Construction Work for the Demised Premises commences the same will be prosecuted to completion with due diligence, will be done in a good and workmanlike manner using only new first class materials and in accordance with all applicable laws, ordinances and regulations, and said work will be done at Landlord's sole cost and expense.  Landlord shall, following thirty (30) days' prior written notice to Tenant deliver possession of the Demised Premises substantially complete, excluding punch list items, free of all occupancies, on or before September 1, 2001. Upon Landlord notifying Tenant in writing when Landlord considers the Demised Premises "substantially complete" (below defined), which such notice shall be referred to as the "Notice of Punch List Inspection", Landlord and Tenant shall then arrange to meet at the Demised Premises on a date no earlier than five (5) days prior to the Delivery Date to inspect the Demised Premises together and to produce an initial punch list of remaining items to be completed by Landlord.  Landlord acknowledges that (a) Tenant will not conduct the punch list inspection until such time as Landlord has given the Notice of Punch List Inspection (but Tenant shall conduct such Inspection promptly after such notice), and (b) Tenant will not accept possession of the Demised Premises until such punch list inspection has occurred and the Demised Premises is substantially completed; thus, failure to give the Notice of Punch List Inspection shall delay the Delivery Date.  If the initial punch list reflects the Demised Premises is not substantially complete, Landlord shall pay Tenant the amount of Tenant's actual out-of-pocket expenses not to exceed One Thousand Five Hundred Dollars ($1,500.00) for reimbursement for the costs and expenses incurred by Tenant in conducting a punch list inspection prior to the date on which the Demised Premises is substantially complete ("Punch List Reimbursement").  In the event Landlord fails to pay the Punch List Reimbursement to Tenant within thirty (30) days after Tenant's invoice therefor, Tenant shall have the right, in addition to any other rights or remedies at law or in equity, to deduct the Punch List Reimbursement, plus interest at the Default Rate, from the first installment of Minimum Rent due under this Lease.  If the initial punch list reflects that the Demised Premises is not "substantially complete" or "substantial completion" has not occurred as defined below, in addition to Landlord's obligation to pay the Punch List Reimbursement as provided hereinabove, Landlord will pursue completion of the punch list items, and Landlord and Tenant will again inspect the Demised Premises together and produce a final punch list of remaining construction items. Tenant will not be required to accept the Demised Premises until the Demised Premises is substantially complete.  Landlord will use reasonable diligence to complete all final punch list items within fifteen (15) days after the Demised Premises are determined to be substantially complete, but in the event such punch list items cannot reasonably be completed within fifteen (15) days, Landlord may have up to an additional thirty (30) days to complete all final punch list items.  Nothing contained in this Section 3.1 shall be construed to require Tenant to accept the Demised Premises prior to the Delivery Date.  For the purposes of this Section 3.1, Section 2.5 and Exhibit C, "substantially complete" shall mean that all systems for the Demised Premises are installed and in good working order; that all utility services serving the Demised Premises are in place and connected to the lines of the appropriate utility company and permanently metered; that Landlord has completed the installation of

the floor, ceiling, walls and storefront of the Demised Premises; that Landlord has obtained, if available prior to Tenant's fixturing, a temporary or permanent certificate of occupancy from appropriate governmental authorities and that there are no items or construction to the Demised Premises remaining that would in any way restrict Tenant from commencing any and all of its .pre-opening activities, including by way of example, but not limitation: installment of signs; interviewing prospective employees; setting up offices; fixturing; merchandising; and opening in the Demised Premises for business with the public; and further that all punch list items would be considered minor by typical retail tenant standards. The date on which Landlord shall have completed Landlord's Construction Work for the Demised Premises and shall deliver possession of the Demised Premises to Tenant in the condition required by this Section 3.1 and by Sections 2.6 and 7.4 hereof is herein referred to as "the Delivery Date."

### 3.2 Measurement of Demised Premises

Within ninety (90) days after the Rental Commencement Date, Tenant may have the GFLA of the Demised Premises verified by Tenant's architect. For purposes of this verification, the GFLA of the Demised Premises shall be measured from the midpoints of any interior walls shared in common with another tenant, and from the outside face of any exterior walls of the buildings (or the outside face of all interior corridor walls). In the event that such verification reveals a discrepancy between the measured size of the Demised Premises and the size set forth in Exhibit A-1 and Section 1.1 of this Lease, and Landlord and Tenant are unable to agree upon the GFLA for purposes of this Lease, an independent architect acceptable to Landlord and Tenant (the cost of which shall be divided equally between Landlord and Tenant) shall measure the Premises in the manner set forth above. In the event that Tenant's architect, Landlord or its architect, and the independent architect are unable to agree upon the GFLA of the Demised Premises for purposes of this Lease, the GFLA shall be deemed to be the average GFLA of the three measurements. In the event that the GFLA of the Demised Premises, as determined in accordance with the methodology set forth above, varies from the GFLA set forth in Exhibit A-1 and Section 1.1 of the Lease, Landlord and Tenant agree to execute a lease modification agreement (effective retroactive to the Rental Commencement Date) adjusting the GFLA of the Demised Premises and, if necessary, appropriately adjusting the Minimum Rent, and those items of Additional Rent to the extent that such rents were originally calculated on a "per square foot basis". Any necessary payments or reimbursements shall be paid within thirty (30) days of the full execution of the lease modification agreement. Notwithstanding the foregoing, in no event shall the yearly Minimum Rent be greater than as set forth in Article IV.

The square footage of the Shopping Center may be re-measured by Landlord or Tenant from time to time and additional charges including, but not limited to, CAM and real estate taxes shall be adjusted accordingly as set forth above.

### 3.3 Pre-Delivery Date Entry.

Tenant shall have the right, without payment of Rent, (as defined in Section 4.1(c) hereof), after the commencement of Landlord's Construction Work for the Demised Premises and prior to the Delivery Date, whenever Tenant shall deem it reasonably appropriate, to enter the Demised Premises to inspect the same, and, prior to the Delivery Date to make such improvements thereto as it shall have the right to make and install therein fixtures, supplies, merchandise and other property for the purpose of opening a store for business therein. Tenant's entry upon the Demised Premises for the foregoing purpose prior to the Delivery Date shall be governed by and subject to the provisions, covenants, and conditions of this Lease with respect to insurance, indemnity, remedies, and mechanic's liens. Tenant agrees that any such entry and the making of any such improvements and any such installations shall be done in compliance with all applicable laws and without unreasonably hampering or interfering with the performance of Landlord's Construction Work. No such entry by Tenant shall be deemed an acceptance of the Demised Premises. Landlord shall pay the cost of water, sewer, gas, electricity, heat, air-conditioning and other utilities used upon the Demised Premises, and until such time Tenant shall have the right to use, without charge, water, sewer, electricity, gas, heat, air-conditioning and other utilities available upon the Demised Premises. Landlord shall have no obligation for payment of

utilities' charges to Tenant for any utilities services consumed in the Demised Premises by Tenant, or any person claiming under Tenant, from and after the Delivery Date.

3.4  Landlord's Contribution.                    Intentionally Deleted

## ARTICLE IV
## RENT

4.1 Minimum Rent.

(a)  Tenant shall pay the following sums per year (" Minimum Rent") to Landlord as follows:

(i)      from the Rental Commencement Date until the end of the fifth (5th) lease year thereof, Tenant shall pay Minimum Rent to Landlord at the rate of Six Hundred Sixty Three Thousand Seven Hundred Fifty and 00/100 Dollars ($663,750) (i.e., $14.75 per square foot) per year;

(ii)     from the commencement of the sixth (6th) lease year until the end of the tenth (10th) lease year thereof, Tenant shall pay Minimum Rent to Landlord at the rate equal to the lesser of: (a) Six Hundred Eighty Six Thousand Two Hundred Fifty and 00/100 Dollars ($686,250.00) (i.e., $15.25 per square foot) per year; or, (b) the product resulting from multiplying 663,750 by four (4) times the fraction, the numerator of which is the Index (defined in paragraph (d) below) for the last full month of the fifth lease year of the term of this Lease and the denominator of which is the Index for the month in which falls the Rental Commencement Date;

(iii)    from the commencement of the eleventh (11th) lease year until the end of the original term, Tenant shall pay Minimum Rent to Landlord at the rate equal to the lesser of: (a) Seven Hundred Eight Thousand Seven Hundred Fifty and 00/100 Dollars ($708,750.00) (i.e., $15.75 per square foot) per year; (b) the product resulting from multiplying 686,250 by four (4) times the fraction, the numerator of which is the Index (defined in paragraph (d) below) for the last full month of the tenth lease year of the term of this Lease and the denominator of which is the Index for the first full month of the sixth lease year of the term of this Lease;

(iv)     during the first Extension Period, if any, Tenant shall pay Minimum Rent to Landlord at the rate of Seven Hundred Forty Two Thousand Five Hundred and 00/100 Dollars ($742,500.00) (i.e., $16.50 per square foot) per year;

(v)      during the second Extension Period, if any, Tenant shall pay Minimum Rent to Landlord at the rate of Seven Hundred Seventy Six Thousand Two Hundred Fifty and 00/100 Dollars ($776,250.00) (i.e., $17.25  per square foot) per year;

(vi)     during the third Extension Period, if any, Tenant shall pay Minimum Rent to Landlord at the rate of Eight Hundred Ten Thousand and 00/100 Dollars ($810,000.00) (i.e., $18.00 per square foot) per year;

(vii)    during the fourth Extension Period, if any, Tenant shall pay Minimum Rent to Landlord at the rate of Eight Hundred Forty Three Thousand Seven Hundred Fifty and 00/100 Dollars ($843,750.00)  (i.e., $18.75 per square foot) per year;

(viii)   during the fifth Extension Period, if any, Tenant shall pay Minimum Rent to Landlord at the rate of Eight Hundred Seventy Seven Thousand Five Hundred and 00/100 Dollars ($877,500.00) (i.e., 19.50 per square foot) per year.

(b)  All Minimum Rent shall be payable in monthly installments of one-twelfth (1/12) the annual rate thereof then in effect, in advance, without notice or demand and without set off or abatement except as expressly set forth herein, upon the first day of each calendar month included within the term of this Lease.  If the Rental Commencement Date shall be the first day of a calendar month, then the initial installment of Minimum Rent shall be paid on the first day of the month following the Rental Commencement Date and after receipt of an invoice and fully executed W-9 form if not previously furnished.  All Minimum Rent and other payments to be made by Tenant to Landlord shall be made payable to Landlord and sent to Landlord at the place to which notices to Landlord are required to be sent, unless Landlord shall direct otherwise by notice to Tenant.  Minimum Rent for any fraction of a month at the commencement or expiration of the term, or in which the rate thereof changes pursuant hereto, shall be prorated on a per diem basis.

(c)  In addition to the payment of Minimum Rent as provided in this Article IV Tenant shall pay to Landlord as "Additional Rent" all other sums of money and charges required to be paid by Tenant to Landlord under this Lease whether or not the same are designated Additional Rent, including but not limited to Tenant's pro rata share of all CAM as provided in Section 14.3 hereof and real estate taxes as defined in Section 5.1(b). Minimum Rent and Additional Rent and  are collectively referred to herein as "Rent."

(d)  As used in this Section 4.1, "Index" means the Consumer Price Index for All Urban Consumers (CPI-U) of the United States Department of Labor's Bureau of Labor statistics in effect and generally published at the time the computation is to be made (1996= 100).  If the aforesaid price indices are no longer published, then another price index, generally recognized as authoritative, shall be substituted by mutual agreement between the parties.  In the event the parties are unable to so agree, the matter shall be submitted to arbitration by agreement of Landlord and Tenant during any period while the determination of such a dispute in the increase of Minimum Rent is pending, Tenant shall pay the sum set forth in Section 4.1 (a)([ii][a]) and ([iii][a]) as applicable provided, however, that the adjusted sum as finally determined shall be retroactive from the prescribed date and upon a final determination of the dispute, any deficiency owed by Tenant shall be paid promptly or any overpayment received by Landlord shall be refunded promptly.

(e)  Any controversy or claim arising from or relative to any matter in connection with paragraph (d) of this Section shall be submitted to arbitration in the County of Suffolk, Massachusetts and settled in accordance with the rules of the American Arbitration Association or its successor organization, and judgment upon the award rendered by the arbitrator  or arbitrators shall be final and non-appealable and may be entered in any court having jurisdiction thereof.

## ARTICLE V

## TAXES

### 5.1 Payment of Taxes.

(a)  Tenant shall pay to Landlord the amount, if any, of all real estate taxes (hereinafter defined) allocable to the Demised Premises as determined below for each tax year which are regularly imposed accruing on and after the Rental Commencement Date and payable during the term of this Lease, including any Extension Period(s) provided in Section 2.2.  If the real estate taxes upon the Demised Premises shall be separately assessed, then Tenant shall pay its real estate taxes as stated on the tax bill(s) received from Landlord prior to the due date stated on the tax bill(s) in accordance with the provisions of Section 5.4 hereof.  If the real estate taxes upon the Demised Premises shall not be separately assessed and the Demised Premises are part of the tax bill(s) for the Shopping Center or part thereof then the real estate taxes allocable to the Demised Premises shall be an amount computed by multiplying the total of such real estate tax bill(s) by a fraction whose numerator is the GFLA of the Demised Premises and whose denominator is the number of square feet of total leasable space within the Shopping Center, whether or not, owned or leased by Landlord.  Tenant's pro rata share of real estate taxes for the Shopping Center shall be no greater than _____ %.  Said computed amount shall be "Tenant's Portion" of the

real estate taxes due.  If the Demised Premises are initially a part of a larger parcel, the same formula shall apply so long as Tenant's Portion shall be equitably adjusted as appropriate and no unused vacant land nor excess land be assessed and made attributable to the real estate tax computation.  If after the Rental Commencement Date any new construction or remodeling shall occur within the Shopping Center, then, to carry out the intent of the parties, an appropriate adjustment shall be made in the amount payable by Tenant under this Article V with respect to any increase in the real estate taxes upon the Shopping Center attributable thereto.

(b)  Landlord covenants and warrants that prior to the Rental Commencement Date of this Lease that all taxes on the Demised Premises and the Shopping Center, except current taxes not yet delinquent, will have been paid in full.  For purposes of this Article V, "real estate taxes" shall only mean those real estate taxes, assessments and related governmental impositions both general and special imposed under the laws of any one or more jurisdictions in which the Shopping Center is located against the land, buildings and all other improvements within the Shopping Center, whether or not, owned or leased by the Landlord. Real estate taxes shall also include any tax, excise, surcharge or assessment hereafter levied by any governmental taxing authority upon or against the rents payable hereunder by Tenant in lieu of any taxes.  Notwithstanding the foregoing, Tenant shall have no obligation to pay any income taxes, sales taxes, excess profit taxes, franchise, capital stock, inheritance or estate taxes, license fees, inspection fees, special assessments not related to real estate taxes or permit fees levied against Landlord. It shall include each and every installment thereof, which may accrue and become due during the term of this Lease. It is the intention of the parties hereto that the Landlord shall receive Minimum Rent and other charges required to be paid to Landlord by Tenant pursuant to this Lease on a net basis and that Tenant shall, except as specifically provided for in this Lease to the contrary, pay all costs and expenses of real estate taxes relating to the Demised Premises or any improvements thereon or to the tenancy therein created by this Lease which costs and expenses may accrue and become due during the term of this Lease. Real estate taxes for the first and last years hereunder shall, if necessary, be prorated based on a three hundred sixty-five (365) day year and apportioned between Landlord and Tenant to coincide with the Rental Commencement Date of the term of this Lease and expiration or earlier termination of this Lease, such that Tenant only pays those real estate taxes and assessments solely allocable to the term of this Lease.

(c)  Nothing contained in this Lease, however, shall be deemed or construed to require Tenant to pay or discharge: (i) any tax upon the income, profits or business of Landlord; or (ii) any personal property taxes, capital levy, franchise, gross receipts, revenue, inheritance or estate taxes, income or profit, gift, payroll, stamp tax or transfer tax which may be levied against the estate or interest of Landlord, however such taxes may be designated, even though such taxes may become a lien against the Demised Premises. If any general or special assessment is assessed against the Demised Premises, the following shall apply: regardless of whether Landlord elects to pay the assessment in installments, assessments shall be computed as if Landlord had elected to pay the same in installments over the longest period of time allowed by applicable law and only those installments (or partial installments) attributable to installment periods (or partial periods) falling within the term of this Lease shall be considered in determining Tenant's tax liability.

(d) Notwithstanding any provision of this Lease to the contrary, Landlord (and not Tenant) shall be obligated to pay any assessment for special improvements heretofore installed or installed in connection with the initial development of the Shopping Center or the Demised Premises, such as the widening of the exterior roads, the installation and/or hook up to and maintenance of sewer and sewer lines, sanitary and storm drainage systems and other utility lines and installations (whether public or private) or any other impact fees negotiated by Landlord with the government taxing authority.  If at any time during the term of this Lease any governmental subdivision shall undertake to create an improvement or special assessment district, the proposed boundaries of which include the Demised Premises, Tenant shall be entitled to appear in any proceeding relating thereto and present its position as to whether the Demised Premises should be included or excluded from the proposed improvement or assessment district and as to the degree of benefit to the Demised Premises resulting from inclusion.  Landlord shall promptly advise Tenant in writing of the receipt of any notice or other information relating to the proposed creation of any such improvement

11

or special assessment district, the boundaries of which include the Demised Premises. To the extent permitted by law, Tenant or its designees shall have the right to apply to have any assessment for local improvements assessed during the term of this Lease payable in annual installments. Landlord shall permit any such application to be filed in its name, if necessary or appropriate, and shall execute any and all reasonable and necessary documents requested by Tenant to accomplish the foregoing result.

5.2 Multiple Taxing Authorities.

If there shall be more than one taxing authority, the real estate taxes for any period shall be the sum of the real estate taxes for such period attributable to each taxing authority. The real estate taxes for any tax year shall mean such amounts as shall be finally determined to be the real estate taxes incurred for such tax year less any abatements, refunds or rebates made thereof. For the purpose of determining payments due from Tenant to Landlord in accordance with the provisions of this Article V: (i) the real estate taxes for any tax year shall be deemed to be the real estate taxes incurred for such tax year until such time as the same may be reduced by abatement, refund or rebate; and, (ii) if any abatement, refund or rebate shall be made for such tax year, the real estate taxes for such tax year shall be deemed to be such real estate taxes as so reduced plus the expenses of obtaining the reduction, with an appropriate adjustment to be made in the amount payable from or paid by Tenant to Landlord on account of real estate taxes. Landlord shall submit to Tenant copies of the real estate assessment notices within fifteen (15) days of Landlord's receipt if the value has increased by fifteen percent (15%) or more from the previous assessment.

5.3 Proceedings to Contest Taxes.

If Landlord shall determine not to contest the validity or amount of any real estate taxes, Tenant shall have such right to contest the validity or amount of any real estate taxes as permitted to Landlord or Tenant by law, either in its own name or in the name of Landlord. Landlord shall cooperate with Tenant at Tenant's expense in any such contest and, in connection therewith, shall make available to Tenant such information in its files as Tenant may reasonably request providing no other Tenant in the Shopping Center has begun such contest and Tenant shall receive the pro rata results of such contest. If any abatement, refund or rebate shall be obtained by either Party or another contesting party, the reasonable expenses of obtaining the same shall be a first charge thereon.

5.4 Payment Procedures.

Landlord shall submit to Tenant copies of the real estate tax bills for each tax year within fifteen (15) days of Landlord's receipt thereof along with a bill for any amount that may be payable by Tenant pursuant to the provisions of this Article V. Such bill shall be accompanied by a computation of the amount payable and in no event shall any administrative or management fees be added to the amount to be paid by Tenant. The amount payable by Tenant hereunder for any tax year shall be payable by Tenant within thirty (30) days of Tenant's receipt of Landlord's invoice, provided taxes are then due and payable to the governmental taxing authority for such tax year. If real estate taxes are payable to any taxing authority for any tax year in installments, the amount payable by Tenant hereunder shall be payable in similar installments. If real estate taxes are payable to different taxing authorities for any tax year at different times, an appropriate apportionment shall be made of the amount payable by Tenant for such tax year and the apportioned amounts shall be payable at such times. Landlord agrees that unless Landlord's Mortgagee requires Landlord to escrow the real estate taxes, the real estate taxes upon the Shopping Center shall be paid by Landlord prior to the last day that the same may be paid without penalty or interest, or if a discount shall be available for early payment, prior to the last day that such discount shall be available, conditioned upon Tenant timely paying its share and Landlord timely billing Tenant as set forth herein.

Notwithstanding anything to the contrary contained in this Section 5.4, if Landlord's Mortgagee requires Landlord to escrow the real estate taxes, then Tenant shall pay to Landlord, as Additional Rent, Tenant's Portion of the real estate taxes in estimated (which estimate may be based on the prior calendar year's actual real estate taxes) equal

monthly installments in advance on the first day of each calendar month during the term of this Lease. If Landlord determines that Landlord has underestimated Tenant's Portion of real estate taxes, Landlord may revise its estimate and adjust Tenant's monthly payments upon written notice to Tenant and such adjusted estimate shall become effective as of the next monthly payment. Within a reasonable time after receipt of the actual tax bill for such calendar year, Landlord shall furnish to Tenant a statement showing Tenant's Portion of real estate taxes for such calendar year and payments made by Tenant for such calendar year. If Tenant's aggregate monthly payments are greater than Tenant's Portion of real estate taxes with respect to such calendar year, then Tenant shall receive a credit for the excess against future payments of Tenant's Portion of real estate taxes becoming due to Landlord (or if such excess occurs at the end of the term or is otherwise incapable of being credited against future payments and provided that Tenant is current in the payment of Rent payable under any of the terms and provisions of this Lease, such excess shall be refunded to Tenant within thirty (30) days after said determination). If Tenant's aggregate monthly payments are less than Tenant's Portion of real estate taxes for such calendar year, then Tenant shall pay to Landlord the difference within twenty (20) days after receipt of Landlord's statement. If the term of this Lease shall begin or end other than on the first or last day of a calendar year, Tenant's Portion of the real estate taxes shall be prorated for such calendar year based on a three hundred sixty-five (365) day year.

Tenant shall be solely responsible for and shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as upon all trade fixtures, merchandise and other personal property in or upon the Demises Premises whether or not owned by Tenant. Should the taxing authorities include in real estate taxes machinery, equipment, fixtures, inventory or other personal property or assets of Tenant, then Tenant shall also pay the entire taxes for such items.

<div align="center">

## ARTICLE VI
## LEASE YEAR AND GROSS SALES  DEFINITIONS

</div>

6.1   Lease Year.

A "lease year" shall mean any twelve month period commencing on February 1 and ending on the following January 31. If the Rental Commencement Date shall occur on a day other than the first day of February, then the period of time from the Rental Commencement Date through the next January 31 shall be a "partial lease year." The first lease year shall then commence on the first February 1 following and end on the next following January 31.

6.2   Gross Sales.

The "Gross Sales" for any lease year or partial lease year shall be the total amount of all sales of merchandise and services made, sold or rendered in, upon or from the Demised Premises during such lease year or partial lease year, in each case whether the same shall be made by Tenant or by any subtenant, licensee or concessionaire of Tenant, whether for cash, check or on a charge credit or time basis, whether delivered from the Demised Premises or elsewhere, except that the following shall not be included in Gross Sales for such lease year or partial lease year or, if previously included in Gross Sales for any lease year or partial lease year, the same shall be deducted from Gross Sales for such lease year or partial lease year, as the case may be:

    (a)   The amounts of all discounts, refunds, credits, allowances and/or adjustments made to customers;

    (b)   The amounts of all sales taxes or other taxes in the nature of sales taxes, whether or not the same be called sales taxes, imposed by any governmental authorities, federal, state or local, irrespective of whether the same be imposed by present or future laws;

(c)   The amounts of all sales to employees of Tenant or of any subtenants, licensees or concessionaires of Tenant which are made at discounts from prices charged to customers;

(d)   The amounts received for merchandise transferred to any other place of business of Tenant or any subtenant, licensee or concessionaire of Tenant or any business organization affiliated with Tenant wherever located, provided such merchandise is not used to fill a sale made in the Demised Premises, and amounts received for merchandise returned to suppliers for credit;

(e)   Interest or other carrying charges on lease, credit or time sales;

(f)   The amounts charged to customers for mailing, delivery, alterations or other services where such services are rendered to the customer without profit;

(g)   Unpaid balances of credit sales which are charged off as "bad debts", provided that if at any time after any such unpaid balance shall be so charged off, but prior to the expiration of the term of this Lease, any amount shall be collected on account thereof, such amount shall then be included in Gross Sales;

(h)   The amounts received from sales of distressed, damaged or obsolescent merchandise sold to other than retail customers, and amounts received from sales of used trade fixtures and store operating equipment;

(i)   The amounts received from licensees or concessionaires of Tenant for occupancy, for services rendered to such licensees or concessionaires by Tenant or for supplies or equipment furnished to such licensees or concessionaires by Tenant; and,

(j)   The amounts paid by Tenant to companies providing credit card services or check fees for Tenant's customers as the fees and other charges for such credit card or check services.

## 6.3  Substitute Rent.

All exclusions or deductions from Gross Sales allowed pursuant to Section 6.2 shall be exclusions or deductions from Gross Sales for purposes of Substitute Rent. All Substitute Rent payable and due under this Lease shall be paid thirty (30) days after each monthly accounting period therefor calculated. Any payment of Substitute Rent under this Lease shall be accompanied by a statement of Gross Sales and any exclusions or deductions therefrom permitted under this Lease.

## 6.4  Gross Sales Audit.

Tenant agrees that it will keep in its principal accounting office true and accurate records, in accordance with generally accepted accounting practices, showing all sales made in, upon or from the Demised Premises, and that Landlord and its duly authorized agents may, from time to time and at reasonable times during Tenant's business hours, upon at least fifteen (15) days written notice to Tenant, examine and audit such records for the purpose of verifying the aforesaid statements when required by the provisions of this Lease to be submitted by Tenant to Landlord. If Landlord does not give Tenant notice that it challenges any statement or payment within two (2) years to which such statement or payment relates, such statement or payment shall be deemed final and conclusive and the obligation of Tenant to keep available for Landlord's examination the sales records upon which such statement or payment was based shall cease. In no event shall Landlord audit Tenant's records more than one time in any lease year. Furthermore, no such audit shall occur in the months of November, December, January or February. In the event such audit reveals that Tenant has underaccounted gross sales by three percent (3%) or more then, Tenant shall, within thirty (30) days after Landlord's notice thereof, pay any deficit and shall reimburse Landlord for all of Landlord's costs in connection with said audit.

6.5  Open for Business.

Nothing in this Article VI or any other provision of this Lease shall require Tenant to keep the Demised Premises open for business any time or times.

## ARTICLE VII
### REPAIRS AND MAINTENANCE

7.1  Tenant's Repair Obligations.

Damage by fire or other casualty (which shall be controlled by Article IX hereof) and reasonable wear and tear excepted, Tenant agrees, at Tenant's expense, to keep in good order and repair: (1) the interior of the Demised Premises, (2) all glass; (3) all heating and air conditioning equipment ("HVAC") and other equipment in or serving the Demised Premises exclusively (except as otherwise provided in Section 7.3 hereof); (4) all permitted signs of Tenant; (5) the interior and exterior of all entry doors; (6) door frames, checks and closers; (7) window and window frames; (8) electrical, plumbing, sewage and other mechanical and utility equipment and systems located upon and  serving the Demised Premises exclusively; (9) trade fixtures, business machinery and trade equipment;  and (10) floor coverings; provided, however, that Tenant shall not be required to perform any such repairs if such damage is caused by the negligence of Landlord, its agents, servants, contractors or employees:  Notwithstanding anything contained in this Section 7.1 to the contrary, Landlord agrees that any repairs, alterations or replacements that shall be required at any time from the Delivery Date until the expiration of the term of this Lease as a result of the negligence or omission by Landlord or as a result of structural failure or movement of the building upon the Demised Premises such as settling, or as the result of settling of the Common Areas, or any repairs, alterations, or replacements required as a result of defective materials or workmanship in the performance of Landlord's Construction Work or Landlord's failure to perform Landlord's Construction Work as required, shall be made by Landlord at Landlord's sole cost and expense.

7.2  Landlord's Repair Obligations.

During the first lease year, Landlord agrees, at its sole cost and expense, to make all repairs and replacements of Landlord's Construction Work, excluding damage caused by Tenant or its agents, employees and invitees, in and about the Demised Premises and within any structural walls of the Demised Premises as well as all utility lines and areas within or under the floorslab.  Landlord agrees to assign to Tenant all warranties relating to the Demised Premises and the equipment located therein, except such warranties as may be used to cover any of Landlord's obligations stated herein.  Landlord covenants and agrees that it will, at its sole cost and expense subject to CAM reimbursement, if applicable, during the entire term of this Lease, maintain and keep in good order and repair those portions of the Demised Premises which are not Tenant's obligation under Section 7.1 above including, but not limited to the repair of  the foundation, all structural elements of the Demised Premises and the building(s) thereon, floorslab, replace and repair exterior walls, steel frame, roof, HVAC (for one (1) year following the Delivery Date) flashings, gutters, downspouts, sprinkler system and underground utility lines of the Demised Premises and the building(s) thereon, and all utility lines serving the Demised Premises but located outside the same, excluding damage caused by Tenant or its agents, employees and invitees. In addition, Landlord shall paint the exterior of the Demised Premises and the building(s) thereon on a periodic basis when needed.  In performing its obligations under this section, Landlord shall not unreasonably interfere with Tenant's business operations.  Landlord shall make any repairs required under this Lease within fifteen (15) days after the receipt by Landlord of written notice from Tenant, or so long as Landlord commences to make such repairs in a diligent and prudent manner, it will be allowed such additional time as necessary to make such repairs.  However, thereafter if such repairs are not made or not completed, then Tenant shall have the right to make such repairs and deduct the cost thereof from the next accruing Minimum Rent or any other sums or charges due hereunder or such succeeding payments until Tenant recovers the entire amount due, provided Tenant has supplied Landlord with a notice detailing said reasonable cost and affording Landlord at least thirty (30) days thereof to reimburse Tenant such costs.

<u>7.3 HVAC Maintenance.</u>

Landlord agrees to make all repairs and replacements to the HVAC system serving the *Demised Premises for the first twelve (12) months after the Rental Commencement Date and after the first twelve (12) months to assign to Tenant any and all original warranties provided to Landlord for the future benefit of Tenant.* Tenant agrees to carry a service contract at Tenant's cost for said system to provide for routine preventive maintenance including changing filters, belts and the lubrication of all moving parts during the term of this Lease. If at any time during the term of this Lease Tenant shall make any repairs or replacements to the HVAC serving the Demised Premises not of a minor nature and not routinely included in a regular service and maintenance contract, then Tenant shall be reimbursed by Landlord, upon Tenant's delivery of an invoice to Landlord setting forth the cost of such repair or replacement, which shall be delivered no earlier than one hundred eighty (180) days prior to the expiration of the term of this Lease for an amount equal to the *product of such cost multiplied by a fraction the denominator of which is one hundred twenty (120) and the numerator of which is one hundred twenty (120) minus the number of months between the date of the making of such repair and/or replacements and the date of the termination of the term of this Lease.* If payment is not made within thirty (30) days of receipt of Tenant's invoice thereof, said reimbursement may be effected by Tenant's deducting the amount thereof from the final payments of Rent due and payable hereunder

7.4  <u>Utilities.</u>

Landlord agrees that on the Delivery Date the Demised Premises will be serviced with the utility requirements specified in the Final Plans. Landlord agrees that from the Delivery Date until the expiration of the term of this Lease, the Demised Premises shall be connected to the electric and gas lines serving the municipality wherein the Demised Premises are located and to the water and sewer systems of such municipality and shall be separately metered for each such utility service, provided, however that water and sewage service may be submetered by Landlord if required. Landlord agrees that from the Delivery Date until expiration of the term of this Lease: (i) all such water, electricity and gas shall be in such amounts per unit of time as shall have existed on the Delivery Date (including, without limitation, sufficient water for air-conditioning and sufficient water pressure to maintain fire systems); and, (ii) all such sewage disposal facilities shall be of such capacity as shall have existed on the Delivery Date. Landlord shall not take, or permit any occupant of the Shopping Center or any person claiming under Landlord or any such occupant to take, any action which shall materially interrupt, or interfere with, any electric, gas, water, sewerage or telephone service to the Demised Premises. Certain meters, controls and conduits for the utilities systems serving the Demised Premises may, from time to time, be situated outside the Demised Premises in other premises within the Shopping Center ("the Utilities Room"). Whenever necessary, Tenant shall have reasonable access to the Utilities Room, and the controls and other conduits therein, and if such Utilities Room is in common with Landlord and other tenants, Tenant shall not interfere with any utilities except those relating solely to the Demised Premises.

<u>7.5 Utilities Easements.</u>

Tenant shall have the right and easement within the Shopping Center to install replace, maintain and use utilities conduits serving the Demised Premises and all of the signs which Tenant is hereby permitted to erect and/or maintain under this Lease, provided that such conduits shall be located only in areas subject to the reasonable prior written approval of Landlord and as permitted by Title Matters and Tenant shall do the same in such manner as shall keep to a reasonable minimum any interference with the business of other tenants in the Shopping Center. Tenant shall repair any and all damage caused by the exercise of its rights hereunder.

<div align="center">

**ARTICLE VIII**
**ALTERATIONS**

</div>

8.1  <u>Alterations.</u>

workmanlike manner and in conformity with all laws, ordinances and regulations of all public authorities having jurisdiction and this Lease, that materials in good quality shall be employed therein, that the structure of the Demised Premises including, without limitation the roof, shall not be endangered or impaired thereby and that except for signs and HVAC and utilities equipment that Tenant is permitted to erect and maintain pursuant to the provisions of this Lease, neither the exterior or structural components of the Demised Premises nor the height of the Demised Premises shall be altered without the written consent of Landlord in each instance.

### 8.2  Surrender of Alterations.

All repairs, alterations, replacements, other improvements or installations made to or upon the Demised Premises which are so attached to the Demised Premises that the same shall be by law deemed to be a part of the realty and shall (subject, however, to the provisions of Section 8.1 above and the provisions of the following sentence) be the property of Landlord and remain upon and be surrendered with the Demised Premises as a part thereof upon the expiration of the term of this Lease. Notwithstanding the foregoing, all trade fixtures, lighting fixtures, slatwalls, floor covering, and signs, whether or not by law deemed to be a part of the realty, shall be the property of Tenant or persons claiming under Tenant and may be removed by Tenant or any person claiming under Tenant at any time or times during the term of this Lease or any occupancy by Tenant thereafter. Tenant shall repair any damage to the Demised Premises occasioned by the removal by Tenant or any person claiming under Tenant of any property from the Demised Premises and leave the Demised Premises in broom clean condition, except for necessary minor, interior holes and other openings to plaster, sheetrock and painted surfaces resulting therefrom.

### 8.3  Permits.

Tenant shall procure all necessary governmental permits pursuant to Section 8.1 before making any repairs, alterations, other improvements or installations to or upon the Demised Premises at no cost to Landlord. Landlord shall cooperate with Tenant in obtaining such permits.

### 8.4  Signage.

(a)      Landlord warrants and represents that, other than local government code, there are no signage restrictions which bind the Shopping Center either by a restrictive covenant or uniform signage plan, whether or not recorded or filed with the local recording or governing authority, and that Tenant shall have the right, at Tenant's sole cost and expense, to erect and maintain throughout the term of this Lease: (i) Tenant's standard prototypical exterior signage upon the front and side exterior of the Demised Premises in the manner depicted on Exhibit H-1; and (ii) Tenant's sign panel upon the Main and I-290 Shopping Center pylon sign(s) or monument(s) in the manner depicted on Exhibit H-2. The design of such signage shall be specifically subject to the sign criteria listed in Section 9.4 of the Target Notice of Ground Lease.   Landlord further represents that Tenant shall be permitted the maximum exterior building signage allowed by code and that the height of Tenant's storefront and exterior signage shall be on equal elevations, at Tenant's option, with other tenants in the Shopping Center.  Notwithstanding anything contained herein, Landlord covenants that the height of Tenant's exterior signage shall be at least forty three feet (43").  Landlord and Tenant acknowledge that the local code limits the square footage of the storefront and side wall sign such that Tenant may have only six (6) foot channel letters, therefore Tenant will commence to obtain a variance to allow for its standard nine foot (9') letters within thirty (30) days of the execution of this Lease.  (Landlord agrees to fully cooperate in assisting Tenant in obtaining such variance).  In the event the Tenant is unable to obtain such variance within four (4) months (excluding the appeal period) of the execution of this Lease, Tenant may terminate this Lease within thirty (30) days the end of such period or the Lease shall be in full force and effect and Tenant shall accept the maximum channel letters allowed.

(b)     Throughout the term of this Lease, Tenant shall be responsible to maintain all of its signs which are allowed pursuant to this Section 8.4 in good condition and repair. Tenant may remove any of its signs which are allowed pursuant to this Section 8.4 at anytime during the term of this Lease so long as Tenant repairs, at Tenant's sole cost and expense, any damage to the Demised Premises or the Shopping Center caused by any such removal. If for any reason Tenant is unable to erect its signage as set forth in this Section 8.4, Tenant may terminate this Lease upon written notice to Landlord.

(c)     In addition, if a replacement Main or I-290 pylon or an additional pylon serving all tenants of the Shopping Center or monument sign is constructed, Tenant shall have the right to install Tenant's sign panel upon said future pylon or monument sign(s), with the size and location of Tenant's sign panel to be determined on a pro rata basis, e.g. the tenant with the most square footage in the Shopping Center shall have the largest panel and choice of location on the sign.

8.5 Mechanics' Liens by Tenant.

Tenant shall permit no mechanics', materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Tenant or any person claiming under Tenant; except, however, that if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part, Tenant shall cause the same to be discharged, provided, however, that if Tenant desires to contest any such lien in good faith, it may do so as long as the enforcement thereof is stayed, but in any event Tenant shall either: (i) cause any such lien to be discharged of record within thirty (30) days after written request of any mortgagee or of Landlord; or, (ii) while contesting the same as aforesaid, deposit with the Landlord or mortgagee pending such contest, a sum sufficient to cover the amount of such lien and all interest, penalties or costs that would be payable to discharge such lien if such lien were valid.

8.6 Mechanics' Liens by Landlord.

Landlord shall permit no mechanics', materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Landlord or any other occupant of premises in the Shopping Center; if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part Landlord shall cause the same to be discharged, provided that if Landlord desires to contest any such lien in good faith, Landlord may do so as long as the enforcement thereof is stayed, the lien is bonded or there is otherwise reasonable assurances that said contents will not subject the property to seizure or other similar disposition or otherwise adversely affect Tenant's use of the Demised Premises.

## ARTICLE IX

## FIRE AND OTHER CASUALTY

9.1 Landlord's Obligations.

If, at any time from and after the Delivery Date, the Demised Premises or any part thereof, the Tenant Service Area or any part of the Common Areas shall be damaged or destroyed by fire, the elements, the act of any public authority or other casualty, then Tenant shall give notice thereof to Landlord and, except as hereinafter otherwise provided, Landlord shall, promptly thereafter, repair or restore the Demised Premises, Tenant Service Area and the Common Areas to substantially the same condition they were in immediately prior to such casualty. If the damage to the Demised Premises, Tenant Service Area or the Common Areas shall render the whole or any part thereof unsuitable for the use for which they were intended and they are actually not used for their intended purpose, a just proportion of the Rent and all other amounts payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to Tenant's business, shall be abated until the earlier of the thirtieth (30th) day after the Demised Premises or part thereof and the Common Areas shall be repaired or restored to substantially the same condition they were in immediately prior to

such casualty or the date Tenant reopens for business in the damaged area.  Rent and any such other amounts paid in advance for a period beyond the date on which the same were so rendered unsuitable for the use for which the same were intended shall be apportioned and adjusted.

If the Demised Premises, for any period, shall be unsuitable for business as a result of such damage or destruction to the Demised Premises or as a result of such damage or destruction to other premises in the Shopping Center, then during any such period or periods no Minimum Rent or CAM shall be payable by Tenant, but Tenant shall continue to pay its proportionate share of real estate taxes.  If more than forty percent (40%) of the gross leasable area in the aggregate of all other premises in the Shopping Center shall for any period be closed for business as a result of damage or destruction and if the Demised Premises remains open for business during such casualty or during the repair period, then in lieu of Rent, Tenant shall pay to Landlord, for such period, Substitute Rent, payable monthly in arrears on or before the thirtieth (30th) day after the end of each calendar month or fraction thereof included in such period.  In addition, if Landlord shall fail to commence to repair or restore such damage within 60 days after the occurrence thereof or shall fail to complete the repair and restoration of such damage within one (1) year after the occurrence thereof then, in either such event, and prior to the commencement or completion thereof, as the case may be, Tenant may at its election terminate this Lease, anytime thereafter, by giving Landlord written notice thereof and the term of this Lease shall then terminate on the date specified therefor in such notice.  Wherever in this Lease it is provided that Rent and any such other amounts shall be suspended or abated for any period according to the nature and extent of the injury to Tenant's business, Tenant's sales figures for comparable periods shall be considered, together with all other evidence.  All insurance proceeds or damages on account of any damage or destruction by fire, the elements, the act of any public authority or other casualty shall be made available for the payment of the cost of the aforesaid repair or restoration.

9.2  End of Term Casualty.

It is agreed and understood that: (i) if during the two (2) year period preceding the expiration of the term of this Lease the Demised Premises shall be damaged or destroyed to the extent of twenty percent (20%) or more of their replacement cost; or (ii) if during the one (1) year period immediately preceding the expiration of the term of this Lease the Demised Premises shall be damaged or destroyed to the extent of fifteen percent (15%) or more of its replacement cost, then either Landlord or Tenant may, if either shall so elect, terminate the term of this Lease, by notice to the other within thirty (30) days after such damage or destruction.  If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this Lease for an Extension Period (as provided in Section 2.2 hereof) and if within fifteen (15) days after Tenant shall receive such notice of termination from Landlord Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect.  In the event of any termination of the term of this Lease pursuant to the provisions of this Section 9.2, the termination shall become effective on the twentieth (20th) day after the giving of the notice of termination, a just proportion of the Rent and all other amounts payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to the Demised Premises or the Common Areas, shall be suspended or abated until the time of termination, Rent and any such other amounts shall be apportioned as of the time of termination and proper adjustments shall be made, and neither Landlord nor Tenant shall be obligated to repair or restore any damage or destruction caused by such fire or other casualty.  In addition, if Landlord shall terminate this Lease pursuant to the provisions of this Section 9.2, Landlord shall pay to Tenant an amount equal to the unamortized cost to Tenant of any leasehold improvements made by Tenant to the Demised Premises.  The unamortized cost to Tenant of any leasehold improvements made by Tenant to the Demised Premises shall be determined in accordance with the straightline method of amortization and the life expectancy of such leasehold improvement used by Tenant for federal income tax purposes.  As used hereinbefore "the cost to Tenant of any leasehold improvements" shall mean the actual cost to Tenant of making such leasehold improvements less any contribution thereto or reimbursement thereof made by Landlord to Tenant, including without limitation, reimbursement effected by deductions from Rent payable under this Lease.

110300

## ARTICLE X
## EMINENT DOMAIN

10.1  Condemnation of Demised Premises.

If after the execution of this Lease and prior to the expiration of the term of this Lease the whole of the Demised Premises shall be appropriated by right of eminent domain, then the term of this Lease shall cease as of the time the fee simple interest shall be vested in the taking authority and Rent and all other payments under this Lease shall be apportioned and adjusted as of the time of such termination.  Tenant shall have the right, at its election, to continue to occupy the Demised Premises, to the extent permitted by law, for all, or such part as Tenant may elect, of the period between the time of such appropriation and the time when physical possession of the Demised Premises shall be taken, subject to the provisions of this Lease insofar as the same may be applicable to such occupancy by Tenant, but the amount, if any, charged to Tenant by the taking authority or its assigns for Rent or use and occupancy shall be deductible from the Rent paid or payable by Tenant hereunder.

10.2  Partial Condemnation.

If by right of eminent domain or any other act of public authority:

(a)     a part of the Demised Premises shall be appropriated and if as a result thereof the GFLA of the Demised Premises shall be reduced to less than ninety percent (90%) of the GFLA thereof set forth in Exhibit A-1 of this Lease; or

(b)     a part of the Common Areas of the Shopping Center shall be appropriated and if as a result thereof (taking into account any prior appropriation of any portion of the Shopping Center) the Protected Parking Areas shall be reduced in size by twenty percent (20%) or more, or as a result thereof the Shopping Center has a parking ratio of less than that required by local code, or a part of the Tenant Service Area shall be appropriated and Tenant is unable to receive merchandise in the ordinary course; or

(c)     the Protected Parking Areas shall cease to have satisfactory ingress and egress for pedestrians and motor vehicles to and from Lincoln Street; or

(d)     there shall cease to be reasonably satisfactory access for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises; or

(e)     there shall cease to be reasonably satisfactory access for trucks to and from Lincoln Street to and around the Tenant Service Area or the Service Drive shall be materially modified so that Tenant's method of delivery in and to the Demised Premises is materially modified; or

(f)     any part of the Demised Premises shall be appropriated during the last year of the term of this Lease; or

(g)     any part of the Protected Parking Areas are appropriated and such appropriation has a material adverse effect upon Tenant's business operation,

then Tenant may, if Tenant shall so elect, terminate the term of this Lease, by giving Landlord notice of the exercise of such election within thirty (30) days after the receipt by Tenant of notice from Landlord of such appropriation.  If by right of eminent domain any part of the Demised Premises shall be appropriated during the last year of the term of this Lease, Landlord may, if Landlord shall so elect, terminate the term of this Lease by giving Tenant notice of the exercise of such election within thirty (30) days after the receipt by Landlord of notice of such appropriation.  If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this Lease for an Extension Period as provided in Section 2.2 hereof and if within fifteen (15)

days after Tenant shall receive such notice of termination from Landlord Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect. In the event of a termination under the provisions of this Section 10.2, the termination shall be effective as of the time that physical possession of the premises so appropriated shall be taken and Rent and all other payments pursuant to this Lease shall be apportioned and adjusted as of the time of such termination, but the amount charged by the taking authority or its assigns for Rent or use and occupancy between the time of appropriation and the time of termination shall be deductible from Rent and other charges paid or payable hereunder. If there shall be an appropriation by right of eminent domain and if the term of this Lease shall not be terminated as aforesaid, then the term of this Lease shall continue in full force and effect and Landlord shall, within a reasonable time after physical possession is taken of the premises appropriated, restore what may remain of the Demised Premises, of the Tenant Service Area and of the Common Areas to as close to substantially the same condition they respectively were in prior thereto, as is reasonably possible subject to reduction in size thereof. A just proportion of the Rent and all other amounts payable by Tenant pursuant to this Lease, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated until the fifteenth (15th) day after what may remain of the Demised Premises and the Common Areas shall be restored, as aforesaid, and thereafter a just proportion of the Rent and any such other amounts, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated for the balance of the term of this Lease. For the purpose used herein, Rent shall be deemed allocable seventy percent (70%) to the Demised Premises and thirty (30%) percent to the Common Areas.

### 10.3 Condemnation Awards.

Landlord reserves to itself, and Tenant assigns to Landlord, all rights to damages accruing on account of any appropriation by eminent domain or by reason of any act of any public authority for which damages are payable. Tenant agrees to execute such instruments of assignment as may be reasonably requested by Landlord in any petition for the recovery of such damages, and to turn over to Landlord any damages that may be recovered in any such proceeding. It is agreed and understood, however, that Landlord does not reserve to itself, and Tenant does not assign to Landlord, any damages in an amount equal to the unamortized cost to Tenant of any improvements made by Tenant to the Demised Premises. The unamortized cost to Tenant of any improvement made by Tenant to the Demised Premises shall be determined in accordance with the straight-line method of amortization and the life expectancy of such improvement used by Tenant for federal income tax purposes. As used hereinbefore, "the cost to Tenant of any improvements" shall mean the actual cost to Tenant of making such improvements less any contribution thereto or reimbursement thereof made by Landlord to Tenant, including, without limitation, reimbursement effected by deductions from Rent payable under this Lease.

### ARTICLE XI
### INDEMNIFICATION

### 11.1   Landlord's Insurance

Landlord shall maintain "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring the Shopping Center Buildings, Common Areas, the Demised Premises and the leasehold improvements, in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions of such property insurance (but only for the lease year then in progress). "Leasehold Improvements" shall include all improvements made by Landlord or Tenant that are permanently affixed to the Demised Premises, including, but not limited to, all lighting, ceiling tiles, partition walls, wall coverings, and floor coverings, but specifically excluding all of Tenant's Personal Property (whether Tenant's Personal Property is in the Demised Premises or in the Tenant Service Area).

### 11.2   Tenant's Insurance

Tenant shall either self insure (provided it has a net worth of Fifty Million Dollars ($50,000,000) or more) or maintain, at its expense, from the date Tenant physically occupies the Demised Premises, "All Risk" property insurance at least as broad as the Insurance Services Office's Causes of Loss Special Form, insuring all of its movable personal property within the Demised Premises including, but not limited to, Tenant's trade fixtures, inventory, merchandise, equipment, furnishings, drapes, and any other items of Tenant's personal property not permanently affixed to the Demised Premises ("Tenant's Personal Property") in an amount equal to one hundred percent (100%) of the full replacement cost thereof and so as to prevent the application of co-insurance provisions. Tenant may carry such insurance under so-called "blanket" policies covering other of Tenant's properties, and such insurance may have commercially reasonable deductible amounts deemed prudent by Tenant if Tenant has met the net worth criteria set forth above.

### 11.3   Liability Insurance

Each Party shall, for the benefit of the other and Landlord's mortgagee (Landlord shall name Tenant as additional insured and Tenant shall name Landlord and Landlord's mortgagee as additional insured), maintain commercial general liability insurance in an amount of not less than One Million Dollars ($1,000,000) combined single limit for bodily injury and property damage per occurrence and have an aggregate of not less than Five Million Dollars ($5,000,000) and such insurance may be satisfied by so called "blankets" or "umbrella" policies. Landlord and Tenant shall also provide umbrella coverage in an amount not less than Ten Million Dollars ($10,000,000). As long as Tenant has a net worth of Fifty Million Dollars ($50,000,000) or more, commercially reasonable deductibles shall be acceptable to Landlord and its mortgagee(s). As of the date of this Lease a commercially reasonable deductible shall be One Hundred Thousand Dollars ($100,000).

### 11.4   Waiver of Subrogation

Each Party, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against the other Party and such Party's agents and invitees for any liability arising out of any loss or damage in or to the Demised Premises, its contents and the Property caused by: (i) any peril normally covered under "All Risk" Special Form policies described in Article 11 (whether or not such Party actually carries such insurance policies); or (ii) if the scope of coverage is broader than in (i) above, then any peril actually covered under the property insurance maintained by such Party. This release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of the other Party or such Party's agents or invitees and shall not be affected or limited by the amount of insurance proceeds available to the waiving Party, regardless of the reason for such deficiency in proceeds. If one Party's insurance carrier prohibits waiver of subrogation, then each Party's release and waiver shall become null and void as each waiver is given in consideration for the other. Each Party covenants that, from and after Delivery Date, its insurance policies will contain waiver of subrogation endorsements, and, if such endorsements for any reason are about to become unavailable, it will give the other Party not less than thirty (30) days' prior written notice of such impending unavailability.

### 11.5   General Requirements

All policies of insurance required to be maintained by Landlord or Tenant shall be issued by insurance companies having an adjusted policy holder's surplus of at least Two Hundred Fifty Million Dollars ($250,000,000.00) and authorized to do business in the state in which the Demised Premises is located. All policies of insurance shall include a written undertaking from the insurer to notify all insureds and additional insureds at least ten (10) days' prior to cancellation for nonpayment of premiums, and at least thirty (30) days' prior to cancellation for any other reason. Either Party may provide any insurance

required hereunder under so-called blanket policies covering other parties and locations so long as the coverage required hereunder is not diminished. Furthermore, upon request, either Party shall furnish the other with a certificate of insurance evidencing any such policy.

### 11.6   Indemnification

Subject to Section 11.4, each Party (in the capacity of "Indemnitor") hereby agrees to indemnify, defend and hold the other (in the capacity of "Indemnitee") harmless from and against all costs, expenses, claims, suits, causes of action, liabilities, losses, injuries and damage, including, without limitation, reasonable attorneys' fees and costs (collectively, "Indemnified Costs") relating to or resulting from bodily injuries, including death, and from injury or destruction of tangible property occurring on the Demised Premises or in other portions of the Shopping Center, the Property or on other adjoining property owned or controlled by Landlord and arising out of such Indemnitor's acts or omissions or use thereof except to the extent caused by the negligent or intentional act or omission of the Indemnitee or its Agents or other tenants. The Indemnitor shall be promptly notified of any suits, proceedings, claims or demands for which the Indemnitee requests indemnification. The Indemnitor shall have the right to assume the entire control of the defense thereof and the Indemnitee shall cooperate fully with the Indemnitor in such defense.

### ARTICLE XII
### DEFAULT

### 12.1   Tenant's Default.

It shall be a default under this Lease: (a) if Tenant shall fail to pay Rent or other amounts due ("monetary default"); or, (b) if Tenant fails to perform any other term, covenant or condition of this Lease ("non-monetary default"). If Tenant shall fail to pay Rent or other amounts due to Landlord as provided for in this Lease, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the rate which is the prime rate as stated in the Wall Street Journal plus two percent (2%) or the maximum interest rate permitted by law (the "Default Rate"), if less.

### 12.2   Landlord's Remedies.

In the event Tenant does not cure (i) a monetary default provided in Clause (a) of Section 12.1 within ten (10) days after written notice thereof from Landlord provided, that Landlord shall have no obligation to provide such notice more than two (2) times in any twelve (12) month period or (ii) in the event Tenant does not cure a non-monetary default provided in Clause (b) of Section 12.1 within thirty (30) days after written notice thereof from Landlord to Tenant or if such default cannot by its nature be cured within such thirty (30) day period and Tenant shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence, Landlord shall be entitled to the following remedies (in addition to any other rights or remedies at law or in equity):

(a)   Landlord may, at Landlord's election, terminate this Lease such termination to be effective thirty (30) days after notice thereof to Tenant. All Tenant's rights in the Demised Premises (and in and to the Tenant Service Area) shall terminate upon the termination of this Lease. Upon the termination, Tenant shall surrender and vacate the Demised Premises and Landlord may re-enter and take possession of the Demised Premises. In the event of such termination, Tenant covenants to pay to Landlord all sums which are due and payable through the date of such termination. In addition, Tenant shall be liable for the cost to relet the Demised Premises, which shall include repair, brokerage fees, advertising, and attorney's fees as long as all costs are reasonable and necessary in Landlord's reasonable business judgment. Landlord shall, in such instance, use reasonable efforts to mitigate damages; or

(b)   Landlord may, at Landlord's election, pursuant to applicable summary proceedings or other judicial process, re-enter the Demised Premises, and without

23

110100

terminating this Lease, at any time thereafter, relet the Demised Premises and improvements, or any part(s) of them, for the account, and in the name of Tenant or otherwise, all upon the best rates readily available. Landlord shall in such instance use reasonable efforts to mitigate damages. Any reletting may be for the remainder of the term or for any longer or shorter period (provided, however, that if Landlord enters into a new lease beyond the current term of this Lease, then Tenant shall only be responsible hereunder through the current term of this Lease). Landlord may execute any leases made under this provision in Landlord's name, and Landlord shall be entitled to all rents from the use, operation or occupancy of the Demised Premises or improvements, or both. Landlord shall have the further right, at Landlord's option, to make such reasonable and necessary alterations, repairs, replacements and/or restorations which shall not operate or be construed to release Tenant from liability hereunder. Tenant shall nevertheless pay to Landlord on the due dates specified in this Lease the equivalent of all sums required of Tenant under this Lease, plus Landlord's expenses set forth in Section 12.2(a) above, less amounts received from successor tenants. No act by or on behalf of Landlord under this provision shall constitute a termination of this Lease unless Landlord gives Tenant written notice of termination.

(c)  If Tenant shall default in the performance of any of its obligations under this Lease, Landlord, without thereby waiving such default, may (but shall not be obligated to) perform the same for the account and at the expense of Tenant, without notice in a case of emergency, and in any other case only if such default continues after the expiration of any applicable notice and cure period(s) set forth herein. Any reasonable expenses incurred by Landlord in connection with any such performance and all sums advanced by Landlord on account of Tenant under this Section shall be and constitute Additional Rent and be due and payable upon Landlord's demand therefor.

(d)  It shall also be an event of default entitling Landlord to the aforesaid remedies if an involuntary case under the federal bankruptcy law as now or hereafter constituted is commenced against Tenant, or under any other applicable federal or state bankruptcy, insolvency, reorganization or other similar law, or there is filed against Tenant a petition seeking the appointment of a receiver, liquidator or assignee, custodian, trustee, sequestrator (or similar official) for Tenant or any substantial part of Tenant's property, or seeking the winding-up or liquidation of Tenant's affairs and such involuntary case or petition is not dismissed within thirty (30) days after the filing thereof, or if Tenant commences a voluntary case or institutes proceedings to be adjudicated as bankrupt or insolvent or consents to the entry of an order for relief under the federal bankruptcy laws as now or hereafter constituted or any other applicable federal or state bankruptcy or insolvency or other similar law, or consents to the appointment of or taking possession by a receiver or liquidator or assignee, trustee, custodian, sequestrator (or other similar official) of Tenant or of any substantial part of Tenant's property, or if Tenant makes any assignment for the benefit of creditors.

## 12.3  Default by Tenant's Assignee.

Notwithstanding anything to the contrary contained in Article XII or elsewhere in this Lease, after any assignment of Tenant's interest in this Lease in which the original Tenant named herein is not released from liability hereunder, Landlord shall not exercise any rights or remedies under this Article XII on account of any default in payment of any Rent or other sum of money unless Landlord shall give: (i) notice to Tenant named herein, as well as the tenant in possession, of such default; and, (ii) the opportunity to both Tenant named herein as well as the tenant in possession  to cure each such default within the applicable period of time provided in Section 12.2 above. After such notice, if the term of this Lease shall be terminated pursuant to the provisions of this Article XII, the Tenant named herein shall not be liable for the payment of any Rent or for the performance or observance of any agreements or conditions to be performed or observed after the date of such termination unless Tenant shall cure any defaults and execute a new lease for the balance of the term of this Lease on the same terms and conditions provided for herein.

## 12.4  Landlord's Waiver of Lien in Favor of Financing Company.

(a) Landlord shall not have any lien for the failure of performance of any obligations of Tenant upon any fixtures, machinery, equipment, goods, wares, merchandise or other personal property, and Landlord hereby expressly waives the provisions of any law giving to Landlord such a lien.

(b) Furthermore, Landlord has contemporaneously with the execution of this Lease, executed a Landlord's Waiver and License Agreement, attached hereto as Exhibit F, in favor of General Electric Capital Corporation, as agent for certain lenders ("GE"), pursuant to which Landlord has agreed that so long as Tenant shall have granted a security interest in its fixtures, machinery, equipment, goods wares, merchandise or other personal property ("Collateral") to GE; (i) Landlord shall not have any lien, for the performance of any obligations of Tenant, and (ii) Landlord hereby expressly waives the provisions of any law giving to Landlord such a lien. Landlord further agrees to execute additional similar landlord's waivers in accordance with (i) and (ii) above upon Tenant's request in favor of such other financing institutions which may have an interest in the Collateral upon substantially similar terms as those contained in Exhibit F .

12.5 Landlord's Successor.

If any person to whom Tenant shall not then be paying Rent under this Lease shall demand payment of Rent from Tenant or any other amount payable by Tenant under this Lease alleging his or its right to receive such Rent or other amount as a result of a transfer of Landlord's interest in this Lease or otherwise, Tenant shall not be obligated to honor such demand unless Tenant shall receive written instructions to do so from Landlord, the person to whom Tenant shall then be paying Rent or shall otherwise receive written evidence from Landlord satisfactory to Tenant of the right of the person making the demand. The withholding of Rent or the payment of Rent to Landlord (the person or entity to whom Tenant shall then be paying Rent) or any other amount payable by Tenant under this Lease by Tenant pending the determination of the right of the Party making the demand shall not be deemed to be a default on the part of Tenant.

### ARTICLE XIII
### SELF-HELP

13.1 Landlord's Right to Self-Help.

If Tenant shall default in the performance or observance of any agreement or condition contained in this Lease to be performed or observed by Tenant, other than an obligation to pay Rent or other amounts due to Landlord under this Lease, and shall not cure such default within thirty (30) days after notice from Landlord specifying such default (or if such is a default that cannot by its nature be cured within such thirty [30] day period, and Tenant shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Landlord may without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant agrees to reimburse Landlord therefor plus interest at the Default Rate within fifteen (15) days after receiving a bill therefor accompanied by invoices or other documentation to substantiate the amount paid on the account of Tenant. Landlord may cure any such default as aforesaid prior to the expiration of said thirty (30) day period, but after notice to Tenant, if the curing of such default prior to the expiration of said thirty (30) day period is reasonably necessary to protect the Shopping Center or Landlord's interest therein or to prevent injury or damage to persons or property. If Tenant shall fail to reimburse Landlord within thirty (30) days for any amount paid for the account of Tenant hereunder, such amount shall be added to and become due as part of the next payment of Rent due to Landlord hereunder.

13.2 Tenant's Right to Self-Help.

If Landlord shall default in the performance or observance of any agreement or condition contained in this Lease to be performed or observed by Landlord or if Landlord shall default in the payment of any tax or other charge which shall be a lien upon the Demised Premises or in the payment of any installment of principal or interest upon any

110200

mortgage which shall be prior in lien to the lien of this Lease and for which Tenant shall not have received a subordination, non-disturbance and attornment agreement in the form required herein, and if Landlord shall not cure such default within thirty (30) days after written notice from Tenant specifying such default (or if such is a default that cannot by its nature be cured within such thirty (30) day period, and Landlord shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor plus interest at the Default Rate and Tenant shall provide documentation to substantiate the amount paid on the account of Landlord. Tenant may cure any such default as aforesaid prior to the expiration of said thirty (30) day period, but after notice to Landlord, if the curing of such default prior to the expiration of said thirty (30) day period is reasonably necessary to protect the Demised Premises and the Tenant Service Area or Tenant's interest therein or to prevent injury or damage to persons or property or to Tenant's business. If Landlord fails to pay any such amount to Tenant within thirty (30) days of Tenant billing Landlord therefor, Tenant shall have the right to (a) set off such amount against up to thirty (30) percent of the future monthly payments of Rent until Tenant is fully reimbursed for such amount, and (b) set off all post-judgment or undisputed amounts due against future payments of Rent until Tenant is fully reimbursed (and in either event if Tenant cannot so reimburse itself prior to the expiration of the term of this Lease (including Extension Period[s]), the term of this Lease shall automatically extend (at the same Rent as owed immediately prior to the expiration of the term of this Lease) for the period of time necessary to allow Tenant to be fully reimbursed).

## ARTICLE XIV
## COMMON AREAS

### 14.1 Right to Use Common Areas.

Landlord grants to Tenant, its agents, employees, customers, invitees, licensees and concessionaires the non-exclusive right during the term of this Lease to use the Common Areas. Tenant's use of the Common Areas shall be in common with others entitled to the use thereof and subject to the provisions of this Lease. Tenant and all persons having business with Tenant shall have the right to use, in common with all other occupants of the Shopping Center and all persons having business with such other occupants, and no other persons, all Common Areas of the Shopping Center, for parking and access in connection with business with the occupants leasing space in buildings in the Shopping Center, and for no other purpose.

### 14.2 Landlord's Management of Common Areas.

Landlord shall operate, manage, equip, light, repair, clean, maintain and replace the Common Areas in a good and serviceable condition for their intended purposes in the manner described in Exhibit J and such Common Areas shall at all times be subject to the exclusive control and management of Landlord. Landlord may, at any time, temporarily close all or any part of the Common Areas to make repairs or changes, to prevent the acquisition of public rights in the Common Areas and to perform such other acts in or to the Common Areas to improve the benefit thereof to Tenant and other occupants of the Shopping Center as Landlord in its reasonable discretion shall deem appropriate. Landlord shall use reasonable efforts to arrange any temporary closing of the Common Areas at such times and in such manner as to minimize interference with or disruption of the conduct of Tenant's business in the Demised Premises.

### 14.3 Charges for Common Area Maintenance.

Tenant shall pay its pro-rata share (as hereinafter defined) of Landlord's actual reasonable and commercially competitive annual cost (as determined on a calendar year basis) of CAM (as hereinafter defined). CAM shall include the reasonable costs and expenses paid or incurred in cleaning, repairing, insuring, and maintaining the Common Areas, including such lighting facilities; curbs, walkways, parking lot patching; security;

trash collection; snow and ice removal; gardening and landscaping; striping of Parking Areas; reasonable depreciation or amortization of, or rents for the equipment used in the operation of Common Areas; annual premiums for insurance required to be maintained by Landlord hereunder; wages, worker's compensation, unemployment taxes and Social Security taxes of employees directly and actually performing the above described services; (provided however, if such persons perform services for more than one shopping center, such wages, workmen's compensation, unemployment taxes and Social Security taxes shall be allocated between the Shopping Center and such other shopping centers, and Tenant shall be obligated to contribute only to the portion allocated to the Shopping Center); fees and assessments imposed by any documents of record; and in lieu of Landlord's profits, administrative fees and overhead costs, Landlord shall be permitted to charge an amount ("Management Fee") computed by multiplying the CAM Costs (exclusive of Insurance Costs, utility charges and the portion of single purpose expenditures that exceed $25,000.00) by seven percent (7%) (the parties acknowledge that the repair or replacement of the roof is not included in CAM). "Insurance Costs" shall mean annual premiums for all insurance required to be obtained by Landlord under this Lease. Tenant's pro rata share incurred by Landlord for CAM for the Shopping Center shall be no greater than _____%.

The following items shall be specifically excluded from CAM and from any other costs, by whatever name called in this Lease, for which Tenant is liable to reimburse Landlord:

(a) all costs incurred in connection with or related to the acquisition of the land comprising the Shopping Center;

(b) all costs incurred in connection with or related to the original construction (as distinguished from operation and maintenance) of the Shopping Center (including the Common Areas) and/or any replacement or expansion of the buildings in the Shopping Center (including the Common Areas);

(c) all principal, interest and/or ground rent payments on any financing, refinancing or ground lease for all and/or any portion of the Shopping Center;

(d) all costs of correcting defects in or inadequacy of the initial design or construction of the buildings and Common Areas of the Shopping Center, or repair and replacement of any of the original materials or equipment required as a result of such defects or inadequacies;.

(e) all costs and expenses incurred as a result of any act, omission, default or negligence of the Landlord, its agents, servants or employees, and any costs and expenses incurred as a result of Landlord's failure to use reasonable efforts to minimize expenses to the extent possible without detracting from the standards of a first class retail Shopping Center;

(f) all costs and expenses incurred as a result of any act, omission, default or negligence of any other tenants in the Shopping Center, including their agents, servants or employees;

(g) any reserves for anticipated future expenses, capital or otherwise, which would be incurred subsequent to the then current calendar year;

(h) all legal and other fees, leasing commissions, advertising expenses and other costs incurred in connection with the original development or original leasing of the Shopping Center and/or any re-leasing of all or any part of the Shopping Center;

(i) any items for which Landlord is reimbursed by insurance or otherwise compensated, including direct reimbursement by any tenant or occupant of the Shopping Center;

(j)    any bad debt loss, rent loss, or reserves for bad debts or rent loss;

(k)    all costs and expenses of repair or restoration to any portion of the Shopping Center that is (i) damaged or destroyed by a fire or other casualty and/or (ii) taken by eminent domain or conveyance of title in lieu thereof;

(l)    the cost and any depreciation or amortization thereof of any improvements, alterations, additions, changes, replacements, repairs to buildings in the Shopping Center except as to the Common Areas which shall include parking lot repaving after the seventh (7th) lease year of the term but never more than once every seven (7) years (and shall not include parking lot replacement); the cost and any depreciation or amortization thereof of any fixtures and equipment and other items which, under generally accepted accounting principles consistently applied as pertaining to the real estate industry, are properly classified as capital expenditures, except that reasonable depreciation or amortization of moveable machinery and equipment used to maintain the Common Areas of the Shopping Center which shall include the cost or portion thereof reasonably allocable to such maintenance over such period as Landlord shall reasonably determine shall be included in CAM;

(m)    all costs and expenses of providing or performing improvements, work, repairs and/or replacements within or to any leased and/or leasable premises in the Shopping Center, or within or to any other portion of the Shopping Center that is not part of the Common Areas, at any time;

(n)    all interest or penalties incurred as a result of Landlord's late payment of any tax, bill, invoice or other cost or expense as the same shall become due except to the extent caused by Tenant's default on payment of its portion of such expense;

(o)    the costs of renting or leasing any item if the purchase price (or depreciation thereon) would not properly be included as a reimbursable expense hereunder;

(p)    any and all costs associated with the operation of the business of the entity which constitutes Landlord; it is intended by this exclusion to distinguish such costs from the costs of operation and maintenance of the Shopping Center. Excluded items shall specifically include, but shall not be limited to, all costs and expenses related to or incurred in connection with: formation of the entity; leasing of the Shopping Center including consulting and marketing fees, advertising costs, renovation costs, and brokerage commissions; internal accounting and legal matters, including but not limited to preparation of tax returns and financial statements and gathering of data therefor; the institution by or against Landlord of any legal action or proceeding related to or involving the Shopping Center or any mortgages or tenant thereof, including rent collection and eviction proceedings; the selling, syndication, financing, mortgaging or hypothecating of all or any of Landlord's interest in the Shopping Center; and all salaries, wages, employment taxes, worker's compensation insurance, fringe benefits and other costs and expenses incurred with respect to any of Landlord's employees and/or officers who are not engaged full-time in the day-to-day operation and maintenance of the Shopping Center (such as, by way of example, real estate personnel of Landlord engaged in leasing activity for the Shopping Center, and all of Landlord's "home office" personnel including executive managers, bookkeepers, accountants, receptionists, clerks, secretaries and the like);

(q)    any fee or charge to the management and/or supervision of the operation of the Common Area, or any part thereof, paid to a third party, commercial management company or similar provider and any administrative charges or

110300

management fees of any kind other than the Management Fee of not more than seven percent (7%) as expressly provided for above;

(r)  all costs, expenses, liabilities, fines, penalties and losses in connection with or related to hazardous materials testing, abatement, remediation, clean-up or removal programs in the Shopping Center;

(s)  all costs and expenses of Landlord's compliance with its repair and maintenance obligations as set forth in this Lease, other than CAM;

(t)  all costs and expenses of putting all or any portion of the Shopping Center into compliance with the requirements of the Americans with Disabilities Act;

(u)  all of Landlord's income, excise, franchise and other taxes; and

(v)  entertainment, transportation, meals and lodging of anyone.

Subject to the provisions of this subparagraph and the last subparagraph of this Section 14.3, Tenant's pro-rata share of CAM due and payable to the Landlord pursuant to the provisions of this Lease shall be an amount that is equal to CAM multiplied by a fraction, the numerator of which shall be the GFLA of the Demised Premises and the denominator of which shall be the gross leasable area of all buildings in the Shopping Center. Notwithstanding the above, in the event any occupant in the Shopping Center provides insurance directly on its parcel or premises or directly performs and pays its full portion of CAM on its parcel or premises (e.g., parking lot lighting, refuse removal, etc.), then the gross leasable floor area of the building(s) occupied by such occupant(s) shall be excluded in determining Tenant's pro-rata share of any such costs; provided, however, the gross leasable floor area of the building(s) occupied by such occupant(s) shall be excluded in determining Tenant's pro-rata share only with respect to the cost paid directly by any such occupant(s). Commencing on the Rental Commencement Date, Tenant shall pay as Additional Rent to Landlord Tenant's pro-rata share of CAM during the term of this Lease for each calendar year or partial calendar year.

Tenant shall pay its pro-rata share of the CAM for each calendar year or partial calendar year during the term of this Lease in monthly installments on the first day of each calendar month, in advance, in an amount estimated by the Landlord. Landlord's estimate shall be made on the basis of the most recent annual CAM (as defined herein above), adjusted to reflect reasonably anticipated increases or decreases of CAM. On an annual basis Landlord shall prepare a statement setting forth in reasonable detail the actual CAM paid or incurred by Landlord in the preceding twelve (12) month period ending December 31, together with copies of invoices, receipts and evidence of payment ("the Annual CAM Statement"). Landlord shall provide to Tenant the Annual CAM Statement not later than ninety (90) days after the end of each calendar year. Thereafter, there shall be an adjustment between Landlord and Tenant with Tenant's payment to Landlord or repayment by Landlord as may be required to the end that Landlord shall receive the entire amount of Tenant's pro rata share of such CAM and not more. Notwithstanding anything contained herein to the contrary, Tenant's pro rata share of CAM for each of the initial partial calendar year (adjusted on a per diem basis) and the first calendar year of the term of this Lease shall be the lesser of: (a) Tenant's actual pro-rata share of CAM; or, (b) One and 00/100 Dollar ($1.00) per square foot of the Demised Premises. Notwithstanding anything contained herein to the contrary, Tenant's charges for CAM shall not be increased in any calendar year by more than Five Percent (5%) over Tenant's charges for CAM for the preceding calendar year (the "CAM Cap Threshold").

Notwithstanding anything contained herein to the contrary, for any period of time included within the term of this Lease that is less than a full calendar year (herein called a "partial calendar year"), Tenant's pro-rata share of CAM for any such partial calendar year shall be equal in amount to Tenant's pro-rata share of CAM for the full calendar year that includes such partial calendar year multiplied by a fraction, the numerator of which shall be the number of days within such partial calendar year and the denominator of which shall be three hundred sixty-five (365).

### 14.4  Tenant's Right to Audit.

Tenant shall have the right at any time within two (2) years from Tenant's receipt of the Annual CAM Statement and, *upon written request to Landlord, at Tenant's expense, to* audit Landlord's books and records relating to CAM and Tenant shall provide Landlord with a copy of the results of the audit.  Tenant's charges shall be adjusted accordingly if such audit discloses any expenses not permitted or provided for under this Lease or that Tenant was charged more than its pro-rata share of CAM.  If Tenant's billings for CAM exceed the actual amount that Tenant should have been billed Landlord shall reimburse Tenant such amount plus interest at the Default Rate.  If Landlord does not reimburse Tenant's overpayment within thirty (30) days after the amount of overpayment is finally determined, then Tenant may elect to deduct such overbillings plus interest at the Default Rate from the next accruing Rent, and/or any other sums and charges due under this Lease until such overbillings are recouped in full.  If the excess is more than three percent (3%) of the amount Tenant should have paid, then Landlord shall also pay Tenant's reasonable costs associated with performing the audit and interest at the Default Rate on the excess until such excess is recouped in full.

### ARTICLE XV
### MORTGAGE SUBORDINATION

### 15.1  Mortgage Subordination.

(a)  Landlord shall, within thirty (30) days of the execution of this Lease, obtain from the current holder of any mortgage upon the Demised Premises a Subordination Non-Disturbance and Attornment Agreement in substantially the form set forth on Exhibit D attached hereto and incorporated herein by reference or other such form reasonably acceptable to Tenant and such mortgage.

(b)  Landlord shall have the right to subject and subordinate this Lease to the lien of any loans or mortgages hereafter placed upon Landlord's interest in the Demised Premises and/or upon the lands and buildings of which the Demised Premises is a part, provided that Landlord shall first secure for Tenant's benefit a written Subordination Non-Disturbance and Attornment Agreement, in substantially the form of Exhibit D or other such form reasonably acceptable to Tenant and Tenant will then execute and deliver an instrument subjecting this Lease to the lien of any such loan or mortgage.

(c)  Upon the failure of Landlord to provide a Non-Disturbance Agreement as required herein to Tenant while the Lease is in effect, Tenant shall have the right to defer fifty percent (50%) of Minimum Rent payable to Landlord until such time as Landlord secures the required Non-Disturbance Agreement for Tenant's benefit.

### 15.2  Senior Lease.

(a)  In the event Landlord herein is the tenant under the terms of any senior lease, Landlord agrees that prior to the commencement of Landlord's Construction Work, it shall secure from any such senior landlord an agreement in the form attached hereto and made a part hereof as Exhibit E whereby such senior landlord, upon default of Landlord herein or upon termination of Landlord's lease with such senior landlord, and for so long as Tenant herein shall not be in default, shall not deprive or disturb Tenant's use and possession of the Demised Premises so long as Tenant attorns to such senior landlord which Tenant hereby agrees to do.

(b)  Upon the failure of Landlord to provide Non-Disturbance Agreement as required herein to Tenant while the Lease is in effect, Tenant shall have the right to pay monthly, in lieu of Rent payable hereunder, Substitute Rent (as defined in Section 1.5 hereof) until such time as Landlord secures the required Non-Disturbance Agreement for Tenant's benefit.

### 15.3  Landlord's Failure to Pay Mortgage.

If Landlord shall default in making payment under any mortgage or mortgages encumbering the Demised Premises, or if Landlord is in breach or in default of any such mortgage or mortgages in any respect, Tenant shall have the right but not the duty to make all rental payments thereafter becoming due under this Lease to such mortgagee in lieu of Landlord, and payments so made shall discharge the obligation of Tenant hereunder respecting the payment of Rent provided Tenant receives notice from Landlord granting such right. Should Landlord, in connection with the mortgaging of the Shopping Center or any tract of which the Demised Premises is a part, execute a conditional assignment of rentals, Tenant will *execute an acceptance of such assignment, provided the assignment recognizes Tenant's rights hereunder.*

## ARTICLE XVI
## ASSIGNMENT, RECAPTURE, AND USE

16.1  Assignment and Subletting.

(a)      Tenant shall be entitled to assign this Lease or sublet all or any part of the Demised Premises without Landlord's consent:

(ii)      to parent, subsidiary or affiliate of Tenant;

(iii)     to the successor to Tenant in the reorganization, consolidation or merger of Tenant or the purchaser of all or substantially all of the stock or assets of Tenant; or

(iii)     to a Permitted Retailer, a "Permitted Retailer" shall mean an operator of a first class retail business (as permitted under Section 16.4 hereof) recognized as a national or regional tenant, and having sufficient financial strength to successfully operate its business;

provided (A) Tenant shall not be released from liability under the Lease; (B) Tenant shall deliver prior written notice to Landlord of any assignment of this Lease or subletting of the Demised Premises; and, (C) any such assignee or sublessee agrees in writing with a copy to Landlord to assume Tenant's obligations under this Lease and be bound by this Lease.

If Tenant intends to assign this Lease to Permitted Retailer under subsection (iii) above, Tenant shall give Landlord written notice of such intention specifying the identity of the permitted Retailer. Landlord shall have fifteen (15) days after receipt of such notice of a proposed assignment to a Permitted Retailer within which Landlord may terminate this Lease and recapture the Demised Premises pursuant to the terms specified in 16.2, and thereafter, neither Landlord nor Tenant shall have any obligations hereunder accruing from and after the effective date of such termination except as expressly provided in this Lease. Landlord's right to terminate shall not apply if the intended assignment to a Permitted Retailer is part of a sale of at lease three (3) of Tenant's stores.

Tenant further acknowledges and agrees that it shall not sublease or otherwise subdivide the Demised Premises into more than two (2) spaces at any time during the term of this Lease.

(b)      In connection with any assignment of this Lease under Section 16.1(a)(iii), no consent from Landlord shall be necessary, tenant shall be released from any liability to Landlord hereunder from and after the effective date of such assignment without the need for any documentation from Landlord and Landlord shall have no right to recapture pursuant to Section 16.1(a) provided such assignee:

(ii)      has a tangible net worth which equals or exceeds Eighty Million and 00/100 Dollars ($80,000,000.);

(iii)     is then also an operator of, or owned by an entity operating, a chain of at least ten (10) retail stores and has a retail operating history of at least five (5) years; and

31

acknowledges and assumes all of Tenant's responsibilities and obligations under this Lease.

(c)    An initial public offering subsequent to which all or a portion of Tenant's stock will be sold or traded on a nationally recognized stock exchange or on the "over the counter" market or the sale of Tenant's stock on a nationally recognized stock exchange or over the counter market shall be deemed not an assignment for the purposes of this Lease and nothing in this Article XVI shall be applicable to, nor prohibit such transaction.

16.2  Recapture Right of Landlord.

If Tenant elects to cease its business operations at the Demised Premises and such cessation is for reasons other than fire and casualty, force majeure, compliance with laws, or repairs, remodeling and renovation and Tenant continues to meet all its obligations under the Lease except for any obligations that could only be met while operating the Demised Premises and such cessation continues for more than one year or Tenant fails to assign this Lease pursuant to Section 16.1 and such assignee is not open and operating in the Demised Premises prior to the one year period, then Landlord shall have the option of recapturing the Demised Premises at anytime thereafter subject to Landlord giving written notice of such recapture to Tenant thirty (30) days in advance.  If Landlord exercises such right of recapture, upon the date of recapture Tenant shall be relieved of and from any and all further liability or obligations pursuant to this Lease and to Landlord thereafter accruing. Furthermore on or before the date of such termination, Landlord shall reimburse Tenant for the unamortized value of leasehold improvements installed by Tenant.  If Landlord fails to exercise such right of recapture within thirty (30) days of the one year period then such right to recapture shall continue thereafter, but Tenant may cancel such right upon receipt of the written notice by reopening for business within the thirty day recapture notice period, or by Tenant's assignee opening within such period.

16.3  . Intentionally Deleted

16.4  Use of the Premises.

Tenant agrees that the Demised Premises shall be used for any retail purpose or for no purpose, and for no other purpose. Tenant further agrees that the Demised Premises shall not be used for any use which violates or conflicts with the Declaration of Lincoln Plaza Prohibited and Restricted Uses recorded October 4, 2000.  Landlord agrees that the Demised Premises shall not be restricted during the term of this Lease from the sale of sporting goods and sporting equipment, apparel or athletic footwear.

## ARTICLE XVII
## INTERPRETATION

17.1  Severability.

It is agreed that if any provision of this Lease or the application of any provision hereof to any person or any circumstance shall be determined to be invalid or unenforceable, such determination shall not affect any other provisions of this Lease or the application of such other provision to any other person or circumstance, and all of such other provisions shall remain in full force and effect.  It is the intention of the parties hereto that if any provision of this Lease is capable of two constructions, one of which would render the provision valid, the provision shall have the meaning which renders it valid.

17.2  Successors and Assigns.

The words "Landlord" and "Tenant" and the pronouns referring thereto, as used in this Lease, shall mean, where the context requires or permits, the persons named herein as Landlord and as Tenant, respectively, and their respective heirs, legal representatives, successors and assigns, irrespective of whether singular or plural, or masculine, feminine or neuter. The agreements and conditions in this Lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord and its successors and assigns and shall inure to the benefit of Tenant and its successors and assigns, and the agreements and

(10300)

conditions in this Lease on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns. If Landlord shall be more than one person or entity, the obligations of Landlord hereunder shall be joint and several.

(a)     In the event Landlord's interest in the Demised Premises passes to a Successor (the "Successor") by sale, lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the term (and any Extension Period[s]) with the same force and effect as if the Successor were the Landlord under the Lease, and Tenant hereby agrees to attorn to such Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Demised Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all future obligations to Tenant hereunder arising after the date Landlord's interest so passes;

(b)     The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Shopping Center and Tenant agrees to look solely to Landlord's interest in the Shopping Center (and the proceeds of sale, insurance, and condemnation awards) for the recovery of any judgment from the Landlord, it being intended that neither Landlord nor any partner, shareholder, member, officer, director, etc. of Landlord shall be personally liable for any judgment or deficiency.

### 17.3   Force Majeure

Provided (i) the delayed Party has periodically kept the other party hereto fully advised by notice of such delays and the cause thereof and (ii) the delayed party uses best efforts and all due diligence to effect the required performance, in any case where either party hereto is required to do any act, such delays caused by or resulting from an Event of Force Majeure shall not be counted in determining the time when the performance of such act must be completed, whether such time be designated by a fixed time, a fixed period of time or "a reasonable time." The provisions of this Section 17.3 shall not be applicable with respect to payment of money or to obligations under Article II. For the purposes hereof, an "Event of Force Majeure" shall be defined as the occurrence of any of the following: Act of God, war, civil commotion, fire or other casualty, extreme weather conditions not predictable in the normal course of work scheduling, strikes, lockouts and the inability to procure labor or materials or reasonable substitutes, uncontrollable governmental interference or other causes beyond the reasonable control of such Party, its agents, employees, contractors or subcontractors (other than causes related to such Party's financial condition.)

### 17.4  Holding Over.

If Tenant or any person claiming under Tenant shall remain in possession of the Demised Premises or any part thereof after the expiration of the term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, the person remaining in possession shall, prior to acceptance of Minimum Rent by Landlord, be deemed a tenant at sufferance, and, after acceptance of Minimum Rent by Landlord, the person remaining in possession shall be deemed a tenant from month-to-month subject to the provisions of this Lease insofar as the same may be made applicable to a tenancy from month-to-month subject to the provisions of this Lease with Minimum Rent at one hundred twenty five percent (125%) of the Minimum Rent during any holdover period.

### 17.5  Waivers.

Failure of either Party to complain of any act or omission on the part of the other Party, no matter how long the same may continue, shall not be deemed to be a waiver by such Party of any of its rights hereunder. No waiver by either Party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision. If any action by either Party shall require the consent or approval of the other Party, the other Party's consent to or approval of such action on any one or more

occasions shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion. Any and all rights and remedies which either Party may have under this Lease or by operation of law, either at law or in equity, upon any breach shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other, and no one of them, whether exercised by such Party or not, shall be deemed to be in exclusion of any other. Any two or more or all of such rights and remedies may be exercised at the same time. Without limiting the generality of the foregoing, if any restriction contained in this Lease for the benefit of either Party shall be violated, such Party, without waiving any claim for breach of agreement against the other Party, may bring such proceedings as it may deem necessary, either at law or in equity, in its own name or in the name of the other Party, against the person or entity violating such restriction.

### 17.6  Disputes.

It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other Party under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", such payment not being regarded as a voluntary payment, and there shall survive the right on the part of such Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of such Party to pay such sum or any part thereof, such Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease. If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the Party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", the performance of such work in no event being regarded as a voluntary performance, and there shall survive the right on the part of such Party to institute suit for recovery of the cost of such work. If it shall be adjudged that there was no legal obligation on the part of such Party to perform the same or any part thereof, such Party shall be entitled to recover the cost of such work or the cost of so much thereof as such Party was not legally required to perform under this Lease. If at any time a good faith dispute shall arise as to any amount to be paid by Tenant pursuant to Article XIV of this Lease and if Tenant shall give notice to Landlord thereof, the failure of Tenant to pay such disputed amount until resolution of such dispute shall not be deemed a default by Tenant under this Lease for purposes of Section 12.1 hereof. Any amount not in dispute shall be paid as set forth in this Lease.

### 17.7  Quiet Enjoyment.

Landlord agrees that upon Tenant's payment of Rent and performing and observing the agreements and conditions on its part to be performed and observed hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy the Demised Premises and all rights of Tenant hereunder during the term of this Lease without any manner of hindrance or molestation.

### 17.8  Notices.

Any notice, consent or approval provided for herein shall be deemed duly given by the sender thereof to the addressee thereof only if in writing and mailed to such addressee at the "Notice Address" of such addressee (as set forth below) by registered or certified mail, postage prepaid, return receipt requested, or by Federal Express, Airborne or other overnight courier service which delivers upon signed receipt of the addressee. The time of the giving of any such notice given in the manner required above shall be the time of receipt thereof by the addressee or any agent of the addressee, except that if the addressee or such agent of the addressee shall refuse to receive any such notice given in the manner required or if there shall be no person available at the time of delivery thereof to receive such notice, the time of the giving of such notice shall be the time of such refusal or the time of such attempted delivery, as the case may be.

The Notice Address of Landlord shall be:

29 Sutherland Road

Worcester, MA
Attention: Sam Adams
Fax #: 508-754-3256

The Notice Address of Tenant shall be:                          with a copy to:

Dick's Sporting Goods, Inc.                         Benjamin J. Viloski, Attorney at Law
200 Industry Drive                                    Benjamin J. Viloski, Esquire
Pittsburgh, PA  15275                             Shopping Center Law Associates
Attention: Senior Vice President                       Park West One Building
Fax #: 412-809-0725                             1000 Cliff Mine Road, Suite 530
                                                    Pittsburgh, PA  15275

If the sender of any notice to any addressee shall have previously been given notice by said
addressee of a change of address of said addressee, such changed address shall thereafter, as
to such sender, be deemed the Notice Address of such addressee.

17.9  Cost and Expense.

        Wherever in this Lease provision is made for the doing of any act by any person it is
understood and agreed that such act shall be done by such person at its own cost and
expense unless a contrary intent is expressed.

17.10  Hazardous Materials.

    (a)    Definitions.

    (i)    "Environmental Laws" – All present and future federal, state and municipal
           laws, ordinances, rules and regulations applicable to the environmental and
           ecological condition of the Demised Premises and the Shopping Center, if
           applicable, including, without limitation, the Federal Comprehensive
           Environmental Response, Compensation and Liability Act of 1980, as
           amended; the Federal Resource Conservation and Recovery Act; the Federal
           Toxic Substance Control Act; the Clean Air Act; the Clean Water Act; the
           rules and regulation of the Federal Environmental Protection Agency, or any
           other federal, state or municipal agency or governmental board or entity
           having jurisdiction over the Demised Premises.

    (ii)   "Hazardous Substances" – includes:

        (A)    Those substances (in actionable levels only) included within the
               definitions of "hazardous substances," "hazardous materials," "toxic
               substances" "solid waste" or "infectious waste" in any of the
               Environmental Laws; and

        (B)    such other substances, materials and wastes (in actionable levels
               only) which are or become regulated under applicable local, state or
               federal law, or which are classified as hazardous, toxic or infectious
               under Environmental Laws.

    (b)    Tenant, at its sole cost and expense, shall promptly comply with the
Environmental Laws which shall impose any duty upon Tenant with respect to the use,
occupancy or maintenance of the Demised Premises.  Tenant shall promptly comply with
any notice from any source issued pursuant to the Environmental Laws pertaining to
Tenant's use, occupancy or maintenance of the Demised Premises, whether such notice shall
be served upon Landlord or Tenant.

    (c)    Tenant shall not cause or permit to occur:

    (i)    any violation of the Environmental Laws related to environmental conditions
           on, under, or about the Demised Premises, or arising from Tenant's use,

occupancy or maintenance of the Demised Premises, including soil and ground water conditions; and

(ii)    the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances (actionable levels) on, under or about the Demised Premises, or the transportation to or from the Demised Premises of any Hazardous Substances, except as necessary and appropriate for general use in which case the use, storage or disposal of such Hazardous Substances shall be performed in compliance with the Environmental Laws and the highest standards prevailing in the industry.

(d)    Tenant shall immediately notify Landlord of (i) any violation by Tenant, its employees, agents, representatives, customers, invitees or contractors of the Environmental Laws on, under or about the Demised Premises, or (ii) the presence or suspected presence of any Hazardous Substances on, under or about the Demised Premises and shall immediately deliver to Landlord any notice received by Tenant relating to (i) and (ii) above from any source.

(e)    Tenant shall execute affidavits, representations and the like from time to time, within ten (10) days of Landlord's request therefor, concerning Tenant's best knowledge and belief regarding the presence of any Hazardous Substances on, under or about the Demised Premises.

(f)    Upon reasonable belief that Hazardous Substances are present (in actionable levels) in, under or about the Demised Premises and upon advance notice (except in the case of emergency when no notice shall be required), Landlord and its agent shall have the right, but not the duty, (unless it is reasonably believed that such Hazardous Substances first existed prior to the Delivery Date or originated outside the Demised Premises, in which cases, Landlord shall have a duty) to inspect the Demised Premises and conduct tests thereon at any time to determine whether or the extent to which there has been a violation of Environmental Laws by Tenant or whether there are Hazardous Substances on, under or about the Demised Premises. In exercising its rights herein, Landlord shall use reasonable efforts to minimize interference with Tenant's business but such entry shall not constitute an eviction of Tenant, in whole or in part, and Landlord shall not be liable for any interference, loss, or damage to Tenant's property or business caused thereby unless such Hazardous Substances first existed prior to the Delivery Date or originated outside the Demised Premises.

(g)    If Landlord, any lender or governmental agency shall ever require testing to ascertain whether there has been a release or Hazardous Substances on, under or about the Demised Premises or a violation of the Environmental Laws, and such requirement arose in whole or in part because of an act or omission on the part of Tenant, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as Additional Rent otherwise Landlord shall pay for such testing at its sole cost and expense.

(h)    Tenant shall indemnify, protect, defend and hold harmless Landlord and Landlord's managing agent from any and all claims, loss, liability, costs, expenses or damage, including attorneys' fees and costs of remediation, incurred by Landlord in connection with any breach by Tenant of its obligations under this Section 17.10. In the event Tenant is required to undertake remediation activities which damages the Shopping Center (other than Tenant's improvements), Tenant shall be responsible for the cost of replacement of said improvements damaged or destroyed as a result such work. The covenants and obligations of Tenant under this Section 17.10 shall survive the expiration or earlier termination of this Lease.

(i)    Landlord represents and warrants that as of the Delivery Date, the Shopping Center (including the Demised Premises) based on a Phase I by Paragon Environmental dated June 6, 2000, shall not contain any Hazardous Substances and has never been used as a sanitary landfill, waste dumpsite or for the treatment, storage or disposal of Hazardous Substances. Landlord hereby agrees to indemnify, protect, hold harmless and defend Tenant from any liability in connection with: (i) the violation of any Environmental Laws by Landlord; (ii) the presence of any Hazardous Substances at the Shopping Center

(including the Demised Premises) not caused by Tenant or anyone acting by, through or under Tenant; and, (iii) any violation of the obligations of Landlord contained in this Section 17.10. In the event of a finding of any Hazardous Substances at the Shopping Center (including the Demised Premises) not caused by the acts of Tenant, Landlord shall undertake all remediation activities required by law and Landlord shall pay all costs and expenses to complete the remediation. In the event Landlord is required to undertake remediation activities which damages *Tenant's improvements, Landlord shall be responsible for the cost of replacement of said improvements damaged or destroyed as a result of such work.* If it is reasonably necessary for Tenant to cease its business operations due to Landlord remediation efforts, all Rent shall abate until Tenant resumes business operations. *Landlord's representations, warranties and indemnity of Tenant pursuant to this Section shall survive the expiration or termination of this Lease.*

(j)    Remediation activities shall include the investigations of the environmental condition, the preparation and delivery of any notices, studies, or reports, and the performance of any cleanup, disposal, removal, remedial or restoration work.

### 17.11  Tenant's Financial Statements.

*Upon written request by Landlord during the term of this Lease and any extensions thereof,* Tenant shall provide to Landlord on an annual basis, within ninety (90) days following the end of Tenant's fiscal year, a copy of Tenant's most recent financial statements prepared as of the end of Tenant's fiscal year. Notwithstanding the foregoing, in the event that the Tenant becomes a public company, Tenant will, within (30) days request therefor, send Landlord a copy of Tenant's most recent Annual Report filed with the Securities and Exchange Commission.

### 17.12  Headings and Captions.

The marginal notes used as headings for the various provisions of this Lease are used only as a matter of convenience for reference and are not to be considered a part of this Lease or used in determining the intent of the parties to this Lease.

### 17.13  Brokers.

Landlord and Tenant each warrant and represent to the other that it has dealt with no broker or brokers in connection with this Lease other than Jed Hayes of Sullivan Hayes Company and Topsfield Associates ("Broker"). In connection therewith, Landlord agrees to be responsible to pay to Broker any and all leasing or broker commissions, fees and expenses in connection with this Lease pursuant to a separate agreement. Otherwise, each Party shall defend, indemnify and hold harmless the other Party from and against all other leasing or brokerage commissions, fees and expenses, and all claims therefor, in connection with this Lease that are otherwise due to, or made by, any other broker alleging that such broker has dealt with the indemnitor Party in bringing about this Lease.

### 17.14  Relationship of the Parties.

Nothing contained in this Lease shall be deemed or construed by the parties hereto nor by any third Party as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that no provision contained in this Lease, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than Landlord and Tenant.

### 17.15  Memorandum of Lease.

The parties will execute, concurrently with the execution of this Lease, a Memorandum of this Lease in substantially the form as shown on attached <u>Exhibit G</u> and Landlord shall record same at Landlord's expense (including but not limited to all taxes, fees, and charges in connection therewith) with the applicable title registry office and provide Tenant with a copy of the recorded instrument showing filing information within thirty (30) days of the date of recording.

If such Memorandum of Lease shall not have been delivered to Tenant, fully executed and recorded as required herein, within thirty (30) days after the date Landlord receives Tenant's request that Landlord record such Memorandum of Lease, then Tenant shall have the right to: (a) terminate this Lease with no liability to Landlord whatsoever; or (b) pay, in lieu of Rent, Substitute Rent (as defined in Section 1.5 hereof) until such time as Landlord delivers said recorded Memorandum of Lease.

Upon the expiration or earlier termination of this Lease, Tenant agrees to execute a Release of Memorandum of Lease within twenty (20) days after receipt of a request therefor.  If such Release has not been executed after an additional ten (10) days' written notice to Tenant (unless Tenant advises of a dispute pursuant to Section 17.6 or Section 12.2 relating to such Release), Landlord is expressly authorized to execute such Release as the agent and attorney in fact for Tenant.

<u>17.16  Representations and Warranties.</u>

(a)  Landlord warrants and represents to Tenant that:

(i)  on or before the Delivery Date, Landlord shall have good title to the Demised Premises and the Common Areas in fee simple absolute, subject only to the Title Matters, it has full right, authority and financing to make this Lease and to perform as required under this Lease, and this Lease and the use of the Demised Premises for the sale of clothing, sporting goods, sporting equipment and casual and athletic footwear does not conflict with any other agreement to which Landlord is bound or any other covenant, condition or restriction affecting or running with the land of which the Demised Premises and the Shopping Center are a part.  Landlord will furnish to Tenant, upon request, evidence reasonably satisfactory to Tenant of its title and authorization;

(ii)  the Demised Premises are zoned to allow their use as a matter of right for the sale of clothing, sporting equipment, sporting goods, casual and athletic footwear and Tenant's use of the Common Areas of the Shopping Center for access to the Demised Premises, accessory automobile parking, signage (subject to Section 8.4) and service facilities contemplated by this Lease, shall not be prevented or materially impaired by any current zoning, building, health, safety, environmental or other governmental law or regulation, or by any restriction, covenant, lease or agreement entered into, whether of record or not;

(iii)  to the best of Landlord's knowledge and belief there are no claims, causes of action or other proceedings pending or threatened in respect to the ownership, operation or environmental condition of the Shopping Center or any part thereof (including disputes with mortgagees, governmental authorities, utilities, contractors, adjoining land owners or suppliers of goods), except for claims which are fully insured and as to which the insurer has accepted defense without reservation; and,

(iv)  to the best of Landlord's knowledge and belief there is no existing, pending, contemplated, threatened or anticipated: (A) condemnation of any part of the Shopping Center except as disclosed with respect to the proposed widening of Lincoln Street; (B) repaving, widening, change of grade or limitation on use of streets, roads, or highways abutting the Shopping Center; (C) special tax or assessment to be levied against the Shopping Center; (D) change in the zoning classification of the Shopping Center; or, (E) change in the tax assessment of the Shopping Center, except as a result of the Shopping Center redevelopment.

If at any time there is a breach or default of any of Landlord's representations, warranties or agreements under this Section 17.16 which results in deprivation or impairment in any material respect in the use and enjoyment of the Demised Premises, or if for any other reason Tenant shall be deprived of or impaired in the use and enjoyment of the Demised Premises and Common Areas as herein provided, the Rent to be paid by Tenant shall be equitably abated during any such period.  If such period continues for more than

thirty (30) days after notice from Tenant and such additional period as is reasonably necessary to cure same so long as Landlord is pursuing with due diligence, but not longer than ninety (90) days, Tenant may at its option cancel this Lease by notice to Landlord while reserving all rights which Tenant may have for Landlord's breach of the Lease.

(b)   Landlord and Tenant represent and warrant to each other that (i) it is duly organized, validly existing and in good standing in accordance with the laws of the state under which it was organized; (ii) all action necessary to authorize the execution of this Lease has been taken by it; and (iii) the individual executing and delivering this Lease on behalf of each Party has been authorized to do so, and such execution and delivery shall bind Landlord and Tenant.  Each Party, at the other parties' request, shall provide the other with evidence of such authority.

### 17.17  Attorney's Fees.

If any legal action is instituted as a result of a default by either Party under this Lease that is not cured within the applicable grace period, the prevailing Party in such action shall be entitled to recover its reasonable attorney's fees from the non-prevailing Party.

### 17.18  Waiver of Trial by Jury.

Landlord and Tenant mutually, expressly, irrevocably and unconditionally waive trial by jury for any proceedings arising out of or in connection with this Lease, or any conduct or course of dealing of the parties, statements or actions of any person.

### 17.19  This Instrument.

This instrument contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.  This Lease shall not be modified in any way except by a writing subscribed by both parties.

### 17.20  Access.

Landlord shall have access to the Demised Premises at all reasonable times for purposes of making inspections, exercising any cure rights as set forth in Section 13.1 above and showing the Demised Premises to prospective mortgagees or purchasers. Landlord shall give Tenant's manager on duty reasonable advance oral notice before seeking access to the Demised Premises, but in an emergency situation no such notice shall be necessary.

### 17.21  Compactors and Dumpsters.

Tenant shall have the right to place compactors and dumpsters at the location shown on Exhibit A, subject to applicable law and to maintain such compactor/dumpster in clean condition.  If applicable law requires the enclosure of compactors and dumpsters, Tenant shall be responsible, at its expense, for the construction and maintenance of such enclosure.

### 17. 22  Estoppel Certificate.

Within fifteen (15) days after receipt of a request, each Party agrees to deliver to the other a duly executed and acknowledged instrument certifying (i) whether this Lease is in full force and effect (and if not, why), (ii) as to the existence of any default, including the nature or extent of such default, (iii) whether there are any defenses, counterclaims or offsets to such default, (iv) whether there has been any modification or amendment to the Lease, and specifying the nature of such modification, (v) as to the commencement and expiration dates of the term, (vi) as to the date to which Rent has been paid, and (vii) as to such other matters relating to this Lease or the Demised Premises as may be reasonably requested.  Any such certificate may be relied upon by the requesting Party and by any other person to whom it has been exhibited or delivered, and the contents of the certificate shall be binding upon the Party executing the certificate.

### 17.23  Interpretation

"Include," "includes," and "including" mean considered part of a larger group and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to." The necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships, or individuals, men or women, as the case may be, shall in all cases be assumed as though in each case fully expressed.

### 17.24  Break Up Fee

Landlord hereby acknowledges that there are no contingencies that would prohibit Landlord from fulfilling its obligation to construct and deliver the Demised Premises pursuant to Article II and Article III under this Lease to Tenant. If subsequent to the mutual execution of this Lease, Landlord for reasons known or unknown to Tenant, fails to perform its obligation to construct and deliver the Demised Premises on the Delivery Date as set forth in this Lease and Landlord or Tenant terminates this Lease due to Landlord's failure to perform, Landlord shall promptly pay Tenant the sum of Fifty Thousand Dollars ($50,000.00) as a "break up" fee to cover Tenant's expenses in (i) negotiating, reviewing and documenting this Lease, (ii) providing the necessary review to complete Final Plans and (iii) incurring other costs in consummating this Lease including planning to open the Demised Premises in Landlord's Shopping Center. This clause shall become null and void and in no further force and effect upon Tenant's acceptance of the Demised Premises on the Delivery Date. Such amount shall be paid within ten (10) days of any such termination of this Lease due to Landlord's failure to perform as required herein. Tenant's rights and Landlord's obligations under this Section 17.22 shall survive the termination of this Lease.

### 17.25  Plats, Riders and Exhibits.

Clauses, plats, riders, addendums and exhibits, if any, affixed to this Lease are hereby incorporated herein by reference as if fully set forth and are expressly made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the day and year first above written.

WITNESS:                                      LANDLORD:

                                              WORCESTER LINCOLN LLC

                                              By: _____

                                              Title: Manager

WITNESS:                                      TENANT:

                                              DICK'S SPORTING GOODS, INC.

                                              By: _____
                                                  Jo___ Qu___
                                              Title: Senior Vice President

### 17.23  Interpretation

"Include," "includes," and "including" mean considered part of a larger group and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to." The necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships, or individuals, men or women, as the case may be, shall in all cases be assumed as though in each case fully expressed.

### 17.24  Break Up Fee

Landlord hereby acknowledges that there are no contingencies that would prohibit Landlord from fulfilling its obligation to construct and deliver the Demised Premises pursuant to Article II and Article III under this Lease to Tenant. If subsequent to the mutual execution of this Lease, Landlord for reasons known or unknown to Tenant, fails to perform its obligation to construct and deliver the Demised Premises on the Delivery Date as set forth in this Lease and Landlord or Tenant terminates this Lease due to Landlord's failure to perform, Landlord shall promptly pay Tenant the sum of Fifty Thousand Dollars ($50,000.00) as a "break up" fee to cover Tenant's expenses in (i) negotiating, reviewing and documenting this Lease, (ii) providing the necessary review to complete Final Plans and (iii) incurring other costs in consummating this Lease including planning to open the Demised Premises in Landlord's Shopping Center. This clause shall become null and void and in no further force and effect upon Tenant's acceptance of the Demised Premises on the Delivery Date. Such amount shall be paid within ten (10) days of any such termination of this Lease due to Landlord's failure to perform as required herein. Tenant's rights and Landlord's obligations under this Section 17.22 shall survive the termination of this Lease.

### 17.25  Plats, Riders and Exhibits.

Clauses, plats, riders, addendums and exhibits, if any, affixed to this Lease are hereby incorporated herein by reference as if fully set forth and are expressly made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the day and year first above written.

WITNESS:                                LANDLORD:

                                        WORCESTER LINCOLN LLC

_____                 By: _____

_____                 Title: _____

WITNESS:                                TENANT:

                                        DICK'S SPORTING GOODS, INC.



### 17.23 Interpretation

"Include," "includes," and "including" mean considered part of a larger group and not limited to the items recited. "Shall" means is obligated to. "May" means "is permitted to." The necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships, or individuals, men or women, as the case may be, shall in all cases be assumed as though in each case fully expressed.

### 17.24 Break Up Fee

Landlord hereby acknowledges that there are no contingencies that would prohibit Landlord from fulfilling its obligation to construct and deliver the Demised Premises pursuant to Article II and Article III under this Lease to Tenant. If subsequent to the mutual execution of this Lease, Landlord for reasons known or unknown to Tenant, fails to perform its obligation to construct and deliver the Demised Premises on the Delivery Date as set forth in this Lease and Landlord or Tenant terminates this Lease due to Landlord's failure to perform, Landlord shall promptly pay Tenant the sum of Fifty Thousand Dollars ($50,000.00) as a "break up" fee to cover Tenant's expenses in (i) negotiating, reviewing and documenting this Lease, (ii) providing the necessary review to complete Final Plans and (iii) incurring other costs in consummating this Lease including planning to open the Demised Premises in Landlord's Shopping Center. *This clause shall become null and void and in no further force and effect upon Tenant's acceptance of the Demised Premises on the Delivery Date.* Such amount shall be paid within ten (10) days of any such termination of this Lease due to Landlord's failure to perform as required herein. Tenant's rights and Landlord's obligations under this Section 17.22 shall survive the termination of this Lease.

### 17.25 Plats, Riders and Exhibits.

Clauses, plats, riders, addendums and exhibits, if any, affixed to this Lease are hereby incorporated herein by reference as if fully set forth and are expressly made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Lease to be executed as of the day and year first above written.

WITNESS:                                    LANDLORD:

                                            WORCESTER LINCOLN LLC

_____                      By: _____

_____                      Title: _____

WITNESS:                                    TENANT:

                                            DICK'S SPORTING GOODS, INC.

_____                      By: _____
                                                 Joe Oliveri
_____                      Title: Senior Vice President

STATE OF _____ )
                    ) SS:
COUNTY OF _____ )

On this _____ day of _____, 2000, before me personally came
_____, to me personally known, who, being by me duly
sworn, did depose and say that he resides in _____, _____;
that he is _____ of _____,
a _____.
that executed the within instrument; and he acknowledged to me that he executed the
same on behalf of and in the name of such _____.

_____
Notary Public

_____
(Printed Signature)

My Commission Expires: _____
My County of Residence: _____


State of Pennsylvania        )
                             ) SS:
County of Allegheny          )

On this _8_ day of _November_, 2000 before me personally came
Joseph Queri, to me personally known, who, being by me duly sworn, did depose and say
that he resides in Pittsburgh, PA; that he is the Senior Vice President of Dick's Sporting
Goods, Inc., the corporation described in and which executed the within instrument; and
that he signed his name thereto by order of the Board of Directors of said corporation.

Witness my hand and Notarial Seal this _8_ day of _November_, 2000.

_____
Notary Public

_____
(Printed Signature)

My Commission Expires: _____
My County of Residence: _____

Notarial Seal
Jeffrey M. McElhinny, Notary Public
Pleasant Hills Boro, Allegheny County
My Commission Expires Mar. 25, 2002

All of said boundaries are determined by the Land Court to be located as shown on a subdivision plan drawn by William I. Thompson, C.E., dated May 1, 1936, as modified and approved by the Court, filed in the Land Registration Office, a copy of which is filed with Certificate of Title No. 2220.

Being Lot 1 on said plan, Plan No. 15937B.

Also, another tract situated in said Worcester, bounded:

Easterly:       by Tyler Prentice Road Thirty (30) feet;

Southerly:      by land now or formerly of Philip N. Curtis, Trustee One Hundred Fifteen (115) feet;

Westerly:       by said Curtis land Thirty (30) feet; and

Northerly:      by Lot 1 on a plan hereinafter described One Hundred Fifteen (115) feet.

All of said boundaries are determined by the Land Court to be located as shown on a subdivision plan drawn by William I. Thompson, C. E., dated July 29, 1936, as modified and approved by the Court, filed in the Land Registration Office, a copy of which is filed with Certificate of Title No. 2248.

Being Lot 2 on said plan, Plan No. 15937C.

Parcel III (8 Tyler Prentice Road, Worcester, MA 01605)

The land in Worcester, County of Worcester, Commonwealth of Massachusetts, bounded and described as follows:

Easterly:       by Tyler Prentice Road eighty (80) feet;

Southerly:      by land now or formerly of Philip N. Curtis, Trustee one hundred fifteen (115) feet;

Westerly:       by said Curtis land eighty (80) feet; and

Northerly:      by Lot 2 as shown on a plan hereinafter described one hundred fifteen (115) feet.

All of said boundaries are determined by the Land Court to be located as shown on a sub-division plan drawn by William I. Thompson, C.E., dated October 28, 1937, as modified and approved by the Court, filed in the Land Registration Office, a copy of which is filed with Land Registration Certificate 2362 as Plan 15937D.

Being lot 3 on said plan, Plan 15937D.

Parcel IV Lincoln Street

That certain parcel of land situated in Worcester, County of Worcester, Commonwealth of Massachusetts, bounded and described as follows:

Northerly:      by the southerly line of Lincoln Street 121.74 feet;

Easterly:       by Lots 1, 2 and 3 as shown on plan hereinafter described 145 feet;

Southerly:      by 121.69 feet;

Westerly:       by 145 feet by land now or formerly of Plaza Center, Inc.

All of said boundaries are determined by the Land Court to be located as shown on Subdivision Plan No. 15937-N, drawn by Francis B. Thompson, Surveyor dated July 1963, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed with Land Registration Certificate No. 6463.

Being Lot 24 on said plan, Plan No. 15937-N.

Worcester, MA

## EXHIBIT A
## SETTLEMENT AGREEENT

## goulstonstorrs

April 3, 2003

**BY FAX**

Joseph Queri
Senior Vice President
Dick's Sporting Goods, Inc.
200 Industry Drive
Pittsburgh, PA 15275

Stephen Adams
Worcester Lincoln, LLC
20 Switzerland Road
Worcester, MA 01604

Re:  *Worcester Lincoln, LLC v. Dick's Sporting Goods, Inc.*
     Worcester Superior Court, Civil Action No. 03-0578A

Dear Joe and Steve:

I understand that you have reached a settlement agreement resolving the dispute in the above-referenced case.  I have summarized the terms of the agreement below.  By signing where indicated, you are agreeing to the terms of this agreement.  This letter agreement will be delivered with a formal document to the Lease incorporating the following terms:

1)  Effective May 1, 2003, the Initial Co-Tenancy requirement in the Lease is deemed to have been satisfied.

2)  Beginning with the rent payable on May 1, 2003, the Minimum Rent payable by Dick's Sporting Goods, Inc. to Worcester Lincoln LLC shall be reduced by $20,000.00 per month for 26 months and $9,491.50 for the 27th month, resulting in a total reduction in Minimum Rent of $529,491.50; and

3)  $246,491.50 of the total remaining reduction described in paragraph 2 above represents Worcester Lincoln LLC's reimbursement of Dick's Sporting Goods, Inc.'s legal fees in connection with the above-referenced action.  Worcester Lincoln will be

Goulston & Storrs, a Professional Corporation • Boston • DC • Denver
400 Atlantic Avenue • Boston, Massachusetts 02110-3333 • 617.482.1776 fax • 617.574.4112 tel • www.goulstonstorrs.com

Joseph Quasi
April 3, 2003
Page 2

_____

provided with redacted copies of Goulston & Storrs, P.C.'s invoices for legal
services to Dick's Sporting Goods, Inc. to verify that the total amount billed is
$49,491.50.

Upon execution of a mutually agreeable amendment to the Lease incorporating these
terms, the parties shall stipulate to the dismissal of the above-referenced action, with prejudice.

Please sign below where indicated. I am available if you have any questions.

Very truly yours,

Kurt W. Hague

Dick's Sporting Goods, Inc.
by:    Joseph Quasi
its:   Senior Vice President

Worcester Lincoln LLC
by:    Sam Adams
its:   Manager

cc:    Barry A. Beckrnick, Esq.
       Martin M. Fantozzi, Esq.

F-0463L1

## EXHIBIT B

## TITLE MATTERS

The Demised Premises are demised to Tenant with the benefit of all of the rights contained in this Lease and all of the rights appurtenant to this Lease and to the Demised Premises by operation of law, and are demised subject to, and with the benefit of, the following title matters (herein referred to as "Title Matters"):

TITLE POLICY AND TITLE MATTERS (EXCEPTIONS) PROVIDED BY LANDLORD

This Policy does not insure against loss or damage (and the Company will not pay costs, legal fees, or expenses) which arise by reason of:

1. The Policy insures that real estate taxes are paid through September 30, 2000. Subsequent real estate taxes and assessments are a lien not yet due and payable.

2. Plan entitled "ALTA/ACSM Land Title Survey Lincoln Plaza Plan of Land Worcester, Mass." prepared for: Worcester Lincoln LLC property of: Worcester Lincoln LLC by SELTEC-Engineering, Inc. dated: June 26, 2000, revised September 11, 2000 Scale 1" = 50' reveals the following:

   a. Stone wall meanders along land n/f Thomas Duquette;

   b. Fence meanders along Interstate 290;

   c. No access to Interstate 290;

   d. Unnamed stream crosses the premises from land n/f F. W. Madigan, Inc. (CVS) to Interstate 290;

   e. Drain easement to Commonwealth of Massachusetts (same as item T);

   f. Parking easement on Lot 55;

   g. 12' right of way from Lincoln Street to land n/f Mass. Electric (same as item F & G);

   h. Street easement along Lincoln Street (same as item U);

   i. Various utilities cross onto the premises along the easterly, westerly and northerly boundaries;

   j. 20' wide sewer easement along Interstate 290 (same as items F, R, Z, AA);

   Note: This policy affirmatively insures that upon the connection to the relocated sewer main pursuant to Permit for Sewer System Extension or Connection executed February 3, 2000, said easement will be deemed relocated to the new connection area or be deemed abandoned.

   k. 4' and 5' swales and 8" sanitary sewer cross onto premises from Interstate 290;

   l. Various ways connecting lots to Lincoln Street;

   Note: As to items 2 f and 2 l this policy affirmatively insures against loss or damage incurred by the insured by reason of forced removal of currently existing buildings or buildings to be constructed over said parking easement and ways pursuant to Site Plan dated September 18, 2000 prepared by Beals and Thomas, Inc.

   m. Fence meanders along land n/f Carol West, et al; and

   n. .04 foot discrepancies between record description and survey at Tyler Prentice Road.

3. Easement to pass and repass over a twelve (12) foot wide strip at Lincoln Street dated June 25, 1957 filed as Document No. 17402. (Affects Parcels I, II & III)

4. Easement to pass and repass over a twelve (12) foot wide strip and to construct a culvert in a brook and right to maintain wires dated August 25, 1958 filed as Document No. 18065. (Affects All Parcels)

5. Easement for laying, constructing and maintaining sewers dated September 2, 1960 as shown on Lot 17 on

(CONTINUED)

Plan 15937-K filed as Document No. 19408. (Affects All Parcels)

Note: This policy affirmatively insures that upon the connection to the relocated sewer main pursuant to Permit for Sewer System Extension or Connection executed February 3, 2000, said easement will be deemed relocated to the new connection area or be deemed abandoned.

6.  Highway location for the widening and relocation of Lincoln Street dated October 17, 1990 filed as Document No. 12595. (Affects All Parcels)

7.  Highway location of Interstate 290 dated April 5, 1997 filed as Document No. 24144. (Affects Parcels I, II & III)

8.  Easement dated May 15, 1974 filed as Document No. 50200. (Affects Parcels I, II & III)

9.  Rights of others in and to the unimpeded flow of brook, as shown on unrecorded plan by Setteo Engineering, Inc. dated June 26, 2000, revised September 11, 2000. (Affects Parcels I, II & III)

10.  Water and sewer easement shown on Plan 14070-3. (Affects Lot 752 on Plan 14079-b). (Affects Parcel I, II & III)

11.  Twenty (20) foot sewer easement and ways as shown on Land Court Plan 15937-G. (Affects Parcels I, II & III)

NOTE: The Company hereby insures the insured that items Numbered F, O, R, U, Z & AA will not interfere with the use and occupancy (including forced removal of existing or new improvements) of the premises described as presently improved or as described by the Site Plan dated September 18, 2000.

NOTE: The Company hereby insures the insured against any loss which said insured shall sustain as a result of any exercise of the right of use or maintenance of the easements or ways referred to in item AA.

12.  Order of Taking by the City of Worcester dated May 2, 1960 filed as Document No. 18248. (Affects Lot 24)

13.  Easements, restrictions and provisions set forth in Deed to Stafac, Inc. dated February 24, 1969 filed as Document No. 22581. (Affects Lot 24)

NOTE: The Company hereby insures the insured that the driveway easement contained in warranty deed in item CH will not interfere with the use and occupancy (including enforced removal of existing or new improvements) of the premises described as presently improved or as described by the Site Plan dated September 18, 2000.

14.  Declaration of Lincoln Plaza Prohibited Uses by Worcester Lincoln LLC dated September ___, 2000 filed September ___, 2000 as Document No. _____.

15.  Activity and Use Limitation Agreement dated _____, 2000 recorded _____, 2000. (Affects Lot 24)

NOTE: While excluded from coverage hereunder, the records at Worcester County Registry of Deeds reveals the existence of the following:

a. Order of Conditions (DEP File No. 348-658) filed February 14, 2000 as Document No. 71718. (Affects Parcels I, II & III)

In addition to the matters set forth in Section 1 of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters. It may be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest:

1.  Lease naming George T. Abdow, et al, Lessee, notice of which is dated June 3, 1976 filed as Document No. 30717, as affected by sublease to Ebel, Inc. dated July 3, 1995 filed as Document No. 62411, as affected Notice of Amendment to Lease dated September ___, 2000 filed September ___, 2000 as Document No. _____, as further affected by Subordination, Non-Disturbance and Attornment Agreement dated _____ 2000 filed _____, 2000 as Document No. _____. (These premises are now occupied by Bickfords) (Affects Parcels I, II & III)

2.  Notice of Lease naming U. S. Health, Inc., Lessee, dated November 30, 1998 filed as Document No. 48596, as affected by Subordination, Non-Disturbance and Attornment Agreement dated _____, 2000 filed _____, 2000 as Document No. _____. (These premises are now occupied by Macy's.) (Affects Parcels I, II & III)

3.  Notice of Lease by and between Worcester Lincoln LLC, as Landlord, and The Stop & Shop Supermarket Company, as Tenant, dated September ___, 2000 filed September ___, 2000 as Document No. _____, as affected by Subordination, Non-Disturbance and Attornment Agreement dated September ___, 2000 filed September ___, 2000 as Document No. _____.

4.  Notice of Lease by and between Worcester Lincoln LLC, as Landlord and Lowe's Home Centers, Inc., as Tenant, dated September ___, 2000 filed September ___, 2000 as Document No. _____, as affected by Subordination, Non-Disturbance and Attornment Agreement dated September ___, 2000 filed September ___, 2000 as Document No. _____.

5.  Notice of Lease by and between Worcester Lincoln LLC, as Landlord, and Target Corporation, as Tenant, dated September ___, 2000 filed September ___, 2000 as Document No. _____, as affected by Subordination, Non-Disturbance and Attornment Agreement dated September ___, 2000 filed September ___, 2000 as Document No. _____.

Lincoln Plaza

## EXHIBIT C
## CONSTRUCTION WORK

"Landlord's Construction Work" is the construction, repair and/or alteration of all the Common Areas and buildings of the Shopping Center as shown on the Lease Plan and "Landlord's Construction Work for the Demised Premises" is the construction of Tenant's Demised Premises pursuant to this Exhibit C, Section 2.5, and Section 3.1 as well us in compliance with Landlord's obligations as detailed in Section 17.10 of this Lease.

The Demised Premises shall be completely constructed and/or repaired and altered by Landlord at Landlord's sole cost and expense and in compliance with the set of Final Plans (as defined in Section 2.5) to be incorporated herein by reference as amended by interlineations (if any) thereon. The Final Plans are to be prepared by Landlord at Landlord's sole cost and expense and approved by Tenant pursuant to Section 2.5. Tenant shall submit to Landlord its prototype plans and specifications dated April 1, 2000 ("Prototype Plans"), receipt of which Landlord hereby acknowledges, and Landlord shall within sixty (60) days thereafter prepare and submit to Tenant for Tenant's review proposed Final Plans for the Demised Premises. Tenant shall review the proposed Final Plans and return the same to Landlord marked with the required changes, all submissions and revisions in accordance with Section 2.5. Landlord shall make such changes and return the revised Final Plans to Tenant for Tenant's final review and approval. It is the intention of the parties hereto that Landlord will construct a complete "turnkey" premises for Tenant pursuant to the Final Plans as finally approved by Tenant.

Landlord shall also be responsible for completion of all buildings and common-area improvements and curb cuts outside of the Demised Premises as shown on the Lease Plan pursuant to Final Plans prepared by Landlord and approved by Tenant, so as to allow Tenant to obtain a certificate of occupancy and open for business as contemplated under this Lease.

Landlord shall be responsible to apply for and obtain, at its sole cost and expense, all permits and approvals necessary to complete Landlord's Construction Work for the Demised Premises.

Landlord shall furnish Tenant within five (5) days after the commencement of Landlord's Construction Work for the Demised Premises a schedule showing when different phases of Landlord's Construction Work, if applicable, including Landlord's Construction Work for the Demised Premises shall be commenced and completed.

During the progress of Landlord's Construction Work for the Demised Premises, Tenant may give written notice to Landlord of changes requested in such Final Plans, as initialed and approved above. These changes shall be incorporated in the Landlord's Construction Work for the Demised Premises to the extent that the same do not affect the soundness of the structure or the architectural or engineering design of the Demised Premises; thereafter such Final Plans, as changed, shall be deemed to be the Final Plans for Landlord's Construction Work for the Demised Premises. The net amount by which any such changes increase or decrease the cost to Landlord of Landlord's Construction Work for the Demised Premises shall be borne by or credited to Tenant. Any such increases shall by payable within forty-five (45) days after receipt of Landlord's invoice but in no event prior to completion of Landlord's Construction Work for the Demised Premises, provided that Landlord shall, prior to the commencement of construction of such changes, have notified Tenant of such net increase and Tenant shall have approved of the cost of any such increase. Any net decreases in the cost of Landlord's Construction Work for the Demised Premises caused by changes made by Tenant, as aforesaid, shall be credited by Landlord to Tenant against any such increases or paid to Tenant within thirty (30) days after the Rental Commencement Date.

Notwithstanding any approval hereunder by Tenant, Landlord shall be. solely responsible in all cases for proper design and coordination of all architectural, structural, plumbing, electrical, heating, ventilating, air conditioning and site elements of the Demised Premises, and Landlord shall furnish Tenant for Tenant's approval a list of all deviations from those Final Plans.

**EXHIBIT C**

## EXHIBIT D
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THE STATE OF
COUNTY OF

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 2000, by and among Worcester Lincoln LLC, a Delaware limited liability company, having a mailing address at 29 Sunderland Road   Worcester, MA   01604-3338 (the *"Landlord"*), _____, a _____, having a mailing address at _____ (the *"Lender"*) and DICK'S SPORTING GOODS, INC., a Delaware corporation, having a mailing address at 200 Industry Drive, Pittsburgh, PA  15275 (the *"Tenant"*).  Landlord, Lender and Tenant are sometimes hereinafter referred to as "Party(ies)."

### WITNESSETH:

WHEREAS, Lender is the holder of a mortgage (the *"Mortgage"*) covering a parcel of land owned by Landlord together with the improvements erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the *"Demised Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Lender, the receipt of which is hereby acknowledged; and

WHEREAS, as an inducement to Tenant to enter into the Lease, Article XV thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Lender; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.      In consideration of the agreements of Tenant contained herein, Lender hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Lender that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement. Tenant's consent and subordination shall be contingent upon and subject to the conditions set forth in Paragraph 3 hereof.

3.      Lender agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and cure period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Demised Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage

EXHIBIT D

or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Demised Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Demised Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Lender or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to Lender or such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to Lender or such new owner and to recognize such new owner as "landlord" under the Lease, such attornment to be effective and self-operative without the execution of any further instrument;

(b)     Notwithstanding anything to the contrary contained herein, Tenant will be under no obligation to pay Rent to Lender or any new owner until Tenant receives written notice from Lender or such new owner that Lender and/or such new owner has succeeded to the interest of "Landlord" under the Lease;

(c)     The respective rights and obligations of Tenant and Lender or any new owner upon such attornment will, to the extent of the then remaining balance of the term of the Lease, including, any extensions or renewals thereof elected by Tenant, be the same as now set forth therein, it being the intention of the Parties hereto for this purpose to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length herein; and

(d)     Lender or such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against Lender or such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if Lender or such new owner had not succeeded to the interest of "landlord"; provided, however, that Lender or such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which Lender or the new owner succeeds to the interest of such prior landlord or during a period of time during which Lender or such new owner is receiving Rent from Tenant;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which Lender or the new owner succeeds to the interest of such prior landlord or during a period of time during which Lender or such new owner is receiving Rent from Tenant;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Lender or the then holder of the Mortgage has received notice thereof whether or not Lender or the then holder of the Mortgage elected to cure or

**EXHIBIT D**

remedy the act or omission (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)     bound by any Rent or Additional Rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), (a) except for credits due Tenant pursuant to any monthly payments paid in advance for CAM, insurance or real estate taxes, or (b) unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any previous amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Lender acknowledges that the Lease specifically provides for amendments and modifications and specific termination rights upon the occurrence of certain events described in the Lease, and, by its execution below, Lender agrees to recognize such amendments, modifications or termination rights as part of the Lease, and Lender further agrees that such new owner shall also be bound by such amendment(s), modification(s) or termination rights under the Lease, without any consent on the part of Lender or such new owner.  Notwithstanding, Lender shall not be bound by a voluntary termination of the Lease or surrender of the Demised Premises, provisions for which was not already expressly contained in the Lease.

(e)     Tenant's obligations hereunder shall be effective only so long as Lender is bound to Lender's obligations hereunder.

5.     If Lender enforces any assignment of rents clause contained in the Mortgage or in any other instrument securing the loan, Lender and Landlord will hold Tenant harmless from any claims arising out of Tenant's paying Rent, as required under the Lease, to Lender or by complying with the assignment of rents clause or similar right.

6.     Tenant will notify Lender of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Lender has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

7.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

8.     Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Lender, at the address of Lender as hereinabove set forth or at such other address or persons as Lender may designate by notice in the manner herein set forth, with duplicate copies to _____, or such other address or persons as Lender may designate by notice in the manner herein set forth, (b) ) if to Landlord, at the address of Lender as hereinabove set forth or at such other address or persons as Landlord may designate by notice in the manner herein set forth, with duplicate copies to _____, or such other address or persons as Landlord may designate by notice in the manner herein set forth, or (c) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Benjamin J. Viloski, Esq., Doepken Keevican & Weiss, 600 Grant Street, USX Tower, 58th Floor, Pittsburgh, Pa 15219, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

EXHIBIT D

9.      This Agreement shall inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees, and any purchaser or purchasers at foreclosure of the Shopping Center and their respective heirs, personal representatives, successors and assigns.

10.      This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the Parties or their respective interests.

11.      This Agreement will be governed by and construed in accordance with the laws of the State of the location of the Demised Premises.

12.      The effective date of this Agreement will be the date of execution by the last Party to sign this Agreement provided an executed copy of this Agreement is thereafter delivered to all other Parties to this Agreement.

13.      This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**EXHIBIT D**

IN WITNESS WHEREOF, the Parties hereto have executed and sealed this Agreement as of the day and year first above written.

TENANT

DICK'S SPORTING GOODS, INC
A Delaware Corporation

By: _____
Name: Joe Queri
Title: Sr. Vice President

WITNESSES:

_____

_____

LANDLORD

WORCESTER LINCOLN LLC

By: _____
Name: _____
Title: _____

WITNESSES:

_____

_____

LENDER

_____

By: _____
Name: _____
Title: _____

WITNESSES:

_____

_____

## ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )
                                       ) SS:

COUNTY OF ALLEGHENY )

         On this, the _____ day of _____, 2000, before me a Notary Public, the undersigned officer, personally appeared Joseph Queri known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for purposes therein contained.

               IN WITNESS WHEREOF, I hereunto set my name and official seal.

                                             _____
                                             Notary Public

MY COMMISSION EXPIRES:

 

STATE OF )
                        ) SS:
COUNTY OF )

         On this, the _____ day of _____, 2000, before me a Notary Public, the undersigned officer, personally appeared _____ known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for purposes therein contained.

               IN WITNESS WHEREOF, I hereunto set my name and official seal.

                                             _____
                                             Notary Public

MY COMMISSION EXPIRES:

STATE OF )
                        ) SS:
COUNTY OF )

         On this, the _____ day of _____, 2000, before me a Notary Public, the undersigned officer, personally appeared _____ known to me or satisfactorily proven to be the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for purposes therein contained.

               IN WITNESS WHEREOF, I hereunto set my name and official seal.

                                             _____
                                             Notary Public

MY COMMISSION EXPIRES:

EXHIBIT E
(NOT APPLICABLE)

EXHIBIT E

**EXHIBIT F**
**LANDLORD'S WAIVER AND LICENSE AGREEMENT**

General Electric Capital
Corporation, as Agent
210 High Ridge Road
Stamford, Connecticut  06927

RE:   <u>Dick's Sporting Goods, Inc.   ("Tenant")</u>
        525 –545 Lincoln Street
        <small>(Shopping Center address to be provided by Landlord)</small>

Ladies and Gentlemen:

Reference is made to a lease dated _____, 2000 (the "Lease") entered into between Worcester Lincoln LLC ("Landlord") and Tenant pursuant to which Landlord, as the owner of the real property and building and improvements to be located thereon commonly known as the proposed Dick's Sporting Goods at the Lincoln Plaza leased to Tenant a portion of such real property and building and improvements to be located thereon as more particularly set forth in the Lease (the "Demised Premises").

Reference is also made to the financing arrangements between Tenant, certain lenders ("Lenders") and you, as agent for the Lenders (in such capacity, together with your officers, directors, employees, agents and invitees, "Agent") including, but not limited to, the Credit Agreement between Tenant, Lenders and Agent (the foregoing, together with all related documents, agreements, instruments and notes, as the same may now exist or may hereafter be amended, supplemented or otherwise modified, being collectively referred to herein as the "<u>Agreements</u>").

Pursuant to the terms of the Agreements, Tenant has granted to Agent for the benefit of Lenders a security interest in all of the existing and hereafter acquired tangible and intangible personal property of Tenant, including, but not limited to, cash, cash equivalents, bank accounts, accounts and other receivables, inventories, (wherever located), securities (whether or not marketable), contract rights, instruments, documents, franchise rights, patents, trade names, trademarks, trade styles, copyrights and all other intellectual property rights, notes receivable and general intangibles and all fixtures and equipment other than those fixtures and equipment which are a part of the real property delivered to Tenant under the Lease, or which are so permanently attached to the real property delivered to Tenant under the Lease that they have become a part of that real property, and all substitutions, accessions and proceeds of the foregoing (collectively, the "<u>Collateral</u>") as security for any now existing or hereafter arising obligations of Tenant to Agent and Lenders pursuant to the Agreements or otherwise.

In order to induce Agent and Lenders to enter into the Agreements and in consideration of the loans and other financial accommodations to Tenant contemplated thereunder which will accrue to the benefit of Landlord by enabling Tenant to meet its various obligations to Landlord, including those arising under or in connection with the Lease, and for ten dollars ($10) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby agrees with Agent for the benefit of Lenders as follows:

1.      **Lease**

(a)     Landlord acknowledges that (i) the Lease is in full force and effect and each of the Lease and this Agreement constitutes the legal, valid and binding obligation of Landlord enforceable against Landlord in accordance with its terms; and, (ii) Landlord is not aware of any existing default under the Lease or any such default which would result from the execution, delivery and performance of the Agreements.

**EXHIBIT F**

(b) · Landlord agrees to provide Agent with (a) a copy of any cancellation, amendment, consent or waiver under the Lease and (b) written notice of any default or claimed default by Tenant under the Lease (a "Default Notice") at the same time as it sends such notice to Tenant; provided that Agent shall have at least (15) days following receipt of such Default Notice to cure such default, but neither Agent nor any Lender shall be under any obligation to cure any default by Company under the Lease. No action by Agent or any Lender pursuant to this Agreement shall be deemed to be an assumption by Agent or Lenders of any obligation under the Lease, and, except as provided in paragraph 3 below, Agent shall not have any obligation to Landlord.

### 2. Waiver of Lien Rights

Landlord hereby waives any and all title, landlord's lien, right of distraint or levy, security interest or other interest which Landlord may now or hereafter have in any of the Collateral now or hereafter located at the Demised Premises, whether for unpaid rent or otherwise and whether by virtue of the Lease, the landlord-tenant relationship, any possession thereof, any local, state or federal law or statute, including, without limitation, Title 11 of the United States Code, as amended, common law doctrine, or otherwise. Landlord agrees that all Collateral (other than the Tenant's interest in the Lease) is and shall remain personal property and shall not constitute fixtures, notwithstanding any attachment to real property except for those fixtures which are a part of the real property or which are so permanently attached to the real property that they have become a part of that real property pursuant to applicable law including but not limited to all parts of the heating, ventilating and air conditioning system serving the Demised Premises and any mechanical equipment or other leasehold improvements, wherever located, and any installations made by or on behalf of Tenant on the Shopping Center roof or otherwise located outside the Demised Premises.

### 3. License

(a) Each of Tenant and Landlord hereby agree that, pursuant to the terms of the Agreements, without any accountability or liability to Landlord or Tenant except as provided in paragraph 3(b) below, Agent may enter on, use and occupy the Demised Premises, at any time prior to sixty (60) days after receipt of written notice from Landlord that Landlord has repossessed the Demised Premises (such date shall be herein referred to as the "Outside Removal Date"), for the purposes of repossessing and/or removing the Collateral in accordance with the provisions of the Agreements (including without limitation, for inspections and collateral audit and management purposes), the Uniform Commercial Code and any other applicable law (and whether or not a default exists under the Lease or the Agreements). Agent agrees that no sale (public or otherwise) will be conducted in, at or upon the Demised Premises or the Shopping Center, and no signage concerning any such sale will be permitted in, at or upon the Demised Premises or the Shopping Center. Landlord agrees not to unreasonably restrict or otherwise unreasonably interfere with access to, or use of, the Demised Premises by Agent for the foregoing purposes prior to the Outside Removal Date. Agent agrees (i) to fully cooperate with Landlord's agents in connection with such removal of the Collateral and (ii) to conduct such removal in a manner reasonably designed to minimize interruption or interference with the normal business operations of the Shopping Center. Said license shall be irrevocable and shall continue at Agent's option until the Outside Removal Date. Use or occupancy of the Demised Premises by Agent as set forth herein shall not constitute an assumption by Agent or any Lender of the Lease or any obligations thereunder.

(b) In consideration of the foregoing, Agent agrees (to the extent not paid by Tenant) to pay to Landlord for the use and occupancy of the Demised Premises by Agent as provided above: (i) per diem rent (based upon base rent and Tenant's pro rata share of operating costs, utilities and taxes payable by Tenant under the Lease but excluding any supplemental rent or other costs, expenses or amounts or any indemnities payable thereunder, upon default or otherwise) for each day Agent uses or occupies the Demised Premises as provided above and (ii) actual out of pocket costs and expenses of repairing any damage (ordinary wear and tear excepted) to the Demised Premises attributable to Agent's use and occupation of the Demised Premises as provided above.

4.     <u>Miscellaneous</u>

Notices hereunder shall be in writing and shall be sent by certified mail, return receipt requested, to the respective Parties at the following addresses:

| | |
|---|---|
| To Landlord: | WORCESTER LINCOLN LLC<br>c/o Plaza Properties<br>29 Sunderland Road<br>Worcester, MA  01604-3338 |
| To Tenant: | DICK'S SPORTING GOODS, INC.<br>200 Industry Drive<br>Pittsburgh, PA  15275 |
| To Lender: | GENERAL ELECTRIC CAPITAL CORPORATION,<br>as Agent<br>800 Connecticut Avenue<br>Two North<br>Norwalk, CT 06854<br>Attn:  Dick's Sporting Loan Officer |

This Agreement shall be governed by the internal laws of the State of Massachusetts and shall remain in full force and effect until the earlier to occur of (i) the Outside Removal Date or (ii) the satisfaction of or earlier termination of the Agreements between Lender and Tenant (the earlier to occur of (i) or (ii) is hereinafter referred to as the "Termination Date").  This Agreement may not be changed or terminated without the prior written consent of Agent.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of the parties hereto and shall also be binding upon any successor, owner, or transferee of said Demised Premises, and shall inure to benefit of Agent and Lenders and their respective successors and assigns and other transferees, as express third party beneficiaries hereof.

Agent may, without affecting the validity of this Agreement, extend the time of payment of any obligations of Tenant to Agent and/or Lenders or alter the performance of any of the terms and conditions of any of the Agreements, without the consent of, or notice to, the undersigned and without in any manner whatsoever impairing or affecting the effectiveness of this Agreement.

**EXHIBIT F**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

LANDLORD:

**WORCESTER LINCOLN LLC**

By: _____
Name:
Title:


TENANT:

**DICK'S SPORTING
GOODS, INC.**

By: _____
Name: Joe Queri
Title: Senior Vice President


Accepted and Agreed to:

**GENERAL ELECTRIC CAPITAL
CORPORATION, as Agent**

By: _____
Name: _____
Title: _____

**EXHIBIT F**

**EXHIBIT G**

SHOPPING CENTER LEASE
WORCESTER LINCOLN LLC
AND
DICK'S SPORTING GOODS, INC.
MEMORANDUM OF SHOPPING CENTER LEASE

Effective Date of Lease._____

Name and address of Landlord:  WORCESTER LINCOLN LLC a Delaware limited
liability company having an office at, c/o Plaza Properties, 29 Sunderland Road,
Worcester, MA  01604-3338 Attention: _____.

Name and address of Tenant:  DICK'S SPORTING GOODS, INC., a Delaware
corporation, having an office at 200 Industry Drive, Pittsburgh PA  15275.
Attention: Senior Vice President, Joe Queri.

Description of Premises.  Approximately 45,000 Leasable Square Feet (with a minimum
frontage of 200 feet) and being a part of Lincoln Plaza (the "Shopping Center") located in
the City of Worcester, County of Worcester, State of Commonwealth of Massachusetts,
and constructed on land described in Exhibit A-1 attached hereto.

Term of Lease.  Commencing on the "Rental Commencement Date" of the Lease (as
such term is defined in the Lease) and terminating on January 31 following the fifteenth
(15th) anniversary of the Rental Commencement Date.

Options to Extend.  This Lease grants to Tenant successive options to extend the Lease
Term from the date upon which the Lease Term would otherwise expire  for five
additional periods of five years each.

Restrictions on Construction.

    (a)  No buildings, signs or structures other than canopies and signs attached to store
buildings, lighting equipment and directional and other signs permitted by the provisions of
this Lease may be built in any area of the Shopping Center shown as "the No-Build Areas"
on the Lease Plan.

    (b)  No portion of the Parking Areas (defined in Section 1.3 below) identified on
the Lease Plan as the "Protected Parking Areas" may be modified (including, but not
limited to, any change in the configuration of the parking stalls) without Tenant's consent
which shall not be unreasonably withheld or conditioned.

Exclusive.

    Landlord covenants and agrees that during the term of this Lease that it has not
and will not, nor will any entity under common control with Landlord, enter into any
lease(s) or occupancy agreement(s) for premises situated on the Shopping Center (other
than the Demised Premises), or otherwise transfer or allow a possessory interest in the
Shopping Center to a tenant or occupant whose primary use shall be the sale of sporting
goods and sporting equipment or athletic footwear.  Landlord warrants and agrees that
during the term of this Lease that it will not, nor will any entity under common control
with Landlord, enter into any lease(s) or occupancy agreements for premises situated on
the Shopping Center (other than the Demised Premises), or otherwise transfer or allow a
possessory interest in the Shopping Center which does not prohibit ("Precluded Sales
Activities"): (i) the sale of sporting goods and sporting equipment in five  thousand
(5,000) or more square feet of sales floor area on the Shopping Center; and, (ii) the retail
sale of athletic footwear in three thousand (3,000) or more square feet of sales floor area
on the Shopping Center.  The foregoing restrictions in this Section 1.5 shall not apply to
the premises designated on Exhibit A as "Lowes" or "Home Improvement Store" and
"Target" unless Landlord can reasonably control any subletting, assignment or use

**EXHIBIT G**

change which would violate the provisions herein or such premises are subdivided. Notwithstanding, if Landlord or a parent, affiliate or other entity controlled by or under common control with Landlord, regains control of any such premises the provisions of this Section 1.5 shall apply to each such premises thereafter.

This instrument is intended to be only a Memorandum of Lease in respect to the Lease, to which Lease reference is made for the full agreement between the parties. This Memorandum is not intended to modify any term, provision or condition of the Lease and to the extent of any conflict between this Memorandum and the Lease, the Lease will control.

Executed this _____ day of _____ 2000.

Signed and acknowledged in
the presence of:

Landlord:

**WORCESTER LINCOLN LLC**

_____

_____

By:_____
Its:_____

Signed and acknowledged in
the presence of:

Tenant:

**DICK'S SPORTING GOODS, INC.**

_____

_____

_____
By: Joe Queri
Its: Senior Vice President

This instrument is prepared by Benjamin J. Viloski, Attorney at Law, Shopping Center Law Associates, 450 Trimont Plaza, 1305 Grandview Avenue, Pittsburgh, PA 15211

**EXHIBIT G**

STATE OF _____ )
                  ) SS:
COUNTY OF_____ )

    On this _____ day of _____, 2000, before me personally came _____, to me personally known, who, being by me duly sworn, did depose and say that he resides in _____, _____; that he is _____ of _____ a _____ that executed the within instrument; and he acknowledged to me that he executed the same on behalf of and in the name of such _____

                                     _____
                                       Notary Public

                                       _____
                                       (Printed Signature)

My Commission Expires: _____
My County of Residence: _____


State of Pennsylvania        )
                          ) SS:
County of Allegheny        )

    On this _____ day of _____, 2000 before me personally came Joseph Queri, to me personally known, who, being by me duly sworn, did depose and say that he resides in Pittsburgh, PA; that he is the Senior Vice President of Dick's Sporting Goods, Inc., the corporation described in and which executed the within instrument; and that he signed his name thereto by order of the Board of Directors of said corporation.

    Witness my hand and Notarial Seal this _____ day of _____,2000.

                                       _____
                                       Notary Public

                                       _____
                                       (Printed Signature)

My Commission Expires: _____
My County of Residence: _____

**EXHIBIT G**

**EXHIBIT F**
**LANDLORD'S WAIVER AND LICENSE AGREEMENT**

General Electric Capital
Corporation, as Agent
210 High Ridge Road
Stamford, Connecticut 06927

RE:   <u>Dick's Sporting Goods, Inc.   ("Tenant")</u>
      525 –545 Lincoln Street
      (Shopping Center address to be provided by Landlord)

Ladies and Gentlemen:

Reference is made to a lease dated _____, 2000 (the "Lease") entered into between Worcester Lincoln LLC ("Landlord") and Tenant pursuant to which Landlord, as the owner of the real property and building and improvements to be located thereon commonly known as the proposed Dick's Sporting Goods at the Lincoln Plaza leased to Tenant a portion of such real property and building and improvements to be located thereon as more particularly set forth in the Lease (the "Demised Premises").

Reference is also made to the financing arrangements between Tenant, certain lenders ("Lenders") and you, as agent for the Lenders (in such capacity, together with your officers, directors, employees, agents and invitees, "Agent") including, but not limited to, the Credit Agreement between Tenant, Lenders and Agent (the foregoing, together with all related documents, agreements, instruments and notes, as the same may now exist or may hereafter be amended, supplemented or otherwise modified, being collectively referred to herein as the "Agreements").

Pursuant to the terms of the Agreements, Tenant has granted to Agent for the benefit of Lenders a security interest in all of the existing and hereafter acquired tangible and intangible personal property of Tenant, including, but not limited to, cash, cash equivalents, bank accounts, accounts and other receivables, inventories, (wherever located), securities (whether or not marketable), contract rights, instruments, documents, franchise rights, patents, trade names, trademarks, trade styles, copyrights and all other intellectual property rights, notes receivable and general intangibles and all fixtures and equipment other than those fixtures and equipment which are a part of the real property delivered to Tenant under the Lease, or which are so permanently attached to the real property delivered to Tenant under the Lease that they have become a part of that real property, and all substitutions, accessions and proceeds of the foregoing (collectively, the "Collateral") as security for any now existing or hereafter arising obligations of Tenant to Agent and Lenders pursuant to the Agreements or otherwise.

In order to induce Agent and Lenders to enter into the Agreements and in consideration of the loans and other financial accommodations to Tenant contemplated thereunder which will accrue to the benefit of Landlord by enabling Tenant to meet its various obligations to Landlord, including those arising under or in connection with the Lease, and for ten dollars ($10) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby agrees with Agent for the benefit of Lenders as follows:

1.     **Lease**

       (a)     Landlord acknowledges that (i) the Lease is in full force and effect and each of the Lease and this Agreement constitutes the legal, valid and binding obligation of Landlord enforceable against Landlord in accordance with its terms; and, (ii) Landlord is not aware of any existing default under the Lease or any such default which would result from the execution, delivery and performance of the Agreements.

(b)    Landlord agrees to provide Agent with (a) a copy of any cancellation, amendment, consent or waiver under the Lease and (b) written notice of any default or claimed default by Tenant under the Lease (a "Default Notice") at the same time as it sends such notice to Tenant; provided that Agent shall have at least (15) days following receipt of such Default Notice to cure such default, but neither Agent nor any Lender shall be under any obligation to cure any default by Company under the Lease. No action by Agent or any Lender pursuant to this Agreement shall be deemed to be an assumption by Agent or Lenders of any obligation under the Lease, and, except as provided in paragraph 3 below, Agent shall not have any obligation to Landlord.

2.    **Waiver of Lien Rights**

Landlord hereby waives any and all title, landlord's lien, right of distraint or levy, security interest or other interest which Landlord may now or hereafter have in any of the Collateral now or hereafter located at the Demised Premises, whether for unpaid rent or otherwise and whether by virtue of the Lease, the landlord-tenant relationship, any possession law, any local, state or federal law or statute, including, without limitation, Title 11 of the United States Code, as amended, common law doctrine, or otherwise. Landlord agrees that all Collateral (other than the Tenant's interest in the Lease) is and shall remain personal property and shall not constitute fixtures, notwithstanding any attachment to real property except for those fixtures which are a part of the real property or which are so permanently attached to the real property that they have become a part of that real property pursuant to applicable law including but not limited to all parts of the heating, ventilating and air conditioning system serving the Demised Premises and any mechanical equipment or other leasehold improvements, wherever located, and any installations made by or on behalf of Tenant on the Shopping Center roof or otherwise located outside the Demised Premises.

3.    **License**

(a)    Each of Tenant and Landlord hereby agree that, pursuant to the terms of the Agreements, without any accountability or liability to Landlord or Tenant except as provided in paragraph 3(b) below, Agent may enter on, use and occupy the Demised Premises, at any time prior to sixty (60) days after receipt of written notice from Landlord that Landlord has repossessed the Demised Premises (such date shall be herein referred to as the "Outside Removal Date"), for the purposes of repossessing and/or removing the Collateral in accordance with the provisions of the Agreements (including without limitation, for inspections and collateral audit and management purposes), the Uniform Commercial Code and any other applicable law (and whether or not a default exists under the Lease or the Agreements). Agent agrees that no sale (public or otherwise) will be conducted in, at or upon the Demised Premises or the Shopping Center, and no signage concerning any such sale will be permitted in, at or upon the Demised Premises or the Shopping Center. Landlord agrees not to unreasonably restrict or otherwise unreasonably interfere with access to, or use of, the Demised Premises by Agent for the foregoing purposes prior to the Outside Removal Date. Agent agrees (i) to fully cooperate with Landlord's agents in connection with such removal of the Collateral and (ii) to conduct such removal in a manner reasonably designed to minimize interruption or interference with the normal business operations of the Shopping Center. Said license shall be irrevocable and shall continue at Agent's option until the Outside Removal Date. Use or occupancy of the Demised Premises by Agent as set forth herein shall not constitute an assumption by Agent or any Lender of the Lease or any obligations thereunder.

(b)    In consideration of the foregoing, Agent agrees (to the extent not paid by Tenant) to pay to Landlord for the use and occupancy of the Demised Premises by Agent as provided above: (i) per diem rent (based upon base rent and Tenant's pro rata share of operating costs, utilities and taxes payable by Tenant under the Lease but excluding any supplemental rent or other costs, expenses or amounts or any indemnities payable thereunder, upon default or otherwise) for each day Agent uses or occupies the Demised Premises as provided above and (ii) actual out of pocket costs and expenses of repairing any damage (ordinary wear and tear excepted) to the Demised Premises attributable to Agent's use and occupation of the Demised Premises as provided above.

4.      <u>Miscellaneous</u>

        Notices hereunder shall be in writing and shall be sent by certified mail, return receipt requested, to the respective Parties at the following addresses:

<table>
<tr><td>To Landlord:</td><td>WORCESTER LINCOLN LLC<br>c/o Plaza Properties<br>29 Sunderland Road<br>Worcester, MA  01604-3338</td></tr>
<tr><td>To Tenant:</td><td>DICK'S SPORTING GOODS, INC.<br>200 Industry Drive<br>Pittsburgh, PA  15275</td></tr>
<tr><td>To Lender:</td><td>GENERAL ELECTRIC CAPITAL CORPORATION,<br>as Agent<br>800 Connecticut Avenue<br>Two North<br>Norwalk, CT 06854<br>Attn:  Dick's Sporting Loan Officer</td></tr>
</table>

        This Agreement shall be governed by the internal laws of the State of Massachusetts and shall remain in full force and effect until the earlier to occur of (i) the Outside Removal Date or (ii) the satisfaction of or earlier termination of the Agreements between Lender and Tenant (the earlier to occur of (i) or (ii) is hereinafter referred to as the "Termination Date").  This Agreement may not be changed or terminated without the prior written consent of Agent.  This Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of the parties hereto and shall also be binding upon any successor, owner, or transferee of said Demised Premises, and shall inure to benefit of Agent and Lenders and their respective successors and assigns and other transferees, as express third party beneficiaries hereof.

        Agent may, without affecting the validity of this Agreement, extend the time of payment of any obligations of Tenant to Agent and/or Lenders or alter the performance of any of the terms and conditions of any of the Agreements, without the consent of, or notice to, the undersigned and without in any manner whatsoever impairing or affecting the effectiveness of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

LANDLORD:

WORCESTER LINCOLN LLC

By: _____
Name: _____
Title: _____

TENANT:

DICK'S SPORTING GOODS, INC.

By: _____
Name:   Joe Quer
Title:   Senior Vice President

Accepted and Agreed to:

GENERAL ELECTRIC CAPITAL CORPORATION, as Agent

By: _____
Name: _____
Title: _____

## EXHIBIT A-1
## SHOPPING CENTER DESCRIPTION

The Demised Premises consist of approximately 45,000 square feet of GFLA with a minimum frontage of approximately 200 feet and other dimension(s) as shown upon the Lease Plan, and _____ square feet of mezzanine floor area.  In addition, Tenant shall have the exclusive right to use certain exterior Service Areas adjacent to the Demised Premises including, without limitation, a loading area and a trash storage area; said exterior Service Areas shall not be included in the Demised Premises, as herein defined.  Said exterior Service Areas and mezzanine shall not be included in computing Tenant's Portion or the amounts payable by Tenant pursuant to Article IV or Article V of this Lease or any other term, or provision of this Lease.  Landlord agrees that the name of the Shopping Center shall not contain the tradename of any business operated in the Shopping Center.

The Demised Premises are situated between Interstate 290 and Lincoln Street (the "Main Streets"), in Worcester, Massachusetts.  The Shopping Center is the land, together with the buildings and other structures from time to time thereon, shown on the Lease Plan, and is more particularly described as follows:

(LEGAL DESCRIPTION OF SHOPPING CENTER)
PROVIDED BY LANDLORD
LEGAL DESCRIPTION OF THE SHOPPING CENTER SITE

**Parcel I (525-545 Lincoln Street, Worcester, MA 01605)**

Land in the City and County of Worcester, Commonwealth of Massachusetts, together with any buildings situated thereon, shown as Lot 50, 51, 52, 53,  54, 55, 56, 57, 58, 59, and 60 as shown on a subdivision plan entitled "Plan of Land in Worcester, Mass. Owned by Plaza Center, Inc." dated 12 September, 1984, by Lavallee Brothers, Inc. as modified and approved by the Land Court, filed in the Land Registration Office and being Land Court Plan 15937-6, a copy of a portion of which is filed with Land Registration Certificate No. 10589.

Also another parcel of land situated in said Worcester bounded and described as follows:

Southwesterly:   by Trinity Avenue fourteen and 93/100 (14.93) feet;

Southerly and
Southwesterly:   by Parcel 34-14 as shown on a plan hereinafter described, eighty-five and 8/100 (85.08) feet and 69.00 feet and sixty-nine (69) feet;

Northeasterly:   by land now or formerly of W. C. Curtis one hundred twenty-three (123.00) feet;

Northwesterly:   by lot 670 on said plan one hundred ten (110) feet.

All of said boundaries are determined by the Land Court to be located as shown on subdivision plan No. 14079-3 drawn by Daniel S. Horgan, Chief Engineer, Massachusetts Department of Public Works, dated April 5, 1967, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed with Land Registration Certificate No. 6557.

Being lot 752 on said plan.

**Parcel II (555 Lincoln Street (Lots 1 and 2 Tyler Prentice Road, Worcester, MA 01605)**

The land on Lincoln Street, in Worcester, County of Worcester, Massachusetts with the buildings thereon bounded and described as follows:

Easterly:   by the westerly line of Tyler Prentice Road eighty (80) feet;

Southerly:   by land now or formerly of Philip N. Curtis, Trustee, one hundred fifteen (115) feet;

Westerly:   by land nor or formerly of Philip N. Curtis, Trustee, eighty-three and 83/100 (83.83) feet; and

Northerly:   by the southerly line of Lincoln Street one hundred fifteen and 14/100 (115.14) feet,

## EXHIBIT A-1

**EXHIBIT J**

LINCOLN PLAZA MAINTENANCE AND REPAIR

COMMON AREAS. The minimum standard of maintenance for the Common Areas shall be comparable to the standard of maintenance followed in other first class retail developments of comparable size in the Worcester Metropolitan area; notwithstanding the foregoing, however, the Common Areas shall be operated and maintained in compliance with all applicable governmental laws, rules, regulations, orders and ordinances, and the provisions of this lease. All Common Areas improvements shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole. Such operation, maintenance and repair obligation shall include but not be limited to the following:

(i)     Drive/Parking Areas and Drainage Facilities.  Maintaining all paved surfaces and curbs in a smooth and evenly covered condition, including, without limitation, resealing and resurfacing as required. (For the purpose of this section, an overlay of the drives and parking areas shall be considered a maintenance item.) Maintain drainage facilities, storm water infiltration and management systems (including government required environmental monitoring), and annual cleaning of catch basins.

(ii)    Debris and Refuse.  Periodically remove papers, debris, filth, refuse, ice and snow (2" on surface) except designated snow storage areas, including vacuuming and broom sweeping to the extent necessary to keep the Common Areas in a first-class, clean and orderly condition; provided, however, that trust and/or garbage removal from a party's building shall be the responsibility of such party. All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the common areas by permittees.

(iii)   Directional Signals and Markers.  Maintaining, cleaning and replacing any appropriate directional, stop or handicapped parking signs or markers: restriping parking lots and drive lanes as necessary to maintain parking space designation and traffic direction; and keeping clearly marked fire lanes, loading zones, no parking areas and pedestrian cross-walks.

(iv)    Lighting, Pylon, Monument and/or Directional Signs. Maintaining, cleaning and replacing Common Areas lighting facilities, including light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers. Exterior building fixtures, including any lighting fixtures associated with a canopy or other architectural feature forming a part of such building, shall not be considered a Common Areas improvement, but instead the maintenance and replacement of such fixtures, and the cost of illumination, shall be the obligation of the party upon whose site such fixtures are located.

(v)     Landscaping.  Maintaining and replacing of all landscape plantings, trees and shrubs in an attractive and thriving condition, trimmed and weed-free; maintaining and replacing landscape planters, including those adjacent to exterior walls of buildings; modifying irrigation systems to satisfy governmental water allocation or emergency requirements. If any party or occupant requires "special" landscaping (i.e. beyond the standard landscaping requirements for the remainder of the Shopping Center), or if landscaping additions/modifications are required as a result of a building addition, expansion or remodel, the cost of

**EXHIBIT J**

installation, replacement and maintenance of such special or required landscaping shall be borne solely by such party or occupant, as the case may be, and shall not be included in CAM.

(vi)   <u>Common Utility Lines</u>.   Maintaining, cleaning, replacing, and repairing any and all common utility lines.

(vii)   <u>Obstructions</u>.   Keeping the Common Areas free from any obstructions, including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provision of this lease.

(viii)   <u>Retaining Walls, Fences, and Guardrails</u>.   Maintain and repair as required.

(ix)   <u>Sidewalks</u>.   Maintaining, cleaning and replacing of sidewalks, including those adjacent and contiguous to buildings located within the Shopping Center, clearing and removal of ice and snow. Sidewalks shall be steam-cleaned as needed bi-monthly and shall be swept at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Areas.

(x)   <u>Seasonal Decorations</u>.   Install and maintain seasonal decorations as required.

(xi)   <u>Supervisory Personnel</u>.   Providing professional supervisory personnel for the Common Areas, if reasonably required.

(xii)   <u>Traffic</u>.   Supervising of traffic by paid police detail at entrances and exits to the Shopping Center and within the Shopping Center, as conditions reasonably require maintaining an orderly and proper traffic flow.

(xiii)   <u>Security</u>.   Patrolling and video monitoring of the Shopping Center parking areas and Common Areas within the Shopping Center as reasonably required.

Notwithstanding anything contained herein to the contrary, each party shall have the obligation to operate, maintain, and repair, at it's sole cost and expense in a clean, sightly and safe condition, the following items (if any) located on its site:   any exterior shipping/receiving dock area; any truck ramp or truck parking area; any recycling center or similarly designated area for the collection of items intended for recycling; and any refuse, compactor or dumpster area.

**EXHIBIT J**

Worcester, MA

**AMENDMENT DATED:**

05-01-03

11-6062-3-1 Dick's Sporting
Goods

<u>FIRST LEASE AMENDMENT</u>

THIS FIRST LEASE AMENDMENT (this "Amendment") is entered into as of this 1ˢᵗ day of May, 2003 (the "Effective Date") by and between **WORCESTER LINCOLN LLC,** a Delaware limited liability company, having a mailing address of 7 Sunderland Road, Worcester, Massachusetts 01604 ("Landlord"), and **DICK'S SPORTING GOODS, INC.,** a Delaware corporation, having a mailing address of 200 Industry Drive, Pittsburgh, Pennsylvania 15275 ("Tenant"). Landlord and Tenant are sometimes hereinafter collectively referred to as the "Parties."

## RECITALS:

A.     Landlord and Tenant entered into that certain Lease dated January 2, 2001 (the "Lease") for certain premises more fully described therein and located at Lincoln Plaza in Worcester, Massachusetts (the "Demised Premises");

B.     Landlord and Tenant are Plaintiff and Defendant, respectively, in that certain civil matter styled *Worcester Lincoln, LLC v. Dick's Sporting Goods, Inc.* currently pending in the Worcester Superior Court as Civil Action No. 02-0978C (the "Lawsuit");

C.     Pursuant to that certain letter agreement dated April 3, 2003 (the "Settlement Agreement") attached hereto as **Exhibit A**, the Parties agreed to settle the dispute in the Lawsuit, fully and forever dismiss the matter and fully and forever release each other from all claims and/or causes of action arising from the Lawsuit;

D.     As required by the Settlement Agreement, the Parties agreed to amend terms of the Lease to reflect a Five Hundred Twenty-nine Thousand Four Hundred Ninety-one and 50/100 Dollars ($529,491.50) reduction in Minimum Rent to be taken in twenty-six (26) consecutive equal reductions of Twenty Thousand and 00/100 Dollars ($20,000.00) per month commencing on the Effective Date with a final reduction in the twenty-seventh (27ᵗʰ) month after the Effective Date of Nine Thousand Four Hundred Ninety-one and 50/100 Dollars ($9,491.50);

E.     As further required by the Settlement Agreement, Tenant shall provide Landlord with redacted copies of invoices from Goulston & Storrs, P.C. demonstrating the Forty-nine Thousand Four Hundred Ninety-one and 50/100 Dollars ($49,491.50) in legal services incurred by Tenant in connection with the Lawsuit;

F.     As further required by the Settlement Agreement, upon the full execution of this Amendment, the Parties shall stipulate to a complete dismissal of the Lawsuit with prejudice.

## AGREEMENTS:

In consideration of the foregoing Recitals, and of the covenants and agreements herein, intending to be legally bound hereby, the Parties agree as follows:

1.     **Amendment.** From and after the Effective Date, <u>Article IV</u> of the Lease is hereby amended by deleting Section 4.1(a)(i) in its entirety and replacing Section 4.1(a)(i) with the following:

(i)     from the Rental Commencement Date until the end of the fifth (5ᵗʰ) lease year thereof, Tenant shall pay Minimum Rent to Landlord at the following rates for the periods specified:

(A)     from the Rental Commencement Date until April 30, 2003, subject to Tenant's rights under the Lease for any violation of the Initial Co-Tenancy Requirement as set forth in Section 1.6 of the Lease, Tenant shall pay Minimum Rent to Landlord at the rate of Fifty-five Thousand Three Hundred Twelve and 50/100

-1-

GSDOCS-1234108-1
4/30/2003 9:38 AM

RECEIVED   SEP 0 8 2004       RECEIVED   SEP 0 8 2004

Worcester, MA

Dollars ($55,312.50) per month (i.e. a rate equivalent to $663,750.00 per year or $14.75 per square foot);

(B) from May 1, 2003 until June 30, 2005, Tenant shall pay Minimum Rent to Landlord at the rate of Thirty-five Thousand Three Hundred Twelve and 50/100 Dollars ($35,312.50) per month (i.e. a rate equivalent to $423,750.00 per annum or $9.41 per square foot, for twenty-six (26) months);

(C) for the month of July 2005, Tenant shall pay Minimum Rent to Landlord at the rate of Forty-five Thousand Eight Hundred Twenty-one and 00/100 Dollars ($45,821.00) per month; and

(D) from August 1, 2005 to the end of the fifth (5th) lease year, Tenant shall pay Minimum Rent to Landlord at the rate of Fifty-five Thousand Three Hundred Twelve and 50/100 Dollars ($55,312.50) per month (i.e. a rate equivalent to $663,750.00 per year or $14.75 per square foot)

2.    Initial Co-Tenancy. As of the Effective Date, the Parties agree that the Initial Co-Tenancy Requirement set forth in Section 1.6 of the Lease is satisfied and Tenant shall have no further remedy for a violation of the Initial Co-Tenancy Requirement, if any, thereafter.

3.    Default. The Parties each acknowledge that the other is not in default under the terms of the Lease as of the Effective Date and that there are no outstanding credits, off-sets, deferred payments, interest, penalties, or other amounts owed by either Party to the other as of the Effective Date, except for Substitute Rent for the month of April, 2003 (paid in lieu of Minimum Rent). The Parties further agree that entering into this Amendment and/or the Settlement Agreement and/or the need therefor shall not constitute a default by either Party under the Lease. Landlord represents and warrants that entering into this Amendment and/or the Settlement Agreement and/or the need therefor shall not constitute a default or event triggering the rights of any secured party under any mortgage, deed of trust, or other agreements encumbering the Shopping Center or Landlord's rights or interests in the rents, leases, proceeds and/or income therefrom, including but not limited to any Subordination, Non-Disturbance and Attornment Agreement executed by Tenant in connection with the Lease (collectively, the "Credit and Security Agreements"). If the execution of this Amendment and/or the Settlement Agreement results in a default or event triggering the rights of any party under any of the Credit and Security Agreements, Landlord shall defend, indemnify and hold harmless Tenant and Tenant's employees, officers, and directors from and against all claims, costs, expenses, and liabilities incurred in connection with any such default or event.

4.    Contingency. This Amendment is expressly contingent upon the filing of a dismissal entry for the Lawsuit, with prejudice, within thirty (30) days of the Effective Date. If the Parties shall fail to file such dismissal entry within such time, this Amendment shall be deemed to be ineffective and any release, settlement, and/or waiver of any disputes or any rights under the Lease as a result of this Amendment or the Settlement Agreement shall be null and void.

5.    Further Assurances. The parties agree to execute, acknowledge and deliver and cause to be done, executed, acknowledged and delivered all such further acts, assignments, amendments, transfers and assurances as shall reasonably be requested of them in order to carry out this Amendment and give effect thereto, including an amended and restated memorandum of lease, if one was previously recorded, in the manner prescribed under the Lease.

6.    Priority of Lease. This Amendment shall not affect Tenant's leasehold estate under the Lease and/or the rights, priority and/or lien Tenant may have by virtue of a recorded memorandum thereof.

-2-

GSDOCS-1234109-1
4/30/2003 9:38 AM

7.    Ratification. Except as specifically modified herein, all the terms, provisions, covenants and conditions of the Lease are hereby ratified and confirmed as if the Lease were being re-executed and shall remain in full force and effect until expiration or termination of the Lease.

8.    Miscellaneous.

(a)    Initially capitalized terms used herein and not specifically defined shall have the same meaning as in the Lease.

(b)    The Parties represent and warrant to each other that each has the right, power and authority to execute this Amendment and be bound by the terms hereof without consent from any entity, person, court or other third-party.

(c)    This Amendment shall be binding upon, and shall inure to the benefit of, the Parties and their respective heirs, executors, administrators, successors and assigns.

(d)    The captions, section numbers and paragraph numbers appearing in this Amendment are inserted only as a matter of convenience and in no way define, amplify, limit, construe, or describe the scope or interest of any section of this Amendment.

(e)    This Amendment and the Lease contain the entire agreement between Landlord and Tenant and shall not be further amended except in a document signed by both Landlord and Tenant. In the event of a conflict between the terms of the Settlement Agreement and the terms of this Amendment, the terms, covenants and conditions of this Amendment shall prevail and control.

(f)    This Amendment may be executed in multiple counterparts each of which when taken together shall constitute a binding amendment.

(g)    Neither this Amendment nor any document reflecting the terms hereof shall be recorded or included as an amendment to any previously recorded document concerning the Lease.

(h)    The Parties agree that the terms of this Amendment and the Settlement Agreement shall be confidential and shall not be disclosed to third parties, other than the professional advisors and lenders of each Party (provided each Party causes their respective professional advisors to retain such confidentiality) without the prior written consent of the other Party.

**EXCEPT AS HEREIN AMENDED, ALL OTHER TERMS, COVENANTS AND CONDITIONS OF LANDLORD AND TENANT SET FORTH IN THE LEASE AND ALL EXHIBITS ATTACHED THERETO REMAIN IN FULL FORCE AND EFFECT AS WRITTEN. LANDLORD AND TENANT DO HEREBY RATIFY AND AFFIRM THE SAID TERMS, COVENANTS AND CONDITIONS OF SAID LEASE EXCEPT AS AMENDED HEREIN. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THE LEASE AND THE TERMS OF THIS AMENDMENT, THE TERMS, COVENANTS AND CONDITIONS OF THIS AMENDMENT SHALL PREVAIL AND CONTROL.**

(SIGNATURES ON NEXT PAGE)

05/16/2003   13:33   SHOPPING CENTER LAW ASSOC. P.C. → 15087543296          NO.096   P08

Worcester, MA

**IN WITNESS WHEREOF,** the Parties hereto have caused this First Lease Amendment to be executed as of the date set forth above.

WITNESS:                                  LANDLORD:

                                          **WORCESTER LINCOLN, LLC,**
                                          a Delaware limited liability company

                                          By: _____
Print name: _____              Sam Adams, Manager

Print name: _____


WITNESS:                                  TENANT:

                                          **DICK'S SPORTING GOODS, INC.,**
                                          a Delaware corporation

Print name: _____          By: _____
Print name: Jodi H. Everette                 Joe Queri, Senior Vice President

Worcester, MA

**IN WITNESS WHEREOF**, the Parties hereto have caused this First Lease Amendment to be executed as of the date set forth above.

WITNESS:                                    LANDLORD:

**WORCESTER LINCOLN, LLC,**
a Delaware limited liability company

Print name: PAMELA S. SIDLAS            By: _____
                                            Sam Adams, Manager
Print name: _____


WITNESS:                                    TENANT:

**DICK'S SPORTING GOODS, INC.,**
a Delaware corporation

Print name: _____            By: _____
                                            Joe Queri, Senior Vice President
Print name: _____

GSDOCS-1234100-1
4/30/2003 9:38 AM

STATE OF MASSACHUSETTS *MA*                )
                                            ) SS:
COUNTY OF WORCESTER *Worcester*             )

On this *One* day of ____*May*____, 2003, before me personally came Sam Adams, to me personally known, who, being by me duly sworn, did depose and say that he resides in ___*Los Angeles*___, ___*CA*___; that he is the Manager of Worcester Lincoln, LLC, the limited liability company described in and which executed the within instrument; and that he signed his name thereto pursuant to his powers as the Manager of such limited liability company and by the order of the members of said limited liability company.

Witness my hand and Notarial Seal this ___*2nd*___ day of ___*May*___, 2003.

_____
Notary Public

Joyce J. McDonnell *Joyce J. McDonnell*
NOTARY PUBLIC (Printed Signature)
My commission expires Mar. 12, 2010

My Commission Expires: _____
My County of Residence: ___*Worcester*___

COMMONWEALTH OF PENNSYLVANIA          )
                                       ) SS:
COUNTY OF ALLEGHENY                    )

On this _____ day of _____, 200__ before me personally came Joe Queri, to me personally known, who, being by me duly sworn, did depose and say that he resides in Pittsburgh, Pennsylvania; that he is the Senior Vice President of Dick's Sporting Goods, Inc., the corporation described in and which executed the within instrument; and that he signed his name thereto by order of the Board of Directors of said corporation.

Witness my hand and Notarial Seal this _____ day of _____, 2003.

_____
Notary Public

_____
(Printed Signature)

My Commission Expires: _____
My County of Residence: _____

-5-

## EXHIBIT A
## SETTLEMENT AGREEENT

11-6062-3-1 Dick's Sporting
Goods

AMENDMENT DATED:

06 - 24 - 04

**SECOND LEASE AMENDMENT**

THIS *SECOND LEASE AMENDMENT* (the **"Amendment"**) is made and entered into this ⟶4 day of June⟶, 2004, (the **"Effective Date"**) by and among **WORCESTER LINCOLN LLC**, a Delaware limited liability company, having a mailing address of 7 Sunderland Road, Worcester, Massachusetts 01604 (**"Landlord"**), and **DICK'S SPORTING GOODS, INC.**, a Delaware corporation, having a mailing address of 200 Industry Drive, Pittsburgh, Pennsylvania 15275 (**"Tenant"**). Landlord and Tenant are sometimes hereinafter referred to as the "Parties."

## RECITALS:

**WHEREAS**, Landlord and Tenant entered into that certain Lease Agreement dated January 2, 2001 as modified pursuant to that certain First Lease Amendment dated May 2, 2003 (hereinafter collectively referred to as the **"Lease"**) for approximately 45,000 square feet of retail space (the **"Premises"**) in Lincoln Plaza (the **"Shopping Center"**) as more particularly described therein; and

**WHEREAS**, Landlord and Tenant desire to amend a certain provision in the Lease; and

**WHEREAS**, the parties hereto are desirous of executing this Amendment for the purpose of setting forth the terms and conditions of this Amendment of the Lease by Landlord and Tenant.

**NOW, THEREFORE**, for and in consideration of the foregoing Recitals, and of the covenants and agreements herein, intending to be legally bound hereby, the Parties agree as follows:

1. The above recitals are incorporated herein by reference.

2. All defined terms used herein, as indicated by the initial capitalization thereof, shall have the same respective meanings designated for such terms in the Lease, except as amended herein.

3. As of the Effective Date, the Lease shall be amended as follows:

   a. Exhibit A attached to the Lease shall be replaced with Exhibit A attached hereto.

(SIGNATURES ON NEXT PAGE)

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment the day and year first above written.

Witnesses:                          LANDLORD:

                                    WORCESTER LINCOLN LLC, a Delaware
                                    limited liability company

_____             By: _____
_____                 Samuel Adams, Manager

Witnesses:                          TENANT:

                                    DICK'S SPORTING GOODS, INC., a Delaware
                                    corporation

_____             By: _____

## ACKNOWLEDGEMENTS

Commonwealth Of Massachusetts   )
   ) ss.
County of Worcester   )

On this the _24th_ day of _June_ , _2004_, before me _Jayce J. McDonnell_ ,
the undersigned Notary Public, personally appeared Samuel Adams, proved to me
through satisfactory evidence of identity, which was _personally known_ , to
be the person whose name was signed on the preceding or attached document in my
presence, as Manager of Worcester Lincoln LLC, and who acknowledged to me that he
signed it voluntarily on behalf of such limited liability company for its stated purpose.

_Jayce J. McDonnell_
Signature of Notary Public

_Joyce J. McDonnell_
Printed Name of Notary Public

My Commission Expires: _3/12/2010_

STATE OF PENNSYLVANIA   )
   ) ss.
COUNTY OF ALLEGHENY   )

   On this _15th_ day of _July_ , 2004, before me, a Notary Public, duly
commissioned, qualified and acting, within and for said County and State, appeared in
person the within named _Joe Queri_ , to me personally known, who
stated that he/she is the _Sr. Vice President_ of Dick's Sporting
Goods, Inc., and was duly authorized in his/her capacity to execute the foregoing
instrument for and in the name of and on behalf of said corporation, and further stated
and acknowledged that he/she signed, executed and delivered said foregoing instrument
for the consideration, use and purposes therein mentioned and set forth.

   WITNESS my hand and official seal this _15th_ day of _July_ , 2004.

_DeeDee E. Tripp_
Notary Public

My Commission Expires:

Notarial Seal
DeeDee E. Tripp, Notary Public
Big Beaver Boro, Beaver County
My Commission Expires Sept. 12, 2006
Member, Pennsylvania Association of Notaries

N:\ShareData\RE Legal\Worcester Lincoln LLC\DICK'S\Second Amendment to Lease 06-04.doc

## THIRD AMENDMENT OF LEASE

THIS THIRD AMENDMENT OF LEASE ("Amendment") is made and dated as of June 30 , 2017, by and between RPAI Worcester Lincoln Plaza, L.L.C., a Delaware limited liability company ("Landlord"), and Dick's Sporting Goods, Inc., a Delaware corporation ("Tenant").

### RECITALS:

A.   Worcester Lincoln LLC ("Original Landlord"), as landlord, and Tenant, as tenant, entered into that certain Lease dated as of January 2, 2001 (the "Original Lease"), as amended by that certain First Lease Amendment dated as of May 1, 2003 (the "First Amendment"), and that certain Second Lease Amendment dated as of June 24, 2004 (the "Second Amendment"; the Original Lease, the First Amendment, and the Second Amendment, together with any and all other amendments or assignments, are hereinafter collectively referred to as the "Lease"), relating to approximately 45,000 square feet of GFLA ("Demised Premises") and being part of the shopping center commonly known as Lincoln Plaza located in Worcester, Massachusetts ("Shopping Center"); and

B.   Landlord is the successor in interest to Original Landlord, and has the authority to modify the terms of the Lease; and

C.   The original term of the Lease is scheduled to expire on January 31, 2018; and

D.   Landlord and Tenant desire to amend the Lease as provided herein; and

E.   All capitalized terms, if not defined in this Amendment, shall have the same meaning as defined in the Lease.

NOW, THEREFORE, for good and valuable consideration including the mutual agreements contained herein, it is hereby agreed as follows:

1.   The parties acknowledge and agree that the original term of the Lease is scheduled to expire on January 31, 2018. Notwithstanding the foregoing, or anything to the contrary in the Lease, Landlord and Tenant hereby agree to extend the original term of the Lease for a period of five (5) years (the "Original Term Extension"). As extended, the original term of the Lease shall expire on January 31, 2023.  Tenant retains the right to extend the original term of the Lease for five (5) consecutive Extension Periods of five (5) years each, in accordance with Section 2.2 of the Lease.

2.   Section 4.1(a)(iii) of the Lease is hereby revised by removing the clause "original term" in the second line thereof and replacing same with "fifteenth (15th) lease year."

3.   Notwithstanding anything to the contrary set forth in Section 4.1(a) of the Lease, during the Original Term Extension (the sixteenth (16th) lease year through the twentieth (20th) lease year of the original term), Tenant shall pay Landlord annual Minimum Rent in the amount of $596,250.00 (based on an annual rate of $13.25 per square foot of the Demised Premises per year) payable in equal monthly installments of $49,687.50.

4.   Minimum Rent during the Extension Periods set forth in Section 2.2 of the Lease shall be as set forth in Section 4.1(a), subsections (iv) though (viii).

5.   [Intentionally deleted].

6.   Section 1.7 of the Lease is hereby revised by deleting Subsection (b) of the definition of Required Tenant (as defined therein) in its entirety and by substituting the following Subsection (b) in lieu thereof: "(b) operates as one of the following:  (i) full line department store, (ii) junior department store, (iii) soft good store, (iv) home improvement store, (v) toy superstore, (vi) electronic equipment/appliance superstore, (vii) craft store, (viii) warehouse department store (e.g. Costco or Sam's Club), (ix) grocery store such as, for example, Stop & Shop, (x) bookstore such as, for example, Barnes and Noble, (xi) home furnishings store such as, for example, Bed Bath & Beyond or HomeGoods, and/or (xii) pet store such as, for example, PetsMart or Petco.".

7.   Section 1.4 of the Lease is hereby amended as follows:

A.   The following language is hereby added to the parenthetical following the phrase "non-retail purposes": ", and Tenant agrees that retail office uses are permitted in Units 11-27 of the Shopping Center (as indicated on

the site plan attached hereto as Schedule No. 1) (collectively, the "Front Pad Buildings")"; and

B.   The parenthetical following the phrase "health club" is deleted in its entirety and following parenthetical is substituted in lieu thereof: "(except that (a) Unit 16 at the Shopping Center, previously occupied by Bally's as a health club, may be used as a health club, spa or gym so long as such premises operates as another national spa, gym or health club concept or brand or as a regional concept or brand with at least three (3) other locations in the Boston or Worcester area [a "National/Regional Health Club Concept"] and (b) either of the following shall be permitted in the Front Pad Buildings (i) one large health club or gym not to exceed 40,000 square feet and operated by a National/Regional Health Club Concept; or (ii) any number of separate small health club type concepts (such as, for example, spinning, pilates, yoga, martial arts), provided that such separate clubs in the aggregate do not exceed 10,000 square feet of GFLA and are operated as a National/Regional Health Club Concept)".

The sole purpose of the site plan attached to this Amendment as Schedule No. 1 is to depict the locations of Units 11-27 of the Shopping Center.

8.   From and after the date hereof, notices to the Landlord shall be addressed as follows:

RPAI Worcester Lincoln Plaza, L.L.C.
c/o RPAI US Management LLC
2021 Spring Road, Suite 200
Oak Brook, IL  60523
Attn: SVP/Director of National Retail Leasing and Services

With a copy to:

RPAI Worcester Lincoln Plaza, L.L.C.
c/o Retail Properties of America, Inc.
2021 Spring Road, Suite 200
Oak Brook, IL  60523
Attn: President – Eastern Division

For any Additional Rent or collection matters, a copy to:

RPAI Worcester Lincoln Plaza, L.L.C.
c/o RPAI HOLDCO Management LLC
2021 Spring Road, Suite 200
Oak Brook, IL  60523
Attn: Director of Collections

9.   From and after the date hereof, notices to the Tenant shall be addressed as follows:

Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, PA  15108
Attn:  Senior Vice President – Real Estate

With a copy to:

Dick's Sporting Goods, Inc.
345 Court Street
Coraopolis, PA  15108
Attn:  Legal Dept.

10.   Landlord and Tenant each represent and warrant that, other than Greenwood Realty and the Dartmouth Company, both representing Tenant, it has not had any contacts or engaged in any actions, which would give rise to any claim from any broker in connection with the negotiation or execution of this Amendment.  Landlord shall pay a commission in the amount of $1.00 per square foot of GFLA of the Demised Premises to the Dartmouth Company pursuant to a separate agreement.  The Dartmouth Company will then pay Greenwood Realty its fee as a cooperating broker.  Each party hereby indemnifies the other from and against any and all other claims for brokers' commissions

relating to the negotiation or execution of this Amendment and alleged to be due because of an agreement of the indemnifying party.

11.    This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Furthermore, any counterpart that is signed and returned by facsimile or electronic transmission shall be deemed properly signed and delivered.

12.    Except as expressly modified herein, all of the provisions of the Lease are hereby ratified and confirmed and shall remain unmodified and in full force and effect.

13.    The parties have full right and authority to enter into this Amendment.  Landlord represents and warrants that it does not need to obtain any lender or other third party consents in order to enter into and effectuate this Amendment.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Amendment on the date first written above.

**LANDLORD:**

RPAI Worcester Lincoln Plaza, L.L.C.,
a Delaware limited liability company

By:  Retail Properties of America, Inc.,
     a Maryland corporation, its sole member

By: _____
Name:
Title:         Maria Tollopoulos
             SVP/Director - **Leasing**

**TENANT:**

Dick's Sporting Goods, Inc.,
a Delaware corporation

By: _____
Name:   Andre' J. Hawaux
Title:     EVP & COO

**SCHEDULE 1**

**SITE PLAN**

# LINCOLN PLAZA
**525 Lincoln Street, Worcester, MA 01605**
**Latitude: 42.29212 N   Longitude: –71.774207 W**



EVERY SEASON STARTS AT
**DICK'S**
SPORTING GOODS
[ CONVEN | SKILLED | PASSIONATE | COMMITTED ]

**345 Court Street, Coraopolis, PA 15108**

Matthew D. Irvin, Vice President, Associate General Counsel | Office Phone: (724) 273-3934 | E-Mail: Matthew.Irvin@dcsg.com

March 19, 2020

**_VIA U.S. CERTIFIED MAIL, RETURN RECEIPT_**

Retail Properties of America, Inc.
2021 Spring Road, Suite 200
Oak Brook, IL 60523

> **RE:** **COVID-19 (Coronavirus) – Force Majeure Notice**
> **00090 - Lansing, MI; 00151 - Worcester, MA; 01368 - Northgate (Seattle), WA**

Dear Sir/Madam:

Dick's Sporting Goods, Inc., on behalf of itself and its subsidiaries and affiliates [including but not limited to Golf Galaxy, LLC, Galyan's Trading Company, LLC and Chick's Sporting Goods, LLC] (collectively, "DSG"), has been closely monitoring the COVID-19 (Coronavirus) Pandemic and evolving our response plans. Keeping our Teammates, Athletes and communities healthy and safe is our top priority and we will make decisions accordingly. This rapidly evolving situation could ultimately require that we temporarily close stores regardless of whether dictated by governmental mandate.

The COVID-19 (Coronavirus) Pandemic constitutes a force majeure event. As such, any store closures resulting from or in response to the COVID-19 (Coronavirus) Pandemic are permitted under the terms of the Lease and any sunsets on DSG's leasehold rights are tolled during the period of such closure. We continue to monitor the status of the situation and will do our best to provide further details as they become available.

Nothing herein shall be construed as a waiver of any of DSG's other rights or remedies contained in the Lease. Thank you for your attention to this matter.

Very truly yours,
DICK'S SPORTING GOODS, INC.

Matthew D. Irvin
Vice President, Associate General Counsel

**EXHIBIT**

**B**



**RPAI US Management LLC**
www.rpai.com

# LANDLORD'S NOTICE OF DEFAULT TO TENANT

To:    Dicks Sporting Goods Inc 151
        Attn Legal Dept
        345 Court Street
        Coraopolis, PA  15108

This Notice is sent by RPAI US Management LLC as managing agent for Landlord.  You are hereby notified of your failure to pay Landlord the amount of $110,684.77 due and owing pursuant to your Lease of the following described premises:

        Dicks Sporting Goods Inc 151  d/b/a  Dicks Sporting Goods
        Lincoln Plaza
        Suite/Unit Number: 003
        525 Lincoln Street
        Worcester, MA  01605-1905

You are further notified that your failure to pay Landlord the above amount in FULL within TEN (10) days after receipt of this Notice will constitute an Event of Default under the Lease.  Payment should be mailed to RPAI US Management LLC, 13068 Collection Center Drive, Chicago, IL, 60693-0130.   Only FULL payment of the amount owed will cure Tenant's default under the Lease, unless Landlord agrees in writing to waive said default in exchange for receiving partial payment. This Notice shall not constitute a withdrawal, rescission or substitution of any prior Notice(s) of Default to Tenant.

If you have any questions regarding the amount due and owing, please contact Landlord's property manager: Tywan Anthony  Phone: 646-690-0506 E-mail: anthony@rpai.com.

This Notice is made under the Lease and all applicable laws, and all rights and remedies of the Landlord are expressly reserved.

Dated:  May 15, 2020

                    *Ann Gottlieb*
                    _____
                    Ann Gottlieb
                    RPAI US Management LLC, as managing agent
                    for Landlord

## PROOF OF SERVICE

I, Ann Gottlieb, certify under oath that on May 15, 2020, I caused a copy of this Notice to be delivered via USPS Certified Mail, return receipt requested, to the address set forth above.

                    *Ann Gottlieb*
                    _____
                    Ann Gottlieb

BLDG. NO 36062 UNIT NO 003   TENANT NO 201780-3   LEASE NO 5394

**EXHIBIT**

C



Retail Properties of America, Inc.
Lease Compliance-Disputes
2021 Spring Road, Ste 200
Oak Brook, IL  60523

**USPS CERTIFIED MAIL**

9214 8901 1664 2800 0000 2700 19

Dicks Sporting Goods Inc 151
ATTN: Legal Dept
345 Court Street
Coraopolis PA 15108

Postage: 55.5000



**RPAI US Management LLC**
www.rpai.com

# LANDLORD'S NOTICE OF DEFAULT TO TENANT

To: Dicks Sporting Goods Inc 151
Attn Senior Vice President Real Estate
345 Court Street
Coraopolis, PA  15108

This Notice is sent by RPAI US Management LLC as managing agent for Landlord.  You are hereby notified of your failure to pay Landlord the amount of $110,684.77 due and owing pursuant to your Lease of the following described premises:

Dicks Sporting Goods Inc 151  d/b/a  Dicks Sporting Goods
Lincoln Plaza
Suite/Unit Number: 003
525 Lincoln Street
Worcester, MA  01605-1905

You are further notified that your failure to pay Landlord the above amount in FULL within TEN (10) days after receipt of this Notice will constitute an Event of Default under the Lease.  Payment should be mailed to RPAI US Management LLC, 13068 Collection Center Drive, Chicago, IL, 60693-0130.   Only FULL payment of the amount owed will cure Tenant's default under the Lease, unless Landlord agrees in writing to waive said default in exchange for receiving partial payment. This Notice shall not constitute a withdrawal, rescission or substitution of any prior Notice(s) of Default to Tenant.

If you have any questions regarding the amount due and owing, please contact Landlord's property manager: Tywan Anthony  Phone: 646-690-0506 E-mail: anthony@rpai.com.

This Notice is made under the Lease and all applicable laws, and all rights and remedies of the Landlord are expressly reserved.

Dated:  May 15, 2020

*Ann Gottlieb*

_____
Ann Gottlieb
RPAI US Management LLC, as managing agent
for Landlord

### PROOF OF SERVICE

I, Ann Gottlieb, certify under oath that on May 15, 2020, I caused a copy of this Notice to be delivered via USPS Certified Mail, return receipt requested, to the address set forth above.

*Ann Gottlieb*

_____
Ann Gottlieb

BLDG. NO 36062 UNIT NO 003   TENANT NO 201780-2   LEASE NO 5394



Retail Properties of America, Inc.
Lease Compliance-Disputes
2021 Spring Road, Ste 200
Oak Brook, IL 60523

**USPS CERTIFIED MAIL**

9214 8901 1664 2800 0000 2700 02

Dicks Sporting Goods Inc 151
ATTN: Senior Vice President Real Estate
345 Court Street
Coraopolis PA 15108

Postage: $5.5000

## Wieck DeLuca & Gemma

INCORPORATED                                        ATTORNEYS AT LAW

E-mail: rgemma@wdglaw.com

**Via U.S. Postal Service &**
**Certified Mail, Return Receipt Requested**

September 16, 2020

Dick's Sporting Goods, Inc.                    Dick's Sporting Goods, Inc.
345 Court Street                               345 Court Street
Coraopolis, PA  15108                          Coraopolis, PA  15108
Attn:  Senior Vice President – Real Estate     Attn:  Legal Department
#7013 2630 0002 3931 2488                      #7013 2630 0002 3931 2471

Re:     Lincoln Plaza, Worcester, Massachusetts

Ladies and Gentlemen:

Please be advised that this firm has been engaged by RPAI Worcester Lincoln Plaza, L.L.C. ("Landlord") to represent the Landlord in the above-referenced matter.

The Landlord and DICK'S SPORTING GOODS, INC. ("Tenant") are parties to that certain Lease dated as of January 2, 2001, as amended by that certain First Lease Amendment dated as of May 1, 2003, Second Lease Amendment dated as of June 24, 2004 and Third Lease Amendment dated as of June 30, 2017 (hereafter "Lease") for that certain premises located at 525 Lincoln Street, Worcester, Massachusetts, as further described in the Lease.

The Tenant has failed to pay the monies due Landlord under the Lease.  By letter dated March 19, 2020, the Tenant notified the Landlord that the Tenant believed that the COVID-19 pandemic constituted a force majeure event.  The Landlord disputes the Tenant's contention that COVID-19 constituted a force majeure event under the Lease which excused Tenant's obligation to pay rent under the Lease.  Tenant has failed to pay the Landlord the sum of $110,684.77 for rent due Landlord for the months of April and May, 2020.  By letter dated May 15, 2020, the Landlord provided notice to the Tenant of the payment default in accordance with the Lease, and the Tenant has failed to pay the delinquent sum within ten (10) days thereafter.  Enclosed please find the Landlord's Notices of Default to Tenant dated May 15, 2020.  Despite Landlord's efforts to contact the Tenant to discuss payment of the delinquent sum to the Landlord, Tenant has not responded to those efforts.

Prior to proceeding with legal action to, inter alia, collect the monies due Landlord under the Lease, Landlord wishes to see if there is a final opportunity to discuss with the Tenant a resolution to the matter.  As a result, within 10 days of receipt of this letter, please either remit to

One Turks Head Place, Suite 1300          Robert D. Wieck          Lindsay C. Sullivan
Providence, Rhode Island 02903            Richard L. Gemma         Christine L.
                                          Steven P. DeLuca
401.454.8700
Fax 401.454.8755

**EXHIBIT**

D

Dick's Sporting Goods, Inc.
September 16, 2020
Page 2

the Landlord payment of the delinquent sum of $110,684.77 or contact the Landlord's undersigned counsel to discuss a mutually acceptable payment plan for the delinquent amount due Landlord.

Thank you for your prompt attention and anticipated cooperation with this matter.

Very truly yours,

Richard L. Gemma, Attorney
RPAI Worcester Lincoln Plaza, L.L.C.

RLG:mvg

Enclosures

G:\RPAI\Dick's Sporting Goods\Correspondence\Tenant 091420.docx



RPAI US Management LLC
www.rpai.com

# LANDLORD'S NOTICE OF DEFAULT TO TENANT

To:    Dicks Sporting Goods Inc 151
         Attn Legal Dept
         345 Court Street
         Coraopolis, PA  15108

This Notice is sent by RPAI US Management LLC as managing agent for Landlord.  You are hereby notified of your failure to pay Landlord the amount of $110,684.77 due and owing pursuant to your Lease of the following described premises:

         Dicks Sporting Goods Inc 151  d/b/a  Dicks Sporting Goods
         Lincoln Plaza
         Suite/Unit Number: 003
         525 Lincoln Street
         Worcester, MA  01605-1905

You are further notified that your failure to pay Landlord the above amount in FULL within TEN (10) days after receipt of this Notice will constitute an Event of Default under the Lease.  Payment should be mailed to RPAI US Management LLC, 13068 Collection Center Drive, Chicago, IL, 60693-0130.   Only FULL payment of the amount owed will cure Tenant's default under the Lease, unless Landlord agrees in writing to waive said default in exchange for receiving partial payment. This Notice shall not constitute a withdrawal, rescission or substitution of any prior Notice(s) of Default to Tenant.

If you have any questions regarding the amount due and owing, please contact Landlord's property manager: Tywan Anthony  Phone: 646-690-0506 E-mail: anthony@rpai.com.

This Notice is made under the Lease and all applicable laws, and all rights and remedies of the Landlord are expressly reserved.

Dated:   May 15, 2020

                                *Ann Gottlieb*
                         _____
                         Ann Gottlieb
                         RPAI US Management LLC, as managing agent
                         for Landlord

## PROOF OF SERVICE

I, Ann Gottlieb, certify under oath that on May 15, 2020, I caused a copy of this Notice to be delivered via USPS Certified Mail, return receipt requested, to the address set forth above.

                                *Ann Gottlieb*
                         _____
                         Ann Gottlieb

BLDG. NO 36062 UNIT NO 003  TENANT NO 201780-3  LEASE NO 5394

Retail Properties of America, Inc.
Lease Compliance-Disputes
2021 Spring Road, Ste 200
Oak Brook, IL 60523

**USPS CERTIFIED MAIL**



9214 8901 1664 2800 0000 2700 19

Dicks Sporting Goods Inc 151
ATTN: Legal Dept
345 Court Street
Coraopolis PA 15108

Postage $5.5000



**RPAI US Management LLC**
www.rpai.com

# LANDLORD'S NOTICE OF DEFAULT TO TENANT

To:   Dicks Sporting Goods Inc 151
      Attn Senior Vice President Real Estate
      345 Court Street
      Coraopolis, PA 15108

This Notice is sent by RPAI US Management LLC as managing agent for Landlord. You are hereby notified of your failure to pay Landlord the amount of $110,684.77 due and owing pursuant to your Lease of the following described premises:

      Dicks Sporting Goods Inc 151  d/b/a  Dicks Sporting Goods
      Lincoln Plaza
      Suite/Unit Number: 003
      525 Lincoln Street
      Worcester, MA  01605-1905

You are further notified that your failure to pay Landlord the above amount in FULL within TEN (10) days after receipt of this Notice will constitute an Event of Default under the Lease. Payment should be mailed to RPAI US Management LLC, 13068 Collection Center Drive, Chicago, IL, 60693-0130. Only FULL payment of the amount owed will cure Tenant's default under the Lease, unless Landlord agrees in writing to waive said default in exchange for receiving partial payment. This Notice shall not constitute a withdrawal, rescission or substitution of any prior Notice(s) of Default to Tenant.

If you have any questions regarding the amount due and owing, please contact Landlord's property manager: Tywan Anthony Phone: 646-690-0506 E-mail: anthony@rpai.com.

This Notice is made under the Lease and all applicable laws, and all rights and remedies of the Landlord are expressly reserved.

Dated:  May 15, 2020

_____
Ann Gottlieb
RPAI US Management LLC, as managing agent
for Landlord

## PROOF OF SERVICE

I, Ann Gottlieb, certify under oath that on May 15, 2020, I caused a copy of this Notice to be delivered via USPS Certified Mail, return receipt requested, to the address set forth above.

_____
Ann Gottlieb

BLDG. NO 36062 UNIT NO 003  TENANT NO 201780-2  LEASE NO 5394



Retail Properties of America, Inc.
Lease Compliance-Disputes
2021 Spring Road, Ste 200
Oak Brook, IL  60523

**USPS CERTIFIED MAIL**

9214 8901 1664 2800 0000 2700 02

Dicks Sporting Goods Inc 151
ATTN: Senior Vice President Real Estate
345 Court Street
Coraopolis PA 15108

Postage: 35.9003